No. 23-____

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

IN RE COINBASE, INC., PETITIONER

ADDENDUM TO COINBASE, INC.'S
PETITION FOR WRIT OF MANDAMUS
TO THE UNITED STATES SECURITIES AND EXCHANGE
COMMISSION

Reed Brodsky
Lefteri J. Christos
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
(212) 351-4000

Monica K. Loseman
Nicholas B. Venable
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Unit 4200
Denver, CO  80202
(303) 298-5700

Eugene Scalia
  *Counsel of Record*
Jonathan C. Bond
Nick Harper
Robert A. Batista
M. Christian Talley
John N. Reed
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioner Coinbase, Inc.*

# TABLE OF CONTENTS

**Page**

SEC, File No. 4-789, https://bit.ly/3Na0rXB ...................................................Add. 1

Coinbase, Petition for Rulemaking
(July 21, 2022), https://bit.ly/3lZ7dUH ...................................................Add. 2

Coinbase, Comment Letter to SEC Re: Petition for Rulemaking
(Dec. 6, 2022), https://bit.ly/3YTE3VN ...............................................Add. 34

Coinbase, Comment Letter to SEC Re: Petition for Rulemaking
(Mar. 20, 2023), https://bit.ly/3N6KWjp .............................................Add. 45

5 U.S.C. § 553 .................................................................................................Add. 63

5 U.S.C. § 555 .................................................................................................Add. 64

5 U.S.C. § 706 .................................................................................................Add. 66

15 U.S.C. § 77i ...............................................................................................Add. 67

15 U.S.C. § 78e ...............................................................................................Add. 69

15 U.S.C. § 78y ...............................................................................................Add. 70

28 U.S.C. § 1651 .............................................................................................Add. 72

17 C.F.R. § 201.192 ........................................................................................Add. 73

Search SEC.gov [Go]

Company Filings

**U.S. SECURITIES AND EXCHANGE COMMISSION**

ABOUT     DIVISIONS & OFFICES     ENFORCEMENT     REGULATION     EDUCATION     FILINGS     NEWS

**REGULATORY ACTIONS**

Rulemaking Index

Proposed Rules

Final Rules

Interim Final Rules

Concept Releases

Interpretive Releases

Policy Statements

PCAOB Rulemaking

SRO Rulemaking and NMS Plans

Exchange Act Exemptive Orders

Investment Advisers Act Notices and Orders

Investment Company Act Notices and Orders

Other Commission Orders and Notices

Public Petitions for Rulemaking

# Comments on Rulemaking petition requesting that the Commission propose and adopt rules to govern the regulation of securities that are offered and traded via digitally native methods, including potential rules to identify which digital assets are securities

## [File No. 4-789]

Comments have been received from individuals and entities using the following Letter Type A: 1,683

Rulemaking petition 4-789

How to Submit Comments

### Submitted Comments

(*Click here* for meetings with SEC officials)

| | |
|---|---|
| Mar. 20, 2023 | Paul Grewal, Chief Legal Officer, Coinbase Global, Inc. |
| Jan. 19, 2023 | Tom Quaadman, Executive Vice President, Center for Capital Markets Competitiveness at the U.S. Chamber of Commerce |
| Dec. 6, 2022 | Paul Grewal, Chief Legal Officer, Coinbase Global, Inc. |
| Jul. 25, 2022 | Judson Talbot |
| Jul. 25, 2022 | Alfredo Nava |
| Jul. 25, 2022 | Jarrod Lowery |
| Jul. 21, 2022 | Cameron Braswell |

### Meetings with SEC Officials

(*Click here* for submitted comments from the public)

| | |
|---|---|
| Feb. 22, 2023 | Memorandum from the Office of Commissioner Hester M. Peirce regarding a February 22, 2023 meeting with representatives of Coinbase |

*Modified: March 21, 2023*

**Add. 1**

# coinbase

July 21, 2022

Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

**Re: Petition for Rulemaking – Digital Asset Securities Regulation**

Dear Ms. Countryman:

Coinbase Global, Inc. ("Coinbase") is filing this petition[1] with the U.S. Securities and Exchange Commission ("Commission" or "SEC") requesting that the Commission propose and adopt rules to govern the regulation of securities that are offered and traded via digitally native methods, including potential rules to identify which digital assets are securities. Digitally native securities are recorded and transferred using distributed ledger technology and do not rely on centralized entities or certificated forms of ownership that characterize traditional financial instruments.[2] Transactions in these securities (henceforth "digital asset securities") are executed and settled in real time, permanently recorded on blockchains, and visible with equal access to all market participants. This is a paradigm shift from existing market practices, rendering many of the Commission rules that govern the offer, sale, trading, custody, and clearing of traditional assets both incomplete and unsuitable for securities in this market.

The U.S. does not currently have a functioning market in digital asset securities due to the lack of a clear and workable regulatory regime.  Digital assets that trade today overwhelmingly have the characteristics of commodities. Coinbase, like many other exchanges, has intentionally and conscientiously steered well clear of securities to ensure that we are able to operate in full compliance with applicable laws and regulations.  However, new rules facilitating the use of digital asset securities would allow for a more efficient and effective allocation of capital in financial markets and create new opportunities for investors.

Globally, many jurisdictions are actively pursuing regulation that meets the specific needs of the crypto market, ensuring investors are well-protected. For example, the EU recently reached agreement on Markets in Crypto Assets (MiCA) regulation first proposed in 2020, and countries and markets such as Australia, Brazil, Dubai, Hong Kong, Switzerland, and the United Kingdom have taken important steps towards establishing (or have already established) regulations around crypto.[3]

---

[1] *See* 17 C.F.R. 201.192(a).

[2] In this petition we are focused on "native" digital asset securities—that is, digital asset securities that exist on a distributed ledger, only in tokenized form. Many, but not all, of the considerations discussed herein would apply similarly to digital asset securities that represent a tokenized version of a traditional security (e.g., tokenized common stock).

[3] Council of the EU, *Digital finance: agreement reached on European crypto-assets regulation (MiCA)* (June 31, 2022), https://www.consilium.europa.eu/en/press/press-releases/2022/06/30/digital-finance-agreement-reached-on-european-crypto-assets-regulation-mica/; Australian Government, The Treasury, *Crypto asset secondary service providers: Licensing and custody requirements (Consultation Paper)* (Mar. 21, 2022), https://treasury.gov.au/consultation/c2022-259046; Chamber of Deputies, Projeto de Lei Nº 4401, De 2021,

The SEC, however, has not yet taken constructive steps in this direction. Despite the well-recognized growth and rapidly developing practices in the digital asset ecosystem, and the Commission's stated view that some digital assets are securities, the Commission has yet to constructively engage with digital asset market participants on the design of a workable regulatory framework, let alone propose any new rules governing this activity. Moreover, as of the publication of its most recently updated regulatory agenda on June 22, 2022, the Commission has not indicated any intention to do so.[4]

Instead, the Commission appears to be following an enforcement-first approach to addressing crypto-related regulatory challenges. Indeed, the Commission recently announced that the Enforcement Division's Crypto Assets and Cyber Unit would soon double in size.[5] Leading with enforcement actions before ensuring regulatory clarity results in arbitrary outcomes with limited value as guiding precedent. Several parties have been the subject of extensive investigation while others—with nearly identical products or services—have apparently been subject to none. This approach has led to both confusion and the uneven treatment of market participants.

Rather than initiate new rulemaking, Chair Gensler has repeatedly stated through speeches and testimony that the vast majority of digital tokens are securities, and has asked issuers and exchanges that offer, sell, and trade them to come in and register.[6] We disagree that the majority of digital assets are securities. For those digital assets that are securities, registration under the current rules is, for many market participants, either not possible or not economically viable given the associated and unnecessary compliance burdens. Additionally, when existing regulations are unworkable, some market participants may be less willing to invest the resources necessary to follow the rules. Failure to resolve these shortcomings leaves investors unprotected due to a lack of regulatory clarity, prevents market participants from leveraging the efficiencies new technology can offer, and materially impairs capital formation in the blockchain technologies that underlie digital assets. This is wholly inconsistent with the SEC's mission.

---

(Aug. 21, 2021), https://www.camara.leg.br/propostas-legislativas/1555470; Dubai Financial Services Authority, *Consultation Paper No. 143, Regulation of Crypto Tokens* (Mar. 8, 2022), https://dfsaen.thomsonreuters.com/sites/default/files/net_file_store/CP143_Regulation_of_Crypto_Tokens.pdf; Legislative Council of Hong Kong, *Anti Money Laundering and Counter-Terrorist Financing (Amendment) Bill*, (June 24, 2022), https://www.gld.gov.hk/egazette/pdf/20222625/es32022262516.pdf; Swiss Federation, *Federal Act on the Adaptation of Federal Law to Developments in Distributed Electronic Ledger Technology* (Jan. 14, 2021), https://fedlex.data.admin.ch/eli/fga/2020/2007; HM Treasury, *Government Sets Out Plan to Make UK a Global Cryptoasset Technology Hub*, (Apr. 4, 2022), https://www.gov.uk/government/news/government-sets-out-plan-to-make-uk-a-global-cryptoasset-technology-hub

[4] The Commission submitted its agenda of rulemaking actions pursuant to the Regulatory Flexibility Act on April 26, 2022, to the Regulatory Information Service Center for inclusion on the Unified Agenda of Federal Regulatory and Deregulatory Actions.  The agenda that was published did not indicate any rulemaking actions to be considered in the current agenda (next 12 months) or the long-term agenda that relates to digital asset regulation.SEC, *SEC Announces Spring 2022 Regulatory Agenda* (June 22, 2022), https://www.sec.gov/news/press-release/2022-112.

[5] SEC, *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit* (May 3, 2022), https://www.sec.gov/news/press-release/2022-78.

[6] *See, e.g.*, Sander Lutz, *SEC Chair Gensler Threatens Action Against Unregistered Crypto Exchanges* (May 18, 2022), https://decrypt.co/100806/sec-chair-gensler-threatens-action-against-unregistered-crypto-exchanges (stating to the House Financial Services and General Government Subcommittee that "[t]he crypto exchanges should come in and register . . ."); Public Statement, Chair Gary Gensler, SEC, *2021 Aspen Security Forum: The View from the SEC: Cryptocurrencies and National Security* (Aug. 3, 2021), https://www.youtube.com/watch?v=tusQLLCgrDs (inviting digital asset trading platforms to "come in, register, work with the SEC.").

In October 2021, we issued our *Digital Asset Policy Proposal – Safeguarding America's Financial Leadership* through which we hoped to initiate a broad and wide-ranging conversation about the role digital assets play in our economic future.[7]  As part of that proposal, we offered a bold idea to regulate digital assets under a separate framework with a single regulator as a way to ensure that investors are properly protected and innovation can occur without, what we believe, may be restricting and cumbersome labels of security and commodity.  Our proposal would require a government-wide focus to create a fundamentally new and comprehensive regime for digital assets. We remain committed to continuing the discussion about the right way to regulate digital assets. This petition, however, is more specific.  We are seeking a transparent and collaborative process to engage directly with the SEC as a means to initiate a discussion about what the SEC can do within its own authority to provide clarity and certainty regarding the regulatory treatment of digital asset securities.

Coinbase firmly believes that a new regulatory framework is needed to ensure that the SEC can fulfill its responsibility to oversee the digital asset securities markets. We respectfully petition the Commission to propose new rules for the offer, sale, registration, and trading of digital asset securities. Existing rules, unchanged, do not achieve the goals of the Commission when applied to digital asset securities.  Following the well-established rulemaking process would allow for input from a wide range of stakeholders, advance the goals of transparent and orderly policy development, and result in clear rules and fair notice to all market participants.

Now is the time for the Commission to begin a public dialogue. The recent collapse of the TerraUSD stablecoin, the bankruptcy of crypto-lenders such as Celsius, ongoing questions about the efficacy of how digital asset markets operate, and the potential onset of another crypto winter can help inform a regulatory path forward. The lessons learned can be used to reinforce the best practices, and guide the industry in building new infrastructure and product offerings. Establishing regulatory guardrails is critical to the future success of digital asset innovation in the United States.

As an initial step, the Commission should solicit input from the public. Many of the unresolved issues are complicated, and developing effective and efficient solutions will require a broad understanding of the technology underpinning developing market practices and products. We believe that we and other market participants will also benefit from an open discussion. The Commission has historically published concept releases for large, novel, or complicated issues, commensurate with the issues related to regulation of digital assets; such public engagement would be an appropriate model to follow here.[8]

As part of this process, the Commission should also consider whether appropriately tailored interpretive guidance and no-action relief could be used to facilitate new activities within existing regulatory frameworks. Doing so will provide the Commission with an opportunity to assess the efficacy of emerging market practices with the ability to later promulgate rules, if appropriate. Any such guidance and other relief must avoid imposing new requirements or exercising policy-making authority that is more appropriately conducted through notice and comment rulemaking pursuant to the Administrative Procedure Act.

---

[7] Coinbase, *Digital Asset Policy Proposal – Safeguarding America's Financial Leadership*, (Oct. 2021), https://assets.ctfassets.net/c5bd0wqjc7v0/7FhSemtQvq4P4yS7sJCKMj/a98939d651d7ee24a56a897e2d37ef30/coinbase-digital-asset-policy-proposal.pdf.

[8] SEC, *Concept Release on Equity Market Structure* (Jan. 14, 2010), https://www.sec.gov/rules/concept/2010/34-61358.pdf; SEC, *Concept Release on the U.S. Proxy System* (July 14, 2010), https://www.sec.gov/rules/concept/2010/34-62495.pdf.

It is imperative that the Commission start this process now. Digital asset securities have not yet been widely offered on regulated platforms because the existing rules do not accommodate them. Until the Commission provides regulatory certainty and a workable framework for digital asset securities, it is not feasible for market participants to "come in and register."[9] And the inability to do so risks not only stunting the development and growth of this market, but also invites those least committed to regulatory compliance to exploit existing ambiguities.

If the U.S. fails to act alongside the efforts of other jurisdictions, global market practices will conform to rules tailored to the preferences of foreign authorities. And once market participants begin implementing foreign rules, the regulatory options available to the Commission will become more limited in order to avoid substantially raising compliance costs of U.S. firms operating internationally.  The U.S. has historically been the world's leader in maintaining and regulating unparalleled capital markets; action is needed to preserve that position for the digital asset securities market.

As the only U.S. public company that operates a digital asset trading platform, Coinbase understands the value of market oversight through clear and workable regulation, and we welcome opportunities to work with policymakers to build a safe, open, and fair crypto ecosystem. We believe appropriately tailored regulation is essential to encouraging capital formation in the digital asset industry, protecting digital asset customers and investors, and facilitating the wider adoption of digital asset technology. We do not currently trade or facilitate trading in digital asset securities because of a lack of clear and workable regulation. But we would consider doing so through our SEC-registered securities broker-dealer subsidiaries[10] once rules are in place that can accommodate the technological manner in which digital asset securities would be offered, sold, traded, custodied, and cleared.

In petitioning the Commission for rulemaking we recognize that existing regulatory questions will be challenging to solve. We know because we have spent more than a year thinking about how to do it. Last October we published a set of principles that we believe should underpin a regulatory framework.[11] And now we offer views on a set of detailed questions that we believe should be answered as part of the process necessary to implement an effective regulatory framework for digital asset securities that promotes the SEC's mission, achieves key regulatory objectives, and encourages innovation that benefits market participants.

Our petition focuses only on areas in which we believe we have expertise, and should not be viewed as a comprehensive list of issues and questions related to the regulation of digital asset securities. For example, regulation pertaining to the Investment Company Act of 1940 and the Investment Advisers Act of 1940 would benefit from consideration through a similar process that solicits the input from knowledgeable market participants. We encourage the Commission to initiate a process to solicit input from areas of the market not covered by our petition.

---

[9]  Gary Gensler, *Prepared Remarks of Gary Gensler On Crypto Markets Penn Law Capital Markets Association Annual Conference* (Apr. 4, 2022), https://www.sec.gov/news/speech/gensler-remarks-crypto-markets-040422.

[10] Coinbase Securities, Inc. and Coinbase Capital Markets Corp.

[11] See, e.g., Coinbase's Digital Asset Policy Proposal (#dApp) at https://assets.ctfassets.net/c5bd0wgjc7v0/7FhSemtQvq4P4yS7sJCKMj/a98939d651d7ee24a56a897e2d37ef30/coinbase-digital-asset-policy-proposal.pdf.

4

**Key Considerations**

There are three primary challenges when applying existing rules to digital asset securities:

1. Lack of clarity regarding how to determine whether a digital asset is a security;

2. Requirements that are fundamentally incompatible with the operation of digital asset securities; and

3. Requirements that are technically possible, but unnecessary or overly burdensome as compared to potential alternative and more efficient rules.

Although Coinbase, and other digital asset trading venues, have identified a number of digital assets that are clearly not securities, and therefore may trade without SEC registration, there are other assets that are harder to classify relying on the SEC's application of the *Howey* and *Reves* tests.  Many of the questions we ask below highlight the challenge of identifying which of these digital assets, if any, fall within the Commission's jurisdiction, the lack of clarity with existing regulatory requirements, and the ways in which the existing regulatory requirements are fundamentally incompatible with the operation of digital asset securities.

Other questions reflect requirements for which compliance is possible, but otherwise not well-suited to digital asset securities premised on distributed-ledger technology. For example, custody requirements contemplate a broker-intermediated model—such as national securities exchanges use today—that is unnecessary for real-time settlement on blockchains.  Each of the questions is also fundamentally tied to the determination of whether a digital asset is a security.  Certainty on the applicable regulatory framework would not only provide greater protection for investors, but also permit the formation of an efficient digital asset market environment.

Finally, in addressing these questions, we believe the Commission should consider the following:

   *1.  Not All Digital Assets Are Securities*

Most digital assets are designed to enable simple functions that provide economic gates to commercial applications and services. They are not securities. Their value is determined by adoption and use, and the disclosures that token holders need are materially different from those of a public company. The issuer registration, disclosure, and listing requirements for securities are currently tailored to the issuers of debt and equity in public companies. But most digital assets—coins and tokens that trade on exchanges like Coinbase—do not represent ownership stakes in complicated public companies or pay a return to investors through dividends or interest.

The Commission should provide clarity regarding which digital assets, if any, are securities.The lack of clarity creates a risk that issuers of non-security digital tokens will feel compelled to comply with public company reporting requirements that are unnecessary, may lead to investor confusion, and may render innovative blockchain projects not economically viable despite the value they could bring to users and the broader economy.

   *2.  Needed Disclosures Are Different*

The SEC disclosure regime has historically focused on ensuring that investors have material information necessary to make an informed investment decision.  Current disclosure

requirements, however, do not cover a number of features unique to digital assets that would undoubtedly be considered important when making an investment decision.  For example, investors would likely find information about the risk of a network attack, what kind of governance rights are embedded in which tokens, who has the ability to change the code underlying the assets or the network, and other features that do not exist with respect to traditional securities to be material.  Additionally, investors would benefit from comparable disclosures across each digital asset security to assist in identifying differences among investment opportunities.  At the same time, the operations of a digital asset issuer are typically less complex than those of a large public company, so investors would likely not require the same level of disclosure in several areas relevant to traditional public companies to make an informed decision.

### 3.   *Real-Time Settlement of Financial Transactions is Possible*

Digital assets and blockchain technology hold the promise of a more efficient and resilient plumbing for financial transactions. This new infrastructure is being built, from the start, to enable peer-to-peer operability with straight-through-processing between different types of service providers. The decentralized structure prevents any one service provider from being the sole gate between market participants. The result is enhanced competition, more seamless services, faster settlements, greater transparency, and the opportunity to automate complex financial transactions. The opportunity to eliminate unnecessary gates and layers of intermediation should ultimately lead to enhanced investor protections (for example by improving market transparency by recording transactions on a public blockchain), improved functionality, and lower transaction costs.

Today's rules, however, do not allow for securities markets to take advantage of these improvements. For example, existing custody rules do not contemplate real-time settlement of transactions on blockchains. They are tailored for trades that typically take two days to settle through a series of intermediaries who must manage default during that period. Real-time settlement on blockchains obviates this need, allowing counterparties to redeploy their capital immediately, improving the allocative efficiencies of markets relative to current practices. Other rules, particularly those promulgated by Regulation National Market System ("NMS"), do not contemplate digitally native securities, and do not provide a clear compliance path for blockchain transactions.

### 4.   *Fewer Market Intermediaries Are Required*

Another important innovation of digital asset markets is the ability to conduct reliable transactions without the need for third-party intermediaries. Trading platforms like Coinbase offer direct access to both retail and institutional traders, letting them execute transactions 24 hours a day, seven days a week. However, rules designed for securities markets trading predate blockchain technology, when the only way to create trust in the financial system was to require the use of separate intermediaries, such as brokers, custodians, exchanges, market makers, transfer agents, and clearing agencies, each with conflicting interests and incentives. Ensuing regulations were premised on the existence of, and need to regulate these intermediaries, enshrining them and their role in law.[12]

---

[12] For additional exploration of the existing regulatory framework, and why it is not properly tailored for digital asset markets, *see* Coinbase's Digital Asset Policy Proposal (#dApp) at https://assets.ctfassets.net/c5bd0wqjc7v0/7FhSemtQvq4P4yS7sJCKMj/a98939d651d7ee24a56a897e2d37e f30/coinbase-digital-asset-policy-proposal.pdf.

Historical intermediation models should be permitted where they continue to add value, but not required when they do not or other methods achieve the same goal. For example, intermediaries should not be required when a transaction can be completed through alternative technological means that achieve the same regulatory objective. Just as regulatory and legislative developments were necessary to address the transition from a paper-based financial system to a computer-based system, a modernization effort is needed today to address the novel features and benefits of blockchain technology.

## Key Questions

Each of these goals cannot be achieved without rethinking and reframing specific parts of existing securities regulation so that it is more efficient and effective for digital asset securities in the context of distributed-ledger technology.  In the following sections, we provide an outline to frame the topic and follow with a number of questions that we believe are important to consider as part of any rulemaking exercise. We have views with respect to each and over time will seek to further share our perspectives. We strongly encourage other market participants to do the same. Our "answers" are just one of many relevant voices, and we hope for and expect a robust discussion that productively informs the Commission and its Staff.

### I.    Classification of Digital Assets as Securities

The threshold question in the development of a regulatory framework for digital asset securities is the determination of whether a particular digital asset is in fact a security, and thus subject to the Commission's jurisdiction and the securities laws.[13] The Commission has taken the view that if a digital asset is a security, its regulatory oversight applies to all aspects of the lifecycle of the security and the parties that are involved in it, including the initial offering of that digital asset as well as any subsequent trading by investors and their dealings with intermediaries.[14]

The determination of whether a non-traditional asset (such as a digital asset) is a security relies heavily on legal tests developed by case law and ultimately Supreme Court decisions. Where the characteristics of an instrument do not clearly fit into one of the well-settled terms, the SEC and federal courts typically analyze whether the instrument is a "security" through the lens of the

---

[13] A "security" is defined in the federal securities laws by reference to lists of instruments that include, for example, stocks and notes like bonds issued by companies. *See* Section 2(a)(1) of the Securities Act (defining a security as "[A]ny note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim.") Despite differences, the Supreme Court has indicated that the definitions of "security" under the Securities Act and the Exchange Act are treated the same. *SEC v. Edwards*, 540 U.S. 389, 393 (2004), citing *Reves v. Ernst & Young*, 494 U.S. 56, 61 n.1 (1990). In addition, the "elements of *Howey* are also applicable to the [Investment Company Act]." *SEC v. Banner Fund Int'l*, 211 F.3d 602, 614 n.* (D.C. Cir. 2000).

[14] *See* U.S. Sec. & Exch. Comm'n, Chair Gary Gensler Letter to Sen. Warren (Aug. 5, 2021), https://www.warren.senate.gov/imo/media/doc/gensler_response_to_warren_-_cryptocurrency_exchanges.pdf.

7

**Add. 8**

*Howey*[15] and *Reves*[16] tests. However, these tests were developed before the emergence of digital assets and are not tailored to their unique properties and use.  As a result, application of these existing tests to digital assets fails to take into account the unique characteristics of digital assets.

The differences between traditional securities and digital assets underscore the challenges with applying these tests to digital assets. While traditional securities typically represent a claim to the assets and profits of a specific corporate issuer, whose management makes choices that influence the success of the company and therefore the return on investment in its securities, digital assets often have decentralized groups of developers whose involvement with a project may ebb and flow over time. The extent to which digital asset holders reasonably rely on the efforts of particular promoters, or the extent to which those efforts are "undeniably significant ones"[17] is much less clear with regard to digital assets.

Further, while many may purchase digital assets with the hope of price appreciation, unlike traditional securities, digital assets typically have functional non-investment uses within a protocol—making them much more akin to real property, which is also often purchased with the hope of price appreciation, but nevertheless is fundamentally a commodity intended for usage.[18] Non-investment use cases include, for example: paying transaction, or "gas" fees; voting on governance proposals related to the operation of the protocol; serving as a medium of exchange for native applications; and helping secure a network.

Coinbase has developed a rigorous process to analyze and review each digital asset, before making any digital asset available on its platforms. These processes ensure that Coinbase is not facilitating transactions in or providing trading infrastructure for digital asset securities. Due to today's substantial regulatory uncertainty, Coinbase is over-inclusive in what it views as a potential security, out of an abundance of caution to ensure that its practices comply with existing applicable law. Coinbase therefore often excludes digital assets based on the mere possibility that they might be securities.

Not all market participants have the resources to apply the same rigorous process. This in turn can result in significant burdens in meeting the Commission's expectation that each market participant conduct and document its own legal analysis for each and every digital asset with which it interacts.[19]

Applying the *Howey* and *Reves* tests piecemeal to an entire market sector has proven itself to be an unworkable solution. The SEC needs to provide clarity on the question of what, in the context of digital assets, constitutes a security. This may be achieved by defining a digital asset security through rulemaking, through the creation of a digital asset security offering exemption, or through other regulatory actions.  In particular, such a rule should be objective and clear such that it

---

[15] *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) (resulting in the so-called "*Howey* test").

[16] *Reves v. Ernst & Young*, 494 U.S. 56 (1990) (resulting in the so-called "*Reves* test").

[17] *SEC v. Glenn W. Turner Enter., Inc.*, 474 F.2d 476, 482 (9th Cir.).

[18] *Cf. United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975).

[19] *See* SEC Strategic Hub for Innovation and Financial Technology Letter to the New York State Department of Financial Services (Jan. 27, 2020), https://www.sec.gov/files/staff-comments-to%20nysdfs-1-27-20.pdf ("Market participants should not rely on a model framework, whitelist, or state license when evaluating compliance with the federal securities laws – without also undergoing careful legal analysis under the federal securities laws" supported by, for example, "opinion[s] of securities counsel.").

produces predictable, consistent and replicable results, and can be applied by all market participants.

For example, the rule should address, consistent with applicable case law, when an "investment of money" has or has not occurred. If the SEC is of the view that airdrops (i.e., digital assets provided free of payment) constitute an investment of money—a position that is likely irreconcilable with case law[20]—it should clearly state that position and clarify in which circumstances that would be the case. Similarly, unlike traditional securities whose sole purpose is to represent an investment, digital assets often provide functionality, utility, or a consumptive use, aside from any speculative value. The Supreme Court has noted that "when a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply."[21] Further, even if the value of an asset, like a dwelling or precious metal, may appreciate, and even if some purchasers may purchase the asset with speculative intent, that does not necessarily convert the consumable asset into a security. The proposed SEC rulemaking therefore should be explicit, in the digital asset context, as to the Commission's view on how the presence or lack of functionality, consumability, and/or utility of the digital asset impacts (and negates) its status as a security.

Given the complexity of the issue, the Commission should seek public input on the classification of digital assets as securities in advance of, or as part of, any proposed rulemaking related to these issues.

*Key questions for the Commission to consider and seek public input on*:

1) Are the *Howey* and *Reves* tests the appropriate tests for determining whether digital assets are securities?

   a) What risks were these tests designed to identify and are those risks consistently presented in digital asset securities?

   b) How should the use and utility of a digital asset, apart from any potential investment purpose, impact the analysis?

   c) Are these tests capable of consistent application to digital assets by issuers, intermediaries, and other market participants? Does this application lead to results that are conducive to advancing the SEC's mission and promoting innovation? Does the application of the *Howey* and *Reves* tests to the specific facts and circumstances of each

---

[20] *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003), quoting *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). While in the context of analyzing whether a "sale" of a particular security occurred, there may be arguments that any form of benefit to an issuer could be sufficient consideration to constitute a sale subject to Section 5 of the Securities Act. *See, e.g.*, SEC, SEC Brings First Actions to Halt Unregistered Online Offerings of So-Called "Free Stock" (July 22, 1999), https://www.sec.gov/news/headlines/webstock.htm. The question under *Howey*, however, is whether the asset is a security in the first place, which requires there to be an investment of money, not that the distribution of the asset provided a non-monetary benefit to the issuer. See also Joseph A. Hall, Howey, Ralston Purina and the SEC's Digital Asset Framework, 52 REV. OF SEC. & COMMODITIES REG. 137 (June 19, 2019), https://www.davispolk.com/files/howey_ralston_sec_digital_asset_framework.pdf (questioning the Digital Asset Framework's "seemingly contradictory" assertion that the "investment of money" prong of *Howey* can be satisfied without an investment of money).

[21] *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975).

9

digital asset result in inefficient markets, an inconsistent application of the law, and/or other adverse consequences?

2) Should the SEC use its exemptive authority under Section 28 of the Securities Act of 1933 (the "Securities Act") and Section 36 of the Securities Exchange Act of 1934 (the "Exchange Act") to exempt certain transactions (e.g., those for consumptive use) in certain digital assets that may otherwise be securities but for which—for the reasons explained in the remaining sections of this petition—the existing regulatory regime is inappropriate?[22] If such transactions are exempted, should an alternative regime be applied and what should that regulation look like?

  a) Should the Staff reconsider the view in the Digital Asset Framework that receipt of tokens without investing money may nonetheless satisfy the "investment of money" prong under *Howey*?

   i) If not, how does the Staff reconcile this position with existing case law, which requires a recipient to "commit his assets to the enterprise in such a manner as to subject himself to a financial loss"?[23]

  b) How should digital assets that provide significant non-investment use cases (e.g., paying transaction, or "gas" fees; voting on governance proposals related to the operation of the protocol; serving as a medium of exchange for native applications; and helping secure a network) be analyzed under the "reasonable expectation of profits" prong of *Howey*?

   i) Would a finding that such digital assets satisfy this prong conflict with Supreme Court precedent, which has stated that where a purchaser is not "'attracted solely by the prospects of a return' on his investment . . . [but] is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply"? More generally, how should "consumption" factor into the investment contract analysis, giving due regard to the Court's decision in *United Housing v. Forman*?[24]

   ii) How should market participants regard digital assets that provide both investment uses and non-investment-based consumptive uses, in light of *Howey* case law that explains the existence of speculative purchasers of an asset and the potential to sell an asset for more than you paid for it does not, on its own, mean that the asset is an investment contract under *Howey*?

---

[22] Section 28 of the Securities Act provides that "[t]he Commission, by rule or regulation, may conditionally or unconditionally exempt any person, security, or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of this subchapter or of any rule or regulation issued under this subchapter, to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors." Section 36 of the Exchange Act provides that, subject to certain exceptions inapplicable here, "the Commission, by rule, regulation, or order, may conditionally or unconditionally exempt any person, security, or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of this chapter or of any rule or regulation thereunder, to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors."

[23] *See supra* note 19.

[24] 421 U.S. 837.

10

     iii)   How should the "efforts of others" prong of the Howey test be understood with respect to the "expectation of profits" prong?  How relevant is the presence of price fluctuations on secondary trading platforms to the *Howey* analysis, given that the price may fluctuate based on the supply and demand of the digital asset for its consumptive use?

     iv)   How should the "expectation of profits" prong be understood to ensure that it does not include digital commodities, where even if bought by a particular buyer with the hope of profit, any such profit is based on supply and demand for the commodity, not the performance of the issuer?

  c)  What efforts may be properly classified as "essential managerial efforts" for digital assets that operate on permissionless blockchains or protocols, where independent, unaffiliated nodes are responsible for processing transactions, securing the network, and approving software implementations, or where such separate parties may be involved in proposing or implementing changes to the network or system?

     i)   How can purchasers be reliant upon the efforts of others in the case of digital assets that have no identifiable central party that could be recognized as an "issuer"?

3)  Recognizing the importance of creating a predictable framework for market participants, how can the SEC provide greater clarity and certainty on which digital assets constitute securities? Should the Staff revisit the Digital Asset Framework and provide bright-line rules that could be applied more consistently and predictably?

4)  Following a reconsideration of, or an exercise of exemptive authority for, the application of the *Howey* and *Reves* tests to digital assets, should the SEC conduct formal or informal public evaluations, such as through a no-action letter or other consultative process, to decide whether a digital asset is a security? Who should be able to seek, and rely on, such a determination?

5)  Should other parties, such as the original promoters, be able to make similar determinations that—absent a formal disagreement from the SEC—third-party market participants could rely on?  Should those determinations have to follow a particular process?  If so, should there be a timeline during which the Commission must respond?

6)  Should a digital asset be viewed independently from the transaction in which it was initially sold—such that the sale may have been a securities transaction, but the asset is not a security? In a traditional company, the company may produce a product that it sells, and from which it derives its profits.  The shareholders share in these profits.  A digital asset issuer, however, may sell its tokens to raise capital to develop the network on which those same tokens will be used.  The product and the security are represented by the same digital asset, creating a unique coincidence of investment, on the one hand, and use and consumption, on the other.

7)  Does the current manner in which the *Howey* test is applied result in or promote the maintenance of fair, orderly, and efficient markets consistent with the SEC's tripartite mission?

8) Does the current manner in which the *Howey* test is applied result in sufficient certainty and consistency to protect investors in a manner that is consistent with the SEC's jurisdiction and tripartite mission?

9) Does the current manner in which the *Howey* test is applied result in sufficient certainty and consistency to facilitate capital formation in a manner that is consistent with the SEC's jurisdiction and tripartite mission?

10) In practice, how does a digital asset security transition to be a non-security digital asset? What constitutes "sufficient decentralization" for purposes of transitioning from a security to a non-security?[25] How would that determination be made and what would be the mechanism for converting a digital asset from a security to a non-security?

   a) Is there a difference, or should there be one, depending on whether the digital asset was initially sold in an offering that did not comply with the federal securities laws, or was instead initially sold pursuant to a registration exemption (such as Regulation D or Regulation S)?

   b) Must the path to sufficient decentralization be predetermined at the time of the digital asset's launch, or may decentralized attributes be introduced over time?

11) Even if initially sold in a securities offering, can uses of a digital asset for non-investment purposes (e.g., to use the asset for its actual technological purpose), including transactions on the secondary market to acquire the digital asset for such non-investment purposes, be deemed to be non-securities transactions?

## II. Issuance of Digital Asset Securities

### A. Registration and Exemptions

The federal securities laws require that the offer or sale of any security be registered with the Commission, unless an exemption is available.

Registration under Section 5 and Section 12 must be sought by the issuer of the security.[26] Given the nature of digital securities, however, it may not be either feasible or necessary to identify an "issuer" as required under the securities laws.  When an issuer registers an offering, it provides a number of disclosures about the operation of the issuer, its financial statements, its leadership, what risks it may face, and information about various other parts of the business.  The purpose behind registration, and therefore requiring these disclosures, is to ensure that investors have the material information they need to make informed decisions.  The insiders of the issuer, such as management, have information about the issuer that will affect the value of its securities and therefore the disclosure rules require the insiders to make material information public.

---

[25] William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (Jun. 14, 2018) https://www.sec.gov/news/speech/speech-hinman-061418 (expressing the view that "current offers and sales of Ether are not securities" because Ether had become "sufficiently decentralized.").

[26] *See, e.g.*, Form S-1, Form 10 (each requiring execution by a representative of the prospective registrant).

In many cases, however, the value of a digital asset—unlike the value of stocks and bonds—is not dependent on the operations of the issuer or the issuer's financial condition. Rather, the value of a digital asset routinely depends on the general supply and demand for using the digital asset. In such cases, there is little information possessed by the issuer that is unavailable to the public or that impacts the value of the digital asset, making traditional securities disclosures about the issuer irrelevant to holders of digital assets. In fact, the typical information that the federal securities laws require public companies to disclose presents the risk of misleading investors in digital assets, who may believe this information to be material to their investment decision because the SEC mandated its disclosure.

There are, additionally, digital assets that are created or managed by a diffuse group of individuals, who are not a central "team" at all. Some digital assets are developed by dispersed groups of individuals who may not even know each other's true identities. Current application of existing securities regulations may treat this group as the "issuer" but there is little insider information that this group has, and requiring them to coordinate and assume liability for disclosures would be both impracticable and futile.  In such circumstances, the kind of information asymmetries that the federal securities laws are designed to remedy do not exist.[27]

Mandated disclosures serve a regulatory purpose when there is material information to be pushed out into the market.  A diffuse collection of individuals may not have such information to disclose.  The SEC's Digital Asset Framework suggests that these dispersed groups may be "Active Participants," or "APs," whose efforts are relevant for determining whether the digital asset is itself a security. But the framework does not itself provide a determinative test for identifying who qualifies as an AP, or specify if these APs are subject to the registration requirements of Section 5 and Section 12.[28]

If the digital asset is a security, then failure to register would violate Section 5 and subject the "issuer" to penalties. But failure to register does not only impact the issuer—it also makes it effectively impossible for national securities exchanges and other secondary markets to lawfully facilitate trading of the digital asset security. U.S. digital asset securities markets, like on that Coinbase may develop, that seek to comply with the U.S. federal securities laws therefore may not facilitate trading in these assets; instead, trading for these assets occurs on less well-regulated and/or offshore platforms where there is little oversight or investor protections. Exceedingly few issuers have successfully registered a digital asset security under Section 5 and Section 12,[29] with many others having failed in attempts to do so.[30] As a result, very few digital

---

[27] *Hinman*, *supra* note 24.

[28] SEC Staff, Framework for "Investment Contract" Analysis of Digital Assets, https://www.sec.gov/files/dlt-framework.pdf.

[29] *See* INX Limited, *Prospectus Supplement*, https://www.sec.gov/Archives/edgar/data/1725882/000121390020023202/ea125858-424b1_inxlimited.htm.

[30] *See, e.g.*, American CryptoFed DAO, Filings, https://www.sec.gov/edgar/browse/?CIK=1881928 (SEC staff rejecting S-1 filing for "serious deficiencies" relating to requirements to comply with the form, resulting in withdrawal); Monster Products, Inc., Filings, https://www.sec.gov/edgar/browse/?CIK=1675583 (same). *See also* Carrier EQ, LLC (f/k/a Airfox), Form 8-K (noting the issuer would discontinue the development of AirTokens because "[c]urrent laws and regulatory regimes do not provide for the Company to utilize the AirTokens as envisioned by the Company. . . ."); Paragon Coin, Paragon Coin Update (explaining that the issuer was filing for bankruptcy after its "plans were impossible to achieve due to several legal mistakes"); Jamie Chacon, Gladius Network shuts down as ICO investors cry foul (Nov. 25, 2019), https://decrypt.co/12044/gladius-network-shuts-down-ico-investors-cry-foul (issuer shutting down after settling an SEC enforcement action that required the issuer to register).

**Add. 14**

asset securities are available for trading in the U.S. This is despite the fact that the lack of information that would have been mandated through the registration process would not have provided material information to the market even if the process had been successfully completed. *Key questions for the Commission to consider and seek public input on:*

12) Given the potential non-investment uses of digital assets that the Commission today seems to believe may be securities as described in Section II.A, and that digital asset securities typically operate on decentralized and open-source blockchains that are publicly accessible to all, what should be the goal of any registration regime for digital asset securities?

   a)  What risks do digital asset securities present that may not be presented by traditional securities?

   b)  What risks might digital asset securities mitigate, or not present, and how should these changes in risk profile be recognized in the kind of disclosures provided to investors?

   c)  Who, if anyone, should be responsible for registration when there is no identifiable central entity that controls the token or protocol, or when the issuer does not believe registration requirements apply?

      i)   If an entity does serve as an issuer for purposes of a registration of an offering of digital assets, how long should the "issuer" be responsible for the ongoing disclosure requirements that may be required?

      ii)  Are Active Participants responsible for these ongoing disclosure requirements? What if the persons who may be properly treated as APs change over time?

      iii) Would such a digital asset security have a means to be offered on a regulated digital asset securities trading platform? Should that digital asset still be categorized as a security and should it be subject to SEC regulation?

      iv)  What regulatory goal would such registration accomplish?  Is there a way that regulation could be tailored to achieve this goal?

      v)   Should the concept of "active participant" exist at all?  How does it promote the goals of the federal securities laws in reducing information asymmetries?

13) Taking into consideration that a digital asset team's operations and relationship to the digital asset security may differ meaningfully from the relationship between traditional issuers and the securities they issue, for example, if they are not receiving any proceeds of an offering, should the Commission use its exemptive power under Section 28 of the Securities Act and Section 36 of the Exchange Act to exempt certain developers or promoters of digital asset securities from registration, and/or ongoing disclosure requirements if the SEC were to determine they are subject to its regulatory reach?

14) Should platforms be able to facilitate trading in digital asset securities if the initial offer or sale was not registered under Section 5, or the "issuer" of the digital asset security has not complied with the requirements of Section 12?

14

**Add. 15**

a) If there is no central entity that controls the token or protocol, or no one that views themselves as an issuer willing or realistically able to comply with the registration requirements, should trading platforms be permitted to facilitate the trading of the digital asset security if sufficient information about a digital asset security is otherwise available to potential investors without mandatory disclosures?

b) What responsibility and potential liability, if any, would a platform have for the accuracy and completeness of the disclosures?

15) Are digital asset "investment contract" securities "equity" securities under Section 12(g)?

16) May a broker-dealer be permitted, under certain circumstances, to facilitate the resale of digital asset securities, even if they were initially sold without registration or an available exemption?

## B.  Relevant Disclosures

The existing registration process for securities offerings requires a number of disclosures designed to ensure that the market has the same material information about the company as company insiders have. There are also exemptions from registration for offerings by entrepreneurs and small companies, but they too have their own regulatory disclosure requirements. While the required disclosures are fewer and different, they rest on the same assumptions and the belief that insider information is more limited in type or scope, or that the investors participating in these exempt offerings have superior access to the insiders and their information.

Aside from the difficulties with registration, discussed in the section above, there is also a mismatch between the disclosures required for traditional securities offerings and what investors in digital asset securities need. As a result, existing disclosure requirements are not well-designed to meet the regulatory goals of ensuring that the market has the information it needs about the securities being offered or traded.

Disclosure requirements are the hallmark of the federal securities laws. Rather than judge the suitability of investments for public investors, the federal securities laws are designed to protect investors by requiring issuers to provide material information about the securities they issue, and the risks associated with investing in them, that are both accurate and not misleading.

But the Commission's disclosure requirements for the offer and sale of securities and ongoing disclosure requirements are designed for traditional corporate entities that typically issue and register equity and debt securities. The disclosure requirements under the federal securities laws focus on disclosure about companies, their management and their financial results—topics that poorly fit the decentralized and open-source nature of blockchain-based digital asset securities. Digital asset securities that are not tokenized versions of traditional securities raise different investor disclosure considerations than ordinary corporate securities. For example, even if these assets have value primarily based on the promoter's efforts, they generally do not provide holders any rights over the residual value of the issuer, or a claim on the issuer's assets. They are neither equity nor debt.

Digital assets that the SEC may claim are securities often function on decentralized protocols with many contributors, and every holder of a digital asset security can typically examine for

15

themselves the functionality and governance structure of the asset. As a result, the existing disclosure requirements are both under-inclusive and overinclusive of the information that is relevant to an investor in a digital asset security.[31] For example, information that may be relevant to digital asset security investors, such as its "tokenomics" (e.g., the supply schedule of the digital asset security),[32] or on-chain governance (rather than traditional boards of directors), are not specifically captured by existing disclosure requirements.[33]

The result of applying existing disclosure requirements to digital asset securities offerings would be to leave investors exposed.  They would be led to believe that information that is irrelevant is actually important to their decision, while missing several pieces of information that could significantly affect the value of the digital assets they hold.

*Key questions for the Commission to consider and seek public input on:*

17) What disclosures should be required for digital asset securities, given their different features as compared to traditional securities?

   a)  What information about the digital asset security, the underlying platform, and those responsible for the development of the digital asset security and the platform should be shared with those who are considering acquiring the digital asset security?

   b)  What existing disclosure requirements are not applicable to digital asset securities? For example, should certain disclosures required under the Williams Act and Section 16 of the Exchange Act be modified or exempted for digital asset securities?

   c)  What new disclosures should be required?

18) If it is necessary to provide those that are transacting in a digital asset security certain information about the digital asset security and related matters on an ongoing basis, how should relevant information be disclosed so that it is accessible and useful, taking into account the fact that traditional methods of disclosure may be less effective for digital asset security investors?

19) Even if the relevant assets were registered or exempt from registration, how would Rule 15c2-11 apply to broker-dealers facilitating trading in digital asset securities?[34] The same

---

[31] Chris Brummer, *Disclosure, Dapps and DeFi*, Forthcoming, Stanford Journal of Blockchain Law and Policy (Mar. 24, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4065143#:~:text=Disclosure%20in%20decentralized%20finance%20is,know%20what%20what%20they're%20buying.

[32] *See* Robert Stevens, *What Is Tokenomics and Why Is It Important?* (Apr. 11, 2022), https://www.coindesk.com/learn/what-is-tokenomics-and-why-is-it-important/#:~:text=A%20portmanteau%20of%20%E2%80%9Ctoken%E2%80%9D%20and,like%20what%20utility%20it%20has.

[33] *See, e.g.*, Disclosure, Dapps and DeFi, *supra* note 30 ("[T]he base layer disclosure documents for securities law fail to anticipate the particular technological features of decentralized technologies and infrastructures . . . they assume and inquire only into governance, technology, and other operational features inherent to industrial economies, and which are often different, or altogether absent in digital and blockchain-based economies.").

[34] Rule 15c2-11 generally requires, before a broker-dealer may publish a quotation for a security or submit a quotation into a quotation medium, that the broker-dealer must have in its possession specified

challenges noted above with respect to registration—the difficulty in obtaining information about the issuer and the over- and under-inclusive relevancy of the information—apply to the information sought by Rule 15c2-11.

20) Should the SEC preempt state blue sky requirements under Section 18 of the Securities Act, for example, by determining that for certain transactions, investors are "qualified purchasers"? If not, given the limited number of digital asset securities that would be listed on a national securities exchange, could a secondary market develop if state-by-state qualification is required?

### III.    Trading Digital Asset Securities on National Securities Exchanges

One of the central innovations of digital asset trading technology is the ability of both retail and institutional traders to have direct access to platforms that execute transactions 24 hours a day, seven days a week. Transactions settle in real time. And broker-dealer intermediaries are no longer needed as the digital asset market infrastructure has developed so that exchange and trading services, clearing, settlement, and custody can be provided effectively and more efficiently by the same entity.

However, registering a trading platform for digital asset securities faces a series of significant challenges. Notably, Chair Gensler has suggested that such platforms should register as national securities exchanges ("NSEs"), rather than alternative trading systems ("ATSs").[35] But existing NSE regulation does not contemplate the existence of, or need for, disintermediated trading. Exchanges require membership to trade directly, and such membership is available only to broker-dealers.[36] Moreover, methods of trading outside of a NSE—either on ATSs or over the counter ("OTC")—also require the use of a broker-dealer. ATSs are themselves registered as broker-dealers while OTC trading is facilitated by a network of broker-dealers. None of these models is designed to accommodate direct investor access to a trading venue, which is wholly inconsistent with the current models of digital asset trading and inserts unnecessary layers of intermediation.

Another challenge with Chair Gensler's approach is that it does not contemplate the side-by-side trading, on the same platform, of digital assets securities and digital assets that are not securities. This is problematic because trading in digital assets that are securities would entail trading many that are not. Unlike traditional securities, which are typically purchased using fiat currency, given the 24/7 trading market, digital assets are often traded for digitally native currencies such as stablecoins, or a cryptocurrency like Bitcoin, which is a commodity. For example, a trader might buy U.S. dollar-backed stablecoins and then use these assets as a store of value for purchases of various other digital assets. We anticipate, given existing practices and preferences in the

---

information about the security and its issuer that it believes are reliable and materially accurate, and much of that information be publicly available.

[35] Gary Gensler, *Prepared Remarks of Gary Gensler On Crypto Markets Penn Law Capital Markets Association Annual Conference* (Apr. 4, 2022), https://www.sec.gov/news/speech/gensler-remarks-crypto-markets-040422.

[36] Under Section 6(c) of the Exchange Act, only registered broker-dealers may be admitted as members of a national securities exchange. Further, under Section 6(b) and 19(g), national securities exchanges are self-regulatory organizations ("SROs"), and are required to enforce their member broker-dealers' compliance with the securities laws. As they currently operate and under current law, it is not clear that digital asset trading platforms could comply with these requirements, nor is it clear there is a regulatory benefit of requiring that they restructure to do so.

market, that investors in digital asset securities would buy those assets in the same way, using a stablecoin or other digital store of value.

To register as an exchange, a person must first meet the definition of "exchange"—including that it brings together purchasers and sellers of *securities*.[37] Its registration must also be approved by the Commission, which must consider, by statute, whether the exchange is "so organized and has the capacity to be able to carry out the purposes of the Exchange Act."[38] Facilitating the trading of non-security digital assets, such as Bitcoin, has not yet been recognized as furthering the purposes of the Exchange Act. For a platform to register as a securities exchange, while also listing non-securities digital assets, the Commission may need to clarify that registered exchanges may facilitate trading in both security and non-security digital assets. Finally, securities on NSEs do not currently trade 24/7, but open and close each day through an auction process on their listing venue. They must also comply with a number of other regulations, including most notably Regulation NMS, that may require clarification before they can be easily applied to digital asset securities exchanges. Regulation NMS, for example, assumes the existence of a national market for each listed security, and imposes a number of requirements to harmonize pricing and fees across venues. Digital assets, however, trade on a global scale, with around-the-clock trading. It is not clear how various provisions of these rules would work in a global, 24/7 market.

*Key questions for the Commission to consider and seek public input on:*

21) Recognizing the difficulties in determining which digital assets should be properly classified as securities under existing legal tests,[39] should a platform be permitted to register with the SEC as a national securities exchange on the basis that some of the assets on the platform may be securities, without making a definitive determination with regard to any particular asset?

22) If an asset-by-asset determination must be made, should a single platform be permitted to register with the SEC for trading both security and non-security digital assets?

   a) Could such a platform meet the definition of "exchange," and be organized to carry out the purposes of the Exchange Act, even for the non-securities?

   b) Would its rules relating to non-securities be subject to the same requirements as those relating to securities?

   c) Would the Commission provide exchanges with legal certainty regarding its security versus non-security determinations?

23) Could a national securities exchange facilitating trading in digital asset securities be permitted to follow the typical non-intermediary model used by existing non-security digital asset exchanges?[40]

   a) If intermediaries are required:

---

[37] Exchange Act § 3(a)(1).

[38] Exchange Act § 6(b)(1).

[39] *See supra* Section I.

[40] As discussed in Section IV.A below, this model is critical to the operation of digital asset markets and an improvement from traditional market structures.

18

**Add. 19**

     i)   How would this impact the viability of these platforms, particularly given the challenges of operating a broker-dealer for digital asset securities?[41]

     ii)   Would the introduction of intermediaries potentially result in increased fees for consumers?

     iii)   How could the introduction of new digital asset trading technologies provide better investor protections? How should the Commission consider these potential benefits as part of any rulemaking?

b)   If intermediaries are not required:

     i)   How would traditional exchange responsibilities, such as operating as an SRO, apply in the context of non-broker-dealer (including retail) users?

     ii)   Would more limited regulatory requirements, such as engaging in market surveillance as an operator of the market, be more appropriate?

24) Would the SEC permit a digital asset security exchange to list digital asset securities that are also traded on unregulated platforms, notwithstanding its Section 6(b)(5) concerns raised in the spot Bitcoin ETF context?

a)   If not, and given the ease in operating an unregulated trading platform and supporting digital asset securities thereon, would such a prohibition have the practical effect of applying to virtually all digital asset securities, and thereby harm investors by depriving them of any regulated platforms to acquire such assets?

25) Would the full scope of NSE requirements apply to an exchange trading digital asset securities? If so:

a)   What would be the appropriate listing standards for digital asset securities? Existing listing standards typically consider, among other things, quantitative and qualitative standards that are more relevant for corporate securities than digital asset securities.

b)   Could any national securities exchange grant unlisted trading privileges to a digital asset security listed on another exchange?

c)   The rules of NSEs generally require that all transactions effected on the exchange be cleared through a registered clearing agency; would this be required for digital asset securities? See also Section IV.D.

d)   How would the various NMS plans apply?

     i)   Should there be different NMS plans specifically designed and more appropriate for digital asset securities?

     ii)   Would the SROs need to amend their Consolidated Audit Trail rules to contemplate digital asset securities?

---

[41] *See infra* Section VI.B.

19

e) Would Regulation SCI apply? How would its references to "industry standards" be interpreted—as applying to the traditional securities industry or the digital asset industry?

26) Would digital asset securities traded on an exchange be deemed NMS securities, and therefore NMS stock? NMS stock is defined as any NMS security (generally all exchange-listed securities) other than an option. If so:

a) How would the various requirements under Regulation NMS, which are designed for traditional corporate stock and shares of stock, apply?

b) Would there be a national best bid and offer ("NBBO") for a digital asset security?

c) Given 24/7 markets, should non-U.S. trading platforms be included in the NBBO?

d) What would constitute a "round lot" under Regulation NMS, where digital asset securities are not measured in "shares?" Would all orders for and transactions in digital assets that are investment contracts be "odd lots" and thus excluded from various aspects of Regulation NMS?

e) How would Rule 611—i.e., the Order Protection Rule, which generally prohibits "trade-throughs"—and the relevant exceptions apply?

f) What data would be required to be reported to the tape as "core data"?

g) How would the various other reporting requirements, such as under Rules 605 and 606, which contemplate shares of stock, apply?

h) What pricing increment(s) would be permitted under Rule 612, which prohibits sub-penny quotations for stocks priced at $1.00 or more per share?

27) How would Regulation SHO apply?

a) Would exchange-listed digital asset investment contracts be considered equity securities for purposes of Rule 200(g), Rule 203, and Rule 204?

b) Would exchange-listed digital asset investment contracts be "covered securities," by virtue of being "NMS stocks," for purposes of Rule 201?

### IV.    Custody of Digital Asset Securities

#### A.    Digital Asset Trading Platforms

One of the most significant innovations of digital assets is the ability to conduct "real-time" or T+0 settlement. Existing regulations regarding the custody of securities, however, make it impossible to realize this considerable benefit. While custody rules for traditional securities are appropriately motivated by a clear regulatory interest—ensuring that customers can rely on their assets being held securely—they allow trades to settle on a T+2 timeframe. This delay permits third-party intermediaries to settle transactions. But if the settlement timeframe is compressed to seconds, reliance on third parties becomes impossible.

20

Traditional securities are typically held on behalf of investors by a custodial bank or broker-dealer (themselves holding through the Depository Trust Company). This facilitates post-trade settlement through existing channels and permits an investor to centralize their cash and securities with third-party custodians, making trading on multiple venues more capital-efficient. However, it means that real-time settlement (i.e., "t-zero" settlement) is not possible given that the third-party custodians must facilitate post-trade settlement.

The structure of existing digital asset trading platforms is different. Real-time settlement is expected because it is inherent to blockchain technology. Transfers of digital assets do not require intermediaries. But in order to provide real-time settlement off-chain, existing digital asset trading platforms must settle transactions on their own books—as opposed to the books of third-party custodians. Digital asset trading platforms can only settle transactions on their own books if they custody the digital assets themselves, which explains the difference in market structure.

The need to provide custody services to customers means that digital asset trading platforms may wish to register as a broker-dealer, or register an affiliate as a broker-dealer.[42] For the real-time settlement model to work, all users of the platform would in turn be required to custody their assets with that custodian, through the same broker-dealer. Once again, existing rules present a roadblock.

First, real-time settlement means that clearing is not necessary. Clearing exists because there is a risk that, between the time the trade is made and when it settles, one party may fail to deliver either the money or the assets. That risk diminishes as the time lag disappears.  Without the risk created by the time lag between execution and settlement, many of the rules related to clearing may not be necessary.  On the other hand, new rules may be required to account for a unique feature of the blockchain—that entries are immutable. Whereas traditional markets can unwind transactions that are completed in error, fraudulently, or without proper authorization, this is not possible with digital asset securities. Reversing a transaction would require a new transaction.

The direct-trading model, and its need for exchange-based custody, also raises questions under Section 6(b)(2) of the Exchange Act, the "fair access" rule.  This rule generally requires exchanges to allow any broker-dealer to become a member. This requirement may prohibit a digital asset security exchange from limiting membership to that one broker-dealer (i.e., itself or its affiliate). The alternative, admitting several broker-dealers as members that each separately handle custody of its own customers' securities, again prevents real-time settlement because it would require the introduction of post-trade netting and a clearing agency (to settle all of the trades of the various brokers).  If digital asset platforms register as exchanges, they must, under current rules, allow other brokers to access the platform. This requirement has the effect of requiring clearing, and therefore eliminating the ability to effectuate real-time settlement, which was the purpose of the exchange custodying assets in the first place.

---

[42] Although "mere custody" of securities, on its own, may not itself require a firm to register as a broker-dealer, the Commission and its Staff have regularly viewed custody combined with transaction execution or other services as potentially requiring registration under Section 15(a). *See, e.g.,* Transfer Online, SEC Denial of No-Action Request (May 3, 2000) (transfer agent may be subject to broker-dealer registration when, in addition to custody services, it brings buyers and sellers of securities together, receiving a fee based on the completion of a transaction); M&A Brokers, SEC No-Action Letter (Jan. 31, 2014); GlobalTec Solutions, LLP, SEC No-Action Letter (Dec. 28, 2005); Swiss American Securities, Inc., Streetline, Inc., SEC No-Action Letter (in each case, granting relief from broker-dealer registration where the proposed services did not also include custodying investors funds or securities).

Additionally the SEC has traditionally been hesitant to allow an exchange, or an affiliate of an exchange, to act as a full-service broker for customers on the exchange because of (i) the potential unfair advantage that one broker-dealer would have, and (ii) conflicts of interest the exchange would face in regulating its affiliated broker-dealer member.[43]  When there are only a handful of exchanges, these concerns are valid.  In the digital assets markets, however, because trading platforms also serve as custodians and because most trades occur directly, without an intermediary, the competition for customers is between exchanges, not between brokers.  This structure, in which customers trade directly on the platform, also significantly mutes any risk that a platform could provide undue advantage to its own broker-dealer; the broker and the platform operate as one service for the customer.  It is a fundamentally different business model and therefore presents a different set of risks, necessitating a different regulatory regime.

*Key questions for the Commission to consider and seek public input on:*

28) Can a digital asset securities exchange provide custody of digital asset securities without also being subject to registration as a broker-dealer?

29) If broker-dealer registration would be required, would a digital asset securities exchange be permitted to limit membership to one affiliated broker-dealer?

30) Would a digital asset securities exchange be permitted to custody both digital asset securities and non-security digital assets?

31) Given the differences in business models between traditional securities markets and digital asset markets, what risks might be presented by a digital securities trading platform that do not exist for traditional platforms or exchanges?  What risks exist for traditional trading venues that would not exist for digital asset security trading venues?

### B.  Broker-Dealers

Custody rules present a second major hurdle for digital asset securities markets.  As noted above, custody requirements embrace the traditional intermediated model, and provide detailed requirements for how intermediaries may safeguard customer assets, making them difficult to apply to digital asset markets.  But these requirements are based on the assumption that assets–or more accurately the proof that a person holds the asset–takes a certain physical form.  Proof of ownership of digital assets is represented differently.  The Commission has not yet put

---

[43] *See, e.g.*, Order Approving Proposed Rule Change by the Pacific Exchange, Inc., as Amended, and Notice of Filing and Order Granting Accelerated Approval to Amendment Nos. 4 and 5 Concerning the Establishment of the Archipelago Exchange as the Equities Trading Facility of PCX Equities, Inc., Exchange Act Release No. 44983  (Oct, 25, 2001) ("The Commission recognizes that the potential for unfair discrimination may be heightened if a national securities exchange or its affiliate owns or operates a broker dealer. This is because the financial interests of the national securities exchange may conflict with its responsibilities as an SRO regarding the affiliated broker-dealer. For this reason, the national securities exchange must not serve as the self-regulatory organization that is primarily responsible for examining its affiliated broker-dealer.  Moreover, a conflict of interest would arise if the national securities exchange (or an affiliate) provided advantages to its broker-dealer that are not available to other members, or provided a feature to all members that was designed to give its broker-dealer a special advantage"). The Commission has also required national securities exchanges to implement rules prohibiting such exchanges from being affiliated with a broker-dealer member without prior SEC approval. *See, e.g.*, New York Stock Exchange Rule 2B; Nasdaq Stock Market, General Rule 2, Section 4(a); Cboe BZX Exchange Rule 2.10.

forward a workable means of achieving the regulatory goal of broker-dealer custody rules: ensuring that customer assets are securely held while facilitating the trading in which customers wish to engage.

Rule 15c3-3, known as the "Customer Protection Rule," is central to this issue. The rule requires that a broker-dealer maintain "physical possession" or "control" over customers' fully paid and excess margin securities in particular ways set out in the rule, such as by holding the paper security certificate (physical possession) or holding through a bank or clearing agency (control). Rule 15c3-3, originally adopted in 1972, does not list holding blockchain private keys as a permitted method of physical possession or control, and the SEC Staff's general position has been that holding blockchain private keys does not qualify as good physical possession or control.[44]

Rather, the staff has suggested that broker-dealers effectively must avoid becoming subject to the rule, by only facilitating transactions in digital asset securities that do not involve the broker-dealer maintaining custody.[45] Furthermore, even though, by its terms, Rule 15c3-3 applies to cash and securities, the Staff has suggested that broker-dealers would be required to comply with the possession or control obligations even when custodying digital assets that are not securities.

The SEC has attempted to provide a path forward.  These attempts, however, are time-limited, not enshrined in final rules, and have ultimately proved not to be workable. In September 2020, the SEC Staff approved a process by which ATSs could facilitate transactions in digital asset securities, where custody is maintained by a third-party custodian (the "Three-Step No-Action Letter"),[46] and in December 2020, the Commission released a time-limited conditional no-action position related to broker-dealer custody of digital assets (the "Commission No-Action Position").[47] Both documents required significant limitations on the business activities of broker-dealers who custody digital assets, and do not present a workable solution.  We are not aware of any firms that have sought to rely on the Commission no-action position. As a result, even if a digital asset security exchange were to adopt a broker-intermediated model, there appear to be *no* broker-dealers that could act as members because of Rule 15c3-3 and the limitations of the SEC's current "special purpose" digital asset security custody position.[48]

As part of issuing its December 2020 no-action position, the Commission requested comment from the public on its approach.[49]  Despite receiving dozens of comment letters in response to its request, the Commission has not revised its position or used these comments to inform

---

[44] SEC, *Joint Staff Statement on Broker-Dealer Custody of Digital Asset Securities* (July 8, 2019), https://www.sec.gov/news/public-statement/joint-staff-statement-broker-dealer-custody-digital-asset-securities (the "Joint Staff Statement").

[45] *Id.*

[46] FINRA, SEC No-Action Letter at 2 (Sept. 25, 2020), https://www.sec.gov/divisions/marketreg/mr-noaction/2020/finra-ats-role-in-settlement-of-digital-asset-security-trades-09252020.pdf.

[47] Custody of Digital Asset Securities by Special Purpose Broker-Dealers, Exchange Act Release No. 34-90788, 86 Fed. Reg. 11,627 (effective Apr. 27, 2021), https://www.sec.gov/rules/policy/2020/34-90788.pdf.

[48] *See, e.g.*, Hester M. Peirce, Statement, *In the Matter of Poloniex, LLC* (Aug. 9, 2021), https://www.sec.gov/news/public-statement/pierce-statement-poloniex-080921 (noting the limited usefulness of the SEC's no-action relief).

[49] Commission No-Action Position, *supra* note 46 at 16–17.

23

**Add. 24**

rulemaking.[50]  We urge the Commission to reengage on this issue to find a workable solution that provides robust customer protection while also enabling investors to access the digital asset securities markets.

Broker-dealers are also subject to Rule 15c3-1, known as the "Net Capital Rule." The Net Capital Rule is designed to ensure that broker-dealers maintain sufficient unencumbered, liquid capital available at all times to satisfy customer claims promptly. A broker-dealer's net capital is calculated by starting with its net worth under generally accepted accounting principles ("GAAP"),[51] and then making various adjustments prescribed by the rule, in particular, deducting non-allowable assets such as those not readily convertible into cash.[52] While customer assets custodied by a broker-dealer are typically not recorded on a broker-dealer's balance sheet, recent SEC Staff guidance ("SAB 121")[53] announced the SEC accounting Staff's view that certain entities that hold custody of customers' digital assets should account for their obligation to safeguard the digital assets by recording (i) a liability on their balance sheet for their obligation to return the digital assets, and (ii) an offsetting asset "similar in nature to an indemnification asset," but "separate and distinct from the crypto-asset itself"—i.e., essentially a "stub" accounting entry.[54]

While by its terms aimed at issuers of securities and SEC reporting companies, it is not clear the extent to which the SEC Staff would view SAB 121 as applicable to broker-dealers that hold custody of digital asset securities for customers, where those broker-dealers are not issuers or reporting companies.[55] If SAB 121 applies to a broker-dealer's financial accounting, all digital assets and digital asset securities custodied by a broker-dealer for its customers would be added to the broker-dealer's liabilities, thus decreasing the broker-dealer's net worth under GAAP. And on the other side of the balance sheet, although the broker-dealer would be able to add some type of offsetting stub asset entry, such an asset would likely be deemed "not readily convertible into cash" under the Net Capital Rule, as there is no market for this accounting stub. For purposes of computing a broker-dealer's net capital, therefore, its liabilities would increase by the fair value of the digital asset securities held in custody, while its allowable assets would not increase by a corresponding amount. Accordingly, for every dollar worth of digital asset securities custodied, the broker-dealer would have a dollar reduction in its net capital, which the broker-dealer would need to replace with allowable assets. In effect, the parent company of the broker-dealer would need to contribute a dollar of cash as additional equity into the broker-dealer for every dollar worth of digital asset security custodied by the broker-dealer. Such a business model would, of course, be non-economic and unsustainable, and no broker-dealers would be able to offer custody services in digital asset securities.

*Key questions for the Commission to consider and seek public input on:*

32) Is it practical for digital asset security trading platforms to operate in a non-custodial manner as suggested by the Joint Staff Statement or the Three-Step No-Action Letter?

---

[50] SEC, *SEC Policy Statement: Custody of Digital Asset Securities by Special Purpose Broker-Dealers* (last modified May 3, 2022), https://www.sec.gov/comments/s7-25-20/s72520.htm.
[51] See Exchange Act Rule 15c3-1(c)(2) and Interp. /01.
[52] See Exchange Act Rule 15c3-1(c)(2)(iv).
[53] SEC, Staff Accounting Bulletin No. 121, https://www.sec.gov/oca/staff-accounting-bulletin-121.
[54] Id. at n.8.
[55] SAB 121 by its terms applies to "crypto-assets," which would appear to include digital asset securities, as SAB 121 defines the term broadly as "digital asset[s] that [are] issued and/or transferred using distributed ledger or blockchain technology using cryptographic techniques." *Id.* at n.3.

24

33) How should "possession" and "control" be understood with regard to custody of digital asset securities?

34) Should banks or trust companies, to the extent permitted to provide custody services pursuant to their applicable regulatory regime, be eligible to act as "good control locations" through which broker-dealers could maintain custody of their customers' digital asset securities (and non-security digital assets) in compliance with Rule 15c3-3?

   a) Under the existing Customer Protection Rule, banks can serve as good control locations for securities under Rule 15c3-3;[56] is there any basis to treat digital asset securities custodied with a bank differently?

35) How should Rule 15c3-3 be amended to explicitly consider its application to digital assets?

36) What protections or structures would be appropriate to adequately protect customers in the event of the insolvency of a broker-dealer that custodies digital assets for customers (whether securities or not)?

37) Should non-security digital assets be subject to Rule 15c3-3 at all, given that they are neither cash nor securities?

38) What best practices exist for the custodying of digital assets that should be adopted as requirements through securities regulation?

39) What benefits does distributed ledger technology offer with respect to transparency of transaction activity that might address risks addressed through regulation for traditional securities?  What new risks does the technology introduce regarding mistaken or unauthorized transactions, and how can these risks be mitigated through regulation?

40) How should Rule 15c3-1 be amended to explicitly consider its application to digital assets, including with regards to digital assets held by customers, in inventory, or used as collateral?

41) If a broker-dealer holds custody of digital asset securities, would SAB 121 apply to the broker-dealer's capital requirement calculations? If SAB 121 does apply:

   a) Would the SEC consider adjusting net capital calculations under Rule 15c3-1 so that broker-dealers with material custody business are not effectively prevented from meeting their net capital requirements?

42) Would the SEC permit the offsetting stub asset to be allowable for purposes of a broker-dealer's net capital, even though it may not be readily convertible into cash?

### C. Requirement for and Role of Transfer Agents

Distributed ledger technology provides an unchangeable record of transactions, visible to all. This could revolutionize how transfer agents can facilitate securities trades.  Before the advent of blockchain technology, there was no way to ensure that transactions were recorded accurately and records were properly maintained without the use of third parties. To facilitate the traditional

---

[56] Exchange Act Rule 15c3-3(c)(5).

intermediated market structure, transfer agents were established to record changes of ownership, maintain the issuer's security holder records, cancel and issue certificates, and distribute dividends. Some transfer agents are required to be registered with the SEC, or if the transfer agent is a bank, with a bank regulatory agency.  Blockchain technology offers to improve this process, performing most if not all of these tasks, with limited labor costs, and without the risks of human error.

It is not clear, however, that existing rules will permit the use of this new technology. We understand that the Commission has only been willing to approve offerings of securities involving a transfer agent where that transfer agent has ultimate control over the official stockholder registry of a security, including the ability to unilaterally make changes to it (e.g., per a court order or to correct errors).[57]  Based on structures that have been approved, it appears that the SEC has not permitted a registered transfer agent to look to a blockchain as its official stockholder registry, and has required that the transfer agent know the identity of each registered owner.[58]  This position prevents the securities markets from realizing the efficiencies offered by the new blockchain technology, harming investors, markets, and issuers alike.

*Key questions for the Commission to consider and seek public input on:*

43) Is a transfer agent necessary for digital asset securities, where records of ownership, at least pseudonymously, are publicly available?

44) How may a person properly act as a transfer agent of a digital asset security, given the nature of blockchain-based assets?

45) Are there circumstances under which a registered transfer agent should be able to look to the blockchain as its official records?

### D.  Clearing Agency Status of Blockchains

There is currently uncertainty surrounding whether the blockchain, the nodes, miners, or validators on the blockchain, or others involved in facilitating the blockchain, are acting as a "clearing agency" and subject to registration with the SEC.  A person who engages in "clearing" activities must generally register with the SEC as a clearing agency.  A person is a "clearing agency" if, among other things, it acts as an "intermediary in making payments or deliveries or both in connection with transactions in securities," it "acts as a custodian of securities in connection with a system for the central handling of" fungible securities, or it "otherwise permits or facilitates the settlement of securities transactions . . . without physical delivery of securities certificates."[59]

---

[57] *See, e.g.*, Arca U.S. Treasury Fund, Form N-2, https://www.sec.gov/Archives/edgar/data/1758583/000121465920005869/s624200n2a2.htm ("Although records of peer-to-peer transactions are viewable on Ethereum, record and beneficial ownership of the Fund's shares is reflected on the records of DTAC, LLC, the Fund's transfer agent (the 'Transfer Agent'). The Transfer Agent is regulated by the Securities and Exchange Commission ('SEC'). The Transfer Agent's records constitute the official shareholder records of the Fund and govern the record ownership of ArCoins in all circumstances.").

[58] *See id.*

[59] Exchange Act § 3(a)(23).

Given the functionality of various components of blockchain technology, it is possible that any or all of these components may be erroneously labeled "clearing agencies." Because a blockchain and each of its components operates without central control, it is not clear how it or any part of it could register as a clearing agency. Nor is the relevance or workability of clearing agency rules evident in the context of digital asset trading occurring on blockchain technology. Many of the rules applicable to clearing agencies are designed to ensure that there is clarity regarding how trades are settled, ensuring it operates fairly and in good faith with respect to all parties, and establishing it as a means of promoting compliance throughout the market. Once again, blockchain technology is specifically designed to mitigate many of the risks that regulation of clearing agencies is intended to address, such as ensuring trades settle, in an open, transparent, and provably final way. Therefore, not only is it unclear how the blockchain or other similar technology could register, it is not clear that the rules applicable to clearing agencies are needed with respect to digital asset securities.

*Key questions for the Commission to consider and seek public input on*:

46) Does the Commission view a blockchain on which digital asset securities may be transferred to be acting as a clearing agency? What risks does a blockchain present that would justify the application of these regulations? What risks does a blockchain mitigate that are presented by traditional clearing agencies? What new risks does blockchain present?

47) If so, who would be required to register? Each node, miner, or validator? A group representing them? Would this be practical, considering the often highly distributed nature of nodes, miners, and validators?

   a) How would nodes, miners and validators satisfy the requirements to assure fair representation of their members and participants in the selection of their directors and the administration of their affairs, particularly where there are no formalized members, participants, or directors?[60]

   b) Would nodes, miners, and validators be required to become SROs like other clearing agencies?[61] If so, would changes to the network require filings with and approval by the SEC under Rule 19b-4?

   c) Would nodes, miners, and validators be required to establish, implement, maintain and enforce the detailed written policies and procedures mandated by Exchange Act Rule 17Ad-22(e)?

   d) Would Regulation SCI apply to nodes, miners, and validators?[62] How would its references to "industry standards" be interpreted—as applying to the traditional securities industry or the digital asset industry?

   e) Would nodes, miners, and validators be subject to examination by the Office of Compliance Inspections and Examinations' Office of Clearance and Settlement?

---

[60] Exchange Act § 17A(b)(3)(C).
[61] Exchange Act § 3(a)(28).
[62] 17 CFR 242.1000 (including registered clearing agencies in the definition of "SCI SROs").

48) Given the typical permissionless nature of blockchains, how could registration be effected or enforced?

49) Could a broker-dealer or exchange facilitate trading of a digital asset security that could, or must, be settled over a blockchain that is not registered as a clearing agency?

50) In light of the difficulties described above with any potential registration, would the Commission offer a class exemptive order excluding blockchains from clearing agency registration? What conditions would be appropriate?

## V.    Necessary Preconditions to Rulemaking

The questions and challenges in this petition highlight the difficult and complex legal, policy, and technical considerations relating to the application of the existing federal securities law regime to digital asset securities. To properly weigh the costs and benefits raised by digital asset security activities, and to understand the market, practices, and needs of investors and market participants, the SEC should engage with all relevant stakeholders to inform the rulemaking we suggest above. We believe the Commission should take the following steps:

First, the SEC needs to seek input from market participants.  The SEC has not yet obtained widespread public input, as it frequently does for novel and significant rulemakings. Rather, to date, the SEC has primarily engaged through non-public, bilateral discussions with particular industry members, or through enforcement investigations. It also does not appear that the SEC has engaged with, or solicited input from, retail investors. There is also no representation from the digital asset community on the Investor Advisory Committee or any of the SEC's other advisory committees.

The Commission has frequently used requests for comment, concept releases, advisory committees, and public roundtables to obtain useful public input prior to proposing specific rulemaking items. For example, the SEC first solicited public comment on climate disclosure in March 2021, a full year before proposing climate disclosure rules and, similarly, the SEC issued a concept release on the harmonization of securities offering exemptions in 2019, over a year before adopting rules.[63] The SEC has also pursued these forms of public engagement to obtain information about many other areas of potential rulemaking, including with regard to equity market structure, fixed income market structure, transfer agent regulation, "proxy plumbing," and emerging market considerations, among others. Banking regulators have similarly solicited public input on digital assets, for example by issuing requests for information.[64]

---

[63] Acting Chair Allison Herren Lee, *Public Input Welcomed on Climate Change Disclosures* (Mar. 15, 2021), https://www.sec.gov/news/public-statement/lee-climate-change-disclosures; SEC, *The Enhancement and Standardization of Climate-Related Disclosures for Investors* (Mar. 21, 2022), https://www.sec.gov/rules/proposed/2022/33-11042.pdf; SEC, *Concept Release on Harmonization of Securities Offering Exemptions* (June 18, 2019), https://www.sec.gov/rules/concept/2019/33-10649.pdf (Concept Release; Request for Comment); SEC, *Facilitating Capital Formation and Expanding Investment Opportunities by Improving Access to Capital in Private Markets* (Nov. 2, 2020), https://www.sec.gov/rules/final/2020/33-10884.pdf (Final Rule).

[64] FDIC, *FDIC Issues Request for Information on Digital Assets* (May 17, 2021), https://www.fdic.gov/news/press-releases/2021/pr21046.html.

28

**Add. 29**

One of the key reasons to conduct public outreach is to ensure that the rules proposed will actually function as intended when put into practice.  Given the considerable differences in how digital assets operate, such input would help the Commission to understand the risks and how best to mitigate them. Thoughtful digital asset security rulemaking will require input from professionals with a deep technical expertise in the operation of digital assets and markets.

Second, the SEC's approach to digital asset regulation should be informed by ongoing developments in the executive and legislative branches. The Biden Administration has commissioned a number of reports on digital assets from various agencies in its March 2022 Executive Order,[65] and this work has only just begun. The Commission itself is requested to contribute to two of these reports, and the knowledge that the Commission gains through this process will be critical to any Commission rulemaking. Congress is also actively working on legislation that could materially affect the regulatory landscape.[66]

Third, coordination between the SEC and other agencies, most notably the CFTC, is critical. CFTC Commissioner Pham and SEC Commissioner Peirce have recently recommended such joint collaboration, noting that "crypto is still early in its development," and such cooperation "would benefit the capital markets, not just the crypto markets."[67]

*          *          *

The core question is how best to achieve the SEC's mission and promote the innovation and application of digital assets and blockchain technology within the capital markets and our economy more broadly.  How best to regulate digital asset securities raises complex and novel issues, and will require thoughtful and rigorous engagement with all stakeholders. We appreciate the opportunity to provide input to the Commission on these important matters and hope the Commission will seek broad public input on how digital asset securities markets can be appropriately regulated in a manner that facilitates investor protection, capital formation, and efficient markets with the integrity investors and other market participants have come to expect. For that reason, we respectfully petition the Commission to solicit broader input from the public to address all relevant questions and challenges related to the regulation of digital asset securities with the goal of informing an important rulemaking on this subject.  As noted above, we are

---

[65] Biden Administration, *Executive Order on Ensuring Responsible Development of Digital Assets* (March 9, 2022), https://www.whitehouse.gov/briefing-room/presidential-actions/2022/03/09/executive-order-on-ensuring-responsible-development-of-digital-assets/.

[66] *See, e.g.*, Lummis-Gillibrand Responsible Financial Innovation Act (released June 7, 2022), https://www.lummis.senate.gov/wp-content/uploads/Lummis-Gillibrand-Responsible-Financial-Innovation-Act-Final.pdf.

[67] Caroline D. Pham and Hester M. Peirce, *Making progress on decentralized regulation — It's time to talk about crypto together* (May 26, 2022), https://thehill.com/blogs/congress-blog/3503277-making-progress-on-decentralized-regulation-its-time-to-talk-about-crypto-together/ ("As an initial step, we are calling on our agencies to hold a joint set of public roundtables to evaluate recent market events and risks, and to discuss how to regulate crypto responsibly. These roundtables would be open to the public, and panelists would include crypto users, investor and customer advocates, industry members, and other regulators. The goal would be to assess whether new regulations are necessary to protect the public and the markets, how existing regulations might be modernized to better account for innovation, and how technology is likely to reshape our markets. We could start with topics such as digital asset trading platforms, crypto derivatives, stablecoins, decentralized finance, and the balance between privacy and anti-money laundering measures.").

29

**Add. 30**

committed to this endeavor as well, and expect to submit our thoughts on how to address some of these challenges in a series of follow-up responses to this petition.

We would be pleased to answer any questions the Commission or its Staff may have regarding our petition. We appreciate the Commission's continuing attention to this important matter and for allowing us an opportunity to present our views.


Sincerely,


Paul Grewal

Chief Legal Officer

Coinbase Global, Inc.


cc:
Hon. Gary Gensler, Chair
Hon. Hester Peirce, Commissioner
Hon. Caroline Crenshaw, Commissioner
Hon. Mark Uyeda, Commissioner
Hon. Jaime Lizárraga, Commissioner

30

**Add. 31**



**Appendix**

**A Brief Overview of *Howey* and *Reves***

*Howey*

Whether an instrument constitutes an "investment contract" is determined by reference to a test articulated by the Supreme Court in *SEC v. W.J. Howey Co.*[68] In 1946, the Supreme Court articulated the *Howey* test in a case involving speculative investments by purely financially motivated parties in a Florida citrus grove profit-generating enterprise—activity plainly within the scope of the federal securities laws. The Court held that the investments amounted to "investment contracts" and thus "securities" because they involved each of the following features:

> (1) an investment of money;
>
> (2) in a common enterprise;
>
> (3) made with a reasonable expectation of profits; and
>
> (4) based predominantly upon the entrepreneurial or managerial efforts of the promoter or other third parties.[69]

In analyzing whether a particular instrument is an investment contract, the Supreme Court has emphasized that "form should be disregarded for substance and the emphasis should be on economic reality."[70] The SEC has adopted a similar position, indicating that "[d]etermining whether a transaction involves a security does not turn on labelling . . . but instead requires an assessment of the economic realities underlying a transaction . . . . All of the relevant facts and circumstances are considered in making that determination."[71] An asset must meet each requirement of the *Howey* test to be an investment contract.

*Reves*

The *Reves* test was articulated by the Supreme Court in 1990 to interpret the term "any note." It is unreasonable to think Congress intended to apply federal securities regulation to every "note"—otherwise a homeowner would have to file a registration statement with the SEC when signing a mortgage note and could only refinance that note through a broker-dealer. Accordingly, the Court laid out a test that considers:

> (1) the motivations of the buyer and seller;

---

[68] 328 U.S. 293, 301 (1946).

[69] *Id.* ("The test [for an investment contract] is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others."); *see also Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 558–62 (1979); *SEC v. Edwards*, 540 U.S. 389, 393 (2004).

[70] *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 848–49 (1975) (internal quotation marks and citations omitted).

[71] *In re Munchee, Inc.*, Securities Act Release No. 10445, at 9 (Dec. 11, 2017).

A-1

**Add. 32**

(2) the plan of distribution of the instrument;

(3) the reasonable expectations of the investing public; and

(4) the presence of an alternative regulatory or other risk-reducing regime.[72]

Unlike the *Howey* test, which requires satisfaction of each of its requirements for an asset to be deemed a security, the *Reves* test is simply a set of factors that a court should consider in making its decision, with no one factor being dispositive or entitled to a particular weighting.

---

[72] *Reves v. Ernst & Young*, 494 U.S. 56, 66–67 (1990).

A-2

**Add. 33**

**coinbase**

December 6, 2022

Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

**Re: Petition for Rulemaking – Digital Asset Issuer Registration and Reporting**

Dear Ms. Countryman:

Coinbase Global, Inc. ("Coinbase") is filing a comment in response to our July 21, 2022 petition for rulemaking on digital asset securities Regulation ("Petition").

As we explained in our Petition, the U.S. does not currently have a functioning market for crypto securities, and in particular investment contracts involving digital assets ("ICDAs"). A key inhibitor to such a market is the lack of a workable set of regulatory requirements for prospective digital asset issuers to register offerings deemed to involve an investment contract and make corresponding disclosures in compliance with securities laws. Issuers and investors would benefit from clear rules adapted to ICDAs that promote compliance and foster safe and transparent practices, including by providing investors with information material to evaluating ICDAs.

In our comment today, we propose a framework (attached as an appendix) designed to achieve this. If implemented, we believe it would create a reasonable and clear path for digital asset developers to raise capital from U.S. investors, provide a disclosure foundation to make ICDAs eligible for trading through SEC-registered intermediaries and platforms, and thus create the necessary economic incentive for a vibrant secondary market in digital asset securities with strong investor protections.

Our views are based on our extensive work with digital asset development teams and years of making asset listing decisions based on legal, compliance, and information security considerations. As we explain in more detail below, the needs of ICDA investors differ substantially from investors in traditional securities because the purpose of ICDAs and the manner in which an ICDA issuer typically offers digital assets is substantially different than an initial public offering of traditional securities. Accounting for these differences in an appropriately tailored registration and reporting regime would better protect investors, provide workable guidance to issuers, and give the SEC greater insight into the health and viability of the market itself.

Digital Assets – And ICDAs – Are Different

Although federal securities laws have recognized "investment contracts" since 1933, SEC rules focus primarily on traditional debt and equity, and do not address the unique features of investment contracts. ICDAs, which incorporate distributions of digital assets, present an additional layer of new features that do not exist in any other class of securities. Recognizing that ICDAs are different from traditional securities is critical to establishing a proper regulatory framework. Below we describe three properties of these assets that need to be accounted for in order to establish a workable and effective registration and reporting regime.

1.  Different information informs investment decisions

Investors in ICDAs require different information than what is found in traditional securities disclosures for companies issuing debt and equity. Unlike an equity stake in a company, an ICDA does not give the holder any residual economic interest in the issuer. So, while traditional securities reflect the value of the issuer as a whole, and depend on the issuer's financial well-being, ICDAs reflect the value of a specific digital asset project, which can depend on factors that are not specifically enumerated in securities disclosure requirements under regulation S-K. These factors center on the technical details about the protocol or networks on which the digital asset operates, how the code may be updated or changed, or how transactions are validated. A principles-based disclosure approach for ICDA-specific disclosures can, to some extent, accommodate these differences, but there is also an opportunity to organize and report disclosures as a standardized schedule of decision-useful information. We provide examples of how this could work in our proposed framework, which calls for disclosure of information about the ICDA issuer, the investment contract, and the underlying digital asset.

2.  Digital Assets Have Intrinsic Utility

An ICDA involves the sale of digital assets that are often designed to be used in exchange for goods or services on a decentralized network. In contrast, traditional securities represent a claim on the profitability of the corporate issuer, but otherwise have no intrinsic use or consumptive value. For example, a share of Apple stock is not needed to operate an iPhone, while digital assets are often needed to, among other things, execute smart contracts on blockchain protocols and/or applications. In many cases, continuous operation of blockchain protocols requires the programmatic distribution of digital assets, for example, as an economic incentive or reward given to protocol participants for securing or validating transactions on a blockchain. This utility makes a digital asset an integral part of the operation of the protocol even if the ICDA separately also has the qualities of an investment. An important implication is that the intrinsic utility of a digital asset can only be fully realized when they are held and used outside the confines of a securities dealer, bank, or other qualified custodian. That is, using or

2

transferring the underlying digital asset to access or transact over a good or service should not be viewed as always involving a securities transaction.

### 3. Control Can Become Decentralized Over Time

One of the primary goals of many digital asset development teams is to eventually relinquish control over their protocol to a community of users. In practice this means that after the project is operational and reaches a critical mass of users, the team's practical control over the live protocol and digital asset diminishes significantly, if not entirely. An initial sponsor of the protocol may dissolve or disaffiliate from the protocol initially (*e.g.*, by relinquishing IP rights to a separately managed and owned, arm's length entity) or otherwise relinquish control gradually over time.

Regardless of the path to decentralization, digital assets can live and thrive without their issuer. In contrast, traditional securities like debt and equity are inextricably tied to the viability of an issuer as a going concern.

Critically, for an ICDA, there comes a point where the original development team may not have a unique ability to modify or influence the functionality of the digital asset or protocol and/or application on which it functions. At this time, the development team is no longer in a position to be the primary source of decision-useful information to digital asset holders. Indeed, once this transition occurs, the information asymmetries that existing securities laws are designed to alleviate disappear. Instead, the value of the digital asset, and implied return on capital from holding it, flows from the use and efforts of a community of users. Therefore, after this point, there is limited to no continued benefit to market participants in requiring the ICDA issuer to file reports with the SEC.

## Path to a Workable and Effective Registration and Reporting Framework

The unique features of ICDAs pose certain challenges to the existing securities law frameworks. But these challenges are not insurmountable. Our proposed disclosure framework provides a path for sale of ICDAs to the general public and to make the ICDAs eligible for trading through SEC-registered intermediaries and platforms. Importantly, this framework accounts for the fact that the goal of many ICDA issuers is to develop protocols or networks that eventually operate without any ongoing effort on their part.

Our proposed framework for ICDAs depends on some overarching considerations.

- A principles-based approach to disclosures for ICDAs must be augmented with a publicly disclosed, standardized set of requirements and expectations to facilitate a streamlined issuance, trading, and reporting process – one that accommodates the practical realities of small development teams that do not plan to grow into large organizations.

3

- The disclosure regime must define an *ex ante* set of conditions whereby reporting is no longer required. Without a specified exit process, there will not be sufficient incentive for the vast majority of ICDA issuers to enter a US registration framework, driving innovation offshore.

- The criteria for exiting SEC reporting following the issuance of an ICDA must be clear enough that issuers can reasonably exit through a notice and self-certification process. The trigger for exit should be the point at which the issuer is no longer exercising essential managerial control over the project, or its ongoing involvement with the project otherwise no longer meets the definition of an investment contract security.

- To enable use and consumption of digital assets underlying the ICDA at all times during the protocol development, an issuance and reporting regime that enables secondary market trading should not unduly impede the self custody, transfer, or use of the digital assets.

- While our focus here is on issuer offers and sales of ICDAs and ongoing reporting, we note that it is equally important for the SEC to develop a workable and effective regulatory regime for trading platforms to transact in ICDAs, which similarly does not exist today. Given that the SEC has consistently stated that SEC-registered platforms cannot facilitate trading in digital asset securities not offered and sold pursuant either to an effective registration statement or exemption from registration, providing a path toward registration of ICDA offerings is a necessary prerequisite to compliant secondary market trading. We refer to our petition on the broader set of issues and questions that require action.

We are broadly encouraged by the statements the Chair has made about flexibility the Commission could use to address digital asset disclosures, e.g.,:

> *"Given the nature of crypto investments, I recognize that it may be appropriate to be flexible in applying existing disclosure requirements. Tailored disclosures exist elsewhere — for example, asset-backed securities disclosure differs from that for equities."*[1]

It is in the spirit of this suggestion that we are proposing our framework.

Sincerely,

Paul Grewal
Chief Legal Officer
Coinbase Global, Inc.

---

[1] https://www.sec.gov/news/speech/gensler-sec-speaks-090822#_ftnref12

# Appendix

# Proposed ICDA Disclosure Framework

*The proposal below would apply only to investment contracts involving digital assets (ICDAs) that are issued on a blockchain or distributed ledger. The proposal is not intended to be applicable to equity, debt or other types of traditional securities merely issued in digital form.[2]*

**ICDA OFFERING DISCLOSURE**

An ICDA issuer seeking to offer and sell digital assets to the general public would be required to file with the SEC an initial disclosure including the following information: (1) Issuer-Related Disclosures; (2) Investment Contract Disclosures; (3) Digital Asset-Specific Disclosures:

**(1) Issuer-Related Disclosure**

(Aligned with disclosure requirements in Regulation S-K or AB to elicit comparable but more appropriately tailored information)

- Security transactional and risk factor information
  - Offering summary (S-K 503)
  - Intended use of proceeds (S-K 504)
  - Determination of offering price (S-K 505)
  - Plan of distribution (S-K 508)
  - Material risks related to the offering (General and Specific) (S-K 105)
- Business description (e.g., S-K 101 + reg AB)
  - Business experience in the digital asset space
  - Information related to management and capitalization
  - Relationships with affiliated entities and other transactional parties (AB)
  - Material roles and responsibilities related to the digital asset, its development deployment and post-launch supporting activities (AB)
  - Permissible and restricted activities related to the protocol and/or digital assets (AB)
- Digital asset holder information (including lockups and release schedules, pricing, and discounts)

---

[2] The term ICDA does not include an asset that provides the holder of the asset with any of the following rights in a business entity: (i) a debt or equity interest in that entity; (ii) liquidation rights with respect to that entity; (iii) an entitlement to an interest or dividend payment from that entity; (iv) a profit or revenue share in that entity *solely* from the entrepreneurial or managerial efforts of others; or (v) any other financial interest in that entity. These exclusions are consistent with those set forth in the proposed Lummis-Gillibrand Responsible Financial Innovation Act.

- ○ Issuer digital asset holdings and rights (new)
    - ○ Digital assets authorized for issuance under compensatory digital asset plans (S-K 201)
    - ○ Digital asset holdings (and rights to digital assets) of management and owners (or affiliated owner groups) of more than 5% of digital assets (S-K 403)
- Representations and warranties (reg AB)
    - ○ Representations and warranties relating to the digital assets, remedies available against transactional parties for such reps/warranties, and information on how any transaction agreements can be modified or amended and/or whether there are any material claims that other parties may have on the digital assets
- Financial disclosures and MD&A
    - ○ To the extent material to the ICDA investment, issuer financial statements covering the two most recently completed fiscal years or such shorter period as the issuer has been in existence (reg S-X)
    - ○ MD&A focused on issuer capital deployed to develop the digital asset and protocol and/or application over the period covered by the financials (S-K 303)

**(2) Investment Contract Disclosure**

(Relevant disclosures not specifically elicited by existing rules)

- **Description of Investment** – Information about the investment opportunity or common enterprise
    - ○ Initial and ongoing rights and obligations associated with the investment contract
    - ○ How investors could expect profits from the issuer's managerial efforts
    - ○ Anticipated future development, including features, integrations, functionality, etc. ("Key Milestones")

- **Relevant transactional parties** – to the extent applicable and material
    - ○ Any entity (other than the issuer) responsible for significant development efforts related to the digital asset (AB)
    - ○ Key digital asset-related service providers material to the asset or offering

**(3) Digital Asset-Specific Disclosures**

(Information specific to the operation of the digital asset or protocol)

- **Digital Asset Functionality** – Commercial and operational information about the digital asset and the protocol on which it will function
    - ○ Technical description of the digital asset and the protocol on which it will function (e.g. consensus mechanism, on-chain components, smart contracts, etc.)

6

- ○ Intended and actual functionality of the digital asset and the protocol on which it will function
- ○ Calculations underpinning distribution of digital asset rewards, if any, whether through staking, reallocation of network fees, or some other mechanism
- ○ Results of any third-party security and code audits completed
- ○ Risk factors related to the digital asset or protocol on which it will function that may materially affect the digital asset's functionality and/or utility

- **Digital Asset Economics ("Tokenomics")** – Digital asset supply and distribution information, pricing, lockups, and release schedules
  - ○ Initial supply and any contemplated or potential changes in digital asset supply
  - ○ Digital assets distributed via consensus mechanism
  - ○ Digital assets distributed to:
    - ■ Issuing entity, sponsor and/or foundation, community, or other

- **Schedule Digital Asset ("DA")** – A standardized schedule of common, digital asset-specific information that is material to understanding the operation of the digital asset and protocol and/or application in which it functions.[3]  This information provided by issuers should be comparable across projects and protocols. See example items below.

## ICDA SECONDARY MARKET DISCLOSURE

ICDA issuers that previously sold ICDAs other than through the <u>ICDA Offering Disclosure</u> framework would be required to provide an initial disclosure for the ICDAs to be eligible for trading through an SEC-registered intermediary or platform, including on a National Securities Exchange, through a broker-dealer on an alternative trading system (ATS), or OTC quotations.

- Information contained in the <u>ICDA Offering Disclosure</u> would satisfy this requirement. However, an <u>ICDA Secondary Market Disclosure</u> would not need to include the disclosures listed under the section "Security Transactional Summary and Risk Factors".

## ONGOING DISCLOSURES

Ongoing disclosures should be a part of any <u>ICDA Offering Disclosure</u> or <u>ICDA Secondary Market Disclosure</u> framework and would be required until the issuer has filed a Closing Certification. The following disclosures would be required only to the extent they are material to a continued understanding of the ICDA:

- Annual updates to the following information from the <u>ICDA Offering Disclosure</u> or <u>ICDA Secondary Market Disclosure</u>

---

[3] These disclosures could be presented on schedule analogous to Schedule AL, used with offerings conducted pursuant to Regulation AB.

- ○ Issuer-Related Disclosures
  - ■ Business description
  - ■ Digital asset holder information
  - ■ Financial disclosures and MD&A
- ○ Investment Contract Disclosures
  - ■ Progress towards completing Key Milestones anticipated in Investment Contract Disclosures and any new anticipated milestones
- ○ Asset-Level Disclosures
  - ■ Results of digital asset audits
  - ■ Digital asset functionality
  - ■ Digital Asset Economics
  - ■ Schedule DA

- ● Material event reporting
  - ○ Any fundamental change to the digital asset or protocol or any event impacting the ongoing viability of the project or issuer
    - ■ E.g. hacks, breaches, and other cyber security events; digital asset and/or protocol mergers; departure of key personnel; material modification to rights of digital asset holders; issuer change of control
  - ○ This would not require disclosure of routine, ministerial changes (e.g., regular code updates)

## PREEMPTION OF STATE LAW

Offers and sales of ICDAs pursuant to any ICDA Offering Disclosure framework are not subject to state securities laws registration and qualification requirements.

## SUFFICIENCY OF INFORMATION

The initial and ongoing disclosure provided pursuant to any ICDA Offering Disclosure or ICDA Secondary Market Disclosure framework would satisfy the specified information requirements of Exchange Act Rule 15c2-11(b) and adequate current public information requirements of Securities Act Rule 144(c).

8

**Add. 41**

**DISCLOSURE RESPONSIBILITY OF ISSUER-AFFILIATED ENTITIES**

Consistent with market practice in certain other asset classes (e.g. asset-backed securities), the issuance of an ICDA may involve one or more affiliated entities. Only one entity would be responsible for the required disclosures (referred to herein as the "issuer") and should be the entity providing the essential ongoing managerial services related to the digital asset and protocol and/or application. The ICDA issuer may not necessarily be the same legal entity that mints or distributes the digital asset.

**DIGITAL ASSET TRANSFERABILITY AND USE**

Nothing in this disclosure framework should be construed as limiting the ability of a holder of a digital asset purchased in an ICDA transaction to self custody, freely transfer or use the digital asset for consumptive or other utility purposes.

- The issuer's contractual reps and warranties related to the digital asset transfer with the digital asset to subsequent purchasers

**CLOSING CERTIFICATION**

In the event an ICDA issuer no longer exercises essential managerial functions for or control over a digital asset, or the digital asset no longer otherwise meets the definition of a security, the ICDA issuer may file a Closing Certification with the SEC, attesting that such criteria have been met.

- The Closing Certification would not affect the remedial rights of any party to an ICDA transaction.
- Consistent with the requirements of Exchange Act Rule 12g-4:
  - An issuer's duty to file reports with the SEC shall be suspended upon filing of the Closing Certification
  - The SEC would have 90 days to review and respond to a Closing Certification
  - If Closing Certification is subsequently withdrawn or denied, the issuer would be required to file all reports which would have been required had the Certification not been filed

**Add. 42**

**SCHEDULE DA**

(non exhaustive list of potentially applicable Schedule DA disclosures)

**Governance and Control**
- Identify parties that:
  - Organize and implement protocol features and changes thereto
  - Coordinate social media, marketing, and press relations
  - Can change digital asset supply and/or release schedules
  - Have access to MNPI
  - Own IP rights and affiliation with issuer
  - Are responsible for code audits
- Description of any decentralized governance over the protocol or digital asset
  - Voting eligibility requirements
  - Distribution of voting power
  - Description of what can be controlled by the decentralized governing body
- Protocol development
  - Scope and number of third party contributions to project, including the number of third party developers and dApps
  - Frequency and number of code contributions in code repository
  - Process for code change implementation
  - Specify ongoing development efforts

**Computation**
- Number of participants providing hash power to and operating nodes on the protocol and/or application upon which the digital asset functions
- Measure of computational power (hash rate), including any limit on the number of transactions that can be verified on a blockchain network in a given block
- Process and eligibility to create How nodes are created and how open access is to node participation, including estimated costs to operate a node and basis for estimate
- Estimated cost to successfully attack the network and basis for estimate
- Number of blockchain wallet choices available to an end user for purposes of interactions with the protocol and/or application
- Software licensing information, including whether code base underlying digital asset, protocol and/or application are published as open source software

**Economic considerations**
- Insider, affiliates, early contributor digital asset ownership
- Market capitalization and liquidity of digital asset

- Degree of digital asset in circulation compared to total digital asset supply, digital assets locked and/or digital assets available for staking
- Description of network transaction fees
- Funding releases or rewards for developers, employees, contributors, etc.
- Efforts for exchange listing(s), market making, airdrops, etc.
- Number and list of known exchanges where digital asset is listed (centralized or decentralized)

**Potential additional information**
- Network layers and cross-chain integrations
- Number of network forks

**Add. 44**

# coinbase

March 20, 2023

Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-1090

**RE: Petition for Rulemaking – "Proof-of-Stake" Blockchain Staking Services**

Dear Ms. Countryman:

Coinbase Global, Inc. ("Coinbase") is filing a comment in response to our July 21, 2022, petition for rulemaking on digital asset securities regulation (the "Petition"). In this letter we focus on the securities law treatment of services related to the validation of proof-of-stake protocols ("staking").

As we recognized in the Petition and in a previous comment on issuer disclosures, the regulatory questions around practices in the digital asset ecosystem can be "complex,"[1] but we believe that the public is best served by the U.S. Securities and Exchange Commission (the "SEC" or "Commission") when it acknowledges such complexities[2] and proactively seeks market participant input in developing and conveying clear policies and guidelines to address them.[3] Indeed, the essence of the Administrative Procedure Act is to promote reasoned decision making by administrative agencies, like the SEC, by requiring agencies to follow a sound rulemaking process that is inclusive of stakeholder input.

Our comment today is in response to a recent and surprising Commission action suggesting that the Commission may now view some staking services as constituting an investment contract and therefore a security.[4] In describing the SEC's recent settlement with Kraken regarding its staking services, the current SEC Chair stated:

---

[1] *See* Transcript of Hearing at 24, *In re Voyager Digital Holdings Inc*., No. 22-10943 (Bankr. SDNY Mar. 2, 2023) (SEC Staff Attorney William Uptegrove acknowledging that the cryptocurrency-related securities laws issues at play in the Voyager bankruptcy case are "complex").

[2] *Id.* at 24 (Judge Wiles expressing frustration that SEC Staff Attorney William Uptegrove's objection to the Voyager bankruptcy plan was not an official Commission position stating, among other things, "I'm sort of unaccustomed to objections to things that may be wrong," and that the SEC being a "[d]eliberative [body] is one thing. Absent is another.").

[3] *See, e.g.*, SEC Rel. No. 33-5325 (Oct. 27, 1972) (establishing the Advisory Committee on Investment Management Services for Individual Investors (the "Advisory Committee")).

[4] Complaint, *Sec. & Exch. Comm'n v. Payward Ventures, Inc. (d/b/a Kraken) & Payward Trading, Ltd. (d/b/a Kraken)*, No. 3:23-Cv-00588 (N.D. Cal. Feb. 9, 2023), Litigation Release No. 25637 (Feb. 13, 2023); Olga Kharif *et al.*, "*What is Crypto Staking and Why is the SEC Cracking Down?*" The Washington Post (Feb. 11, 2023), *available at* https://www.washingtonpost.com/business/what-is-crypto-staking-and-why-is-the-sec-cracking-down/2023/02/10/b815851e-a996-11ed-b2a3-edb05ee0e313_story.html.

*Today's action should make clear to the marketplace that staking-as-a-service providers must register and provide full, fair, and truthful disclosure and investor protection.*[5]

Until this settlement, the Commission had not conveyed that it might consider staking services to constitute an investment contract and therefore a securities offering requiring registration with the SEC.[6] And the SEC had not previously made this position known despite ample opportunity to engage the crypto industry and its participants with its concerns. Indeed, Coinbase began providing detailed presentations on what staking services are and how they work as early as December 18, 2019,[7] and Coinbase repeatedly explained its own staking services throughout its S-1 process when becoming a public company nearly two years ago.[8]

The Chair's assertion that the Commission has expressed a new policy position and legal determination about a widespread industry practice through a single enforcement action, rather than through any formal guidance, is creating unnecessary uncertainty for market participants. The action against one company's embodiment of a staking service provides no guidance about what aspects of that embodiment or other embodiments of staking services may be of concern to the Commission nor provides a path for remediation if needed.

Staking services are not a monolith. A number of different models exist and while some might be categorized as offering an investment contract, core staking services that we describe in this letter are not. These services do not fit the definition of a securities offering when applying the analysis laid out in the Supreme Court case, *SEC v. W. J. Howey Co.* and as refined over the years.[9] Considering both the black letter law of the "*Howey* test" as well as the policy and regulatory concerns underlying that analysis we find that core staking services neither meet the test as a matter of law, nor present the risks the federal securities laws were designed to mitigate.

---

[5] SEC Press Release, *Kraken to Discontinue Unregistered Offer and Sale of Crypto Asset Staking-As-A-Service Program and Pay $30 Million to Settle SEC Charges*, (Feb. 9, 2023), *available at* https://www.sec.gov/news/press-release/2023-25.

[6] Although the Chair has previously provided his personal view that some lending services labeled "staking" might be securities offerings, those services were not core staking services. Additionally, there was no action by the Commission nor any statement or other indication from the staff expressing a view that staking services were being offered in contravention of the securities laws. The statement of one commissioner during a media interview is generally understood as reflecting only the views of that individual and not of the commission as a whole (as commissioners typically state at the start of speeches and interviews). Interview by David Ignatius with Garry Gensler (Sept. 21, 2021),
https://www.washingtonpost.com/washington-post-live/2021/09/21/transcript-path-forward-cryptocurrency-with-gary-gensler/.

[7] For its part in helping the SEC understand the nature of staking services, Coinbase has repeatedly discussed its own staking services with the Commission, including explanations of how those services operate and why they do not constitute securities. Specifically, on December 18, 2019, again on July 14, 2020, and again on August 20, 2020, Coinbase presented detailed information to the Commission regarding its staking services. Also on January 10, 2020, Coinbase, with the Proof of Stake Alliance, submitted a detailed White Paper to FinHub on staking generally, and the relevant securities analysis. Then one month later, on February 12, 2020, Coinbase presented to the Commission on these same topics.

[8] Throughout Coinbase's S-1 process in 2020 and 2021, Coinbase provided substantial information to the Commission regarding its retail staking services—and the relevant legal analysis—including in letters dated December 21, 2020, and February 12, 2021.

[9] 328 U.S. 293 (1946).

For those staking services that may constitute an investment contract, the SEC should provide a path to workable registration. Today there is no established process. As we described in our July 21, 2022, petition and explained in greater detail in our December 6, 2022, comment on our petition, there are features of investment contracts involving digital assets that do not squarely fit within existing regulation. In developing a regulatory framework for the offering of investment contracts involving digital assets, we would encourage the SEC to also consider how that framework should apply to any staking services that do constitute an offering of securities.

In the meantime, we ask the Commission to clarify how it views various aspects of staking services, and also to solicit input from the public on those views. Engaging in a public process would require the Commission to articulate its view on how securities law applies to staking services, including which elements of the service render it an offering of securities. This would afford us and others an opportunity to respond and demonstrate which staking services do not fit within the definition of a securities offering and how those that do could best be regulated by the SEC. And where the Commission believes action might be appropriate, processes and precedents already exist that provide a template on how the Commission could address the perceived concerns in the SEC's action.

It is important to get the regulatory treatment of staking services right. Consensus mechanisms form the backbone of the digital asset ecosystem. The inappropriate application of securities laws to the transaction validation process could unnecessarily stifle financial innovation and harm the 20 percent of American who own crypto and the three-quarters of Americans who believe that the current financial system is unfair and needs an update.[10] This is our mission at Coinbase – to support more economic freedom by making financial products and services more accessible, faster, and cheaper. We are advancing this purpose by building the most trusted products, tools, and services, here in the US, with a commitment to help transform our current system, designed before the computer even existed, into one that is digitally native.

The risk of getting regulation wrong is that innovation moves offshore to jurisdictions that do get it right. The U.S. is competing with the EU, UK, Hong Kong, Singapore, UAE, and a host of other countries that are racing to establish crypto hubs by proposing clear regulatory frameworks. Letting critical infrastructure migrate to other jurisdictions – the validators that are paid through staking services – because rules in the U.S. are inappropriate is unnecessary. We believe it is possible for the SEC to constructively engage on these issues without compromising protections in a way that preserves U.S. innovation. This would ensure that U.S. capital markets remain the gold standard of the world.

## I.    Description of Blockchain Consensus Mechanisms and Staking Services

Cryptocurrencies like Bitcoin and Ethereum are powered by a technology called a blockchain. Blockchains are peer-to-peer computer networks running open-source software that records a list

---

[10] Morning Consult, "Cryptocurrency Perception Study," February 24, 2023, found at https://assets.ctfassets.net/c5bd0wqjc7v0/WvuOkBwNXZsqhd6EWtkEL/7f94f8b6fbb222f3faf4d0346e473012/Morning_Consult_Cryptocurrency_Perception_Study_Feb2023_Memo__1_.pdf

of all transactions that anyone can view and verify. Its power is the people, so to speak. This database of transactions is updated across all or many computers in the network. Generally, new transactions are added to the database in sets called "blocks" and each block and its constituent transactions must adhere to the protocol rules agreed to by a majority of the network's computers.

Blockchains are the basic underlying technology for many cryptocurrencies and other forms of digital assets that have proliferated globally over the past decade. In recent years, the rapid growth, issuance, and adoption of digital assets designed to function as media of exchange, stores of value or other units of account on blockchain-based platforms, along with the emergence of marketplaces for digital assets, has resulted in a nascent yet large industry with a market value of over $1 trillion and an estimated 420 million participants worldwide.[11] And, while the promise of digital assets and related continued technological developments has yet to be fully realized, many believe that these emerging technologies are likely to result in, among other things, a fundamental shift away from traditional financial services businesses and intermediaries to an increasingly digitally native, peer-to-peer financial ecosystem.

The protocol rules of a blockchain are often referred to as its "consensus mechanism" and they dictate how the computers in the network reach agreement on what transactions and blocks to add to the blockchain. These consensus mechanisms prevent cryptocurrencies from being "double-spent" and protect a blockchain from attack and manipulation. The most commonly-known consensus mechanisms are based on what are called "proof-of-work" and "proof-of-stake" protocols.

### a. Shift from Proof of Work to Proof of Stake Validation

In proof-of-work, participants in the network compete to add new blocks to the blockchain in a process called "mining." The participant who is first to solve a special math puzzle that confirms a block of transactions – verifiable by all miners – is the winner and receives a small amount of newly-minted cryptocurrency as a reward and incentive. The mining process is not considered "green," in that it entails a large number of competing miners who use specialized, expensive computer hardware that consumes a very large amount of computing power and electricity.

Proof-of-stake is generally considered to be faster and less resource-intensive. In proof-of-stake, participants must lock up, or "stake," their cryptocurrency in order to validate transactions and add new blocks to the blockchain. These "validators" receive rewards from the protocol for their contribution to securing the blockchain. Locking up the crypto currency creates trust. If validators behave dishonestly, proof-of-stake blockchains like Ethereum incorporate penalties, which include the destruction, or "slashing," of the validator's stake.

---

[11] *See, e.g.*, CoinMarketCap (noting that the current global crypto market value is $1.16 trillion) (accessed Mar. 18, 2023), *available at* https://coinmarketcap.com; Triple.a Ownership Data (accessed Mar. 20, 2023), *available at* https://triple-a.io/crypto-ownership-data/; *See also* Faryar Shirzad, "Digital Asset Policy Proposal: Safeguarding America's Financial Leadership," Coinbase (Oct. 24, 2021), *available at* https://www.coinbase.com/blog/digital-asset-policy-proposal-safeguarding-americas-financial-leadership.

In addition to not requiring miners to engage in more energy intensive processes, proof-of-stake also offers the advantage of not requiring expensive specialized hardware. Proof-of-stake can often be run on average computers with a minimum amount of cryptocurrency to stake. Moreover, the software to operate a validator node is typically available for free and can be installed without any special expertise. This makes participating in proof-of-stake blockchain networks much more accessible to individuals who want to participate.

### b.  Efficiencies Derived From Staking Services

While it is generally easier to participate in proof-of-stake networks than proof-of-work networks, and this participation does not require specialized skill or efforts, operating a validator node nonetheless imposes costs. It typically requires a dedicated computer with a highly reliable Internet connection as inadvertent downtime can result in lost rewards. Additionally, running a node securely requires frequent attention to ensure software is up to date, all hardware is functioning correctly, and that signing keys have not been compromised.

These operational chores, combined with the significant proliferation of proof-of-stake blockchains over the past few years, have contributed to the development of various services that facilitate participation in staking cryptocurrency on proof-of-stake blockchains. Customers choose to use core staking services for their convenience and security.  The operations performed by the services are routine ministerial functions, including executing customers' staking requests, operating all of the computer hardware and software related to a proof-of-stake blockchain, and ensuring that the underlying protocol requirements are observed. Users do not obtain more rewards through the use of a service than they would if they staked independently.  The services perform a pass-through function, taking a fee from users to pay for the service provided.  These services do not require managerial efforts to allow users to stake, but provide routine administrative services that are key to blockchain infrastructure because they allow more people to stake, adding more validating capabilities.

Core staking services are fundamentally a form of cloud computing services (CCS): a traditional technology concept where shared data centers are made available to users over the Internet, often with open-source preinstalled software packages. Users of CCS avoid the time, cost and complexity of running hardware and managing software updates. Instead, they obtain this functionality by paying a fee to the CCS operator who performs these IT tasks on their behalf. Moreover, CCS operators are often able to obtain economies of scale, for example by building larger data centers, sharing unused compute time across multiple customers, and batch processing certain routine tasks.

Similar to CCS, core staking service providers operate blockchain software for use by customers who hold cryptocurrency over the internet and manage the underlying security, technology and availability of the service. Staking rewards come from the underlying protocol, not the staking service provider.

### II.    Core Staking Services are Not a Securities Offering

**Add. 49**

In offering core staking services, these providers are not offering a security. When determining whether a scheme or set of services is a security, the SEC and the courts generally look at the catch-all category of "investment contract." The test for determining whether a contract for services could be an "investment contract" was first set out by the Supreme Court in its 1946 case, *SEC v. W.J. Howey Co.*, and the SEC has used it as a touchstone for addressing the novel structures created by the development of crypto and blockchain technology.

Although staking involves new technology, the analysis in this case, if applying *Howey*, is fairly straightforward. As refined over the years, it involves four prongs:

- The investment of money (or value);
- In a common enterprise;
- With the reasonable expectation of profits;
- Derived from the managerial efforts of others.

In order to be an investment contract, a set of services must meet all four elements, and core staking as a service meets none. Additionally, an investigation into the economic reality of these staking services, when overlaid on the risks that the securities laws are designed to mitigate—and that underpin the *Howey* Court's reasoning—further confirms the fact that this type of staking service is a software service, and not an investment contract.

### a. Investment of Money

*Core staking services do not involve an investment of money*

At the heart of the "investment of money" prong is financial risk. Whether an investment of cash or of other assets, the courts have agreed that there must be risk of financial loss. The "investment of money" prong narrows the forms of financial risk that concern the securities laws. This risk, moreover, must be the sort of loss that accompanies an investment and not the risk that every party to a contract faces when depending on the other party to perform its agreed-upon role. That kind of investment risk is simply absent from the use of core staking services, and therefore there is no investment contract, just a plain contract for services.

Although staking customers use the assets they own, and give up alternative uses of those assets during the time they are staked, the opportunity cost of staking is not an investment. Unlike investors in an enterprise, stakers who use these services retain full ownership over their assets at all times, which means, by definition, there cannot be an investment of money. What these users are giving up—the temporary alternative use of their assets—is the same whether they use this type of service or stake on their own and cannot therefore be an investment in the staking service as an enterprise. While users of core staking services instruct the service to stake their assets, and may sacrifice other potential uses of those assets for the time being, this process does not involve the kind of investment of money that concerned the *Howey* court.

By contrast, in *Howey*, although the investors entered into a services contract with W. J. Howey Co., the primary risk they faced was not breach of contract, but the financial risk of a failed

**Add. 50**

enterprise. If the company failed in its agricultural efforts, or if other risks, such as poor weather or a depressed orange market, intervened, there would be insufficient oranges to sell to make up the investors' losses. The investors were making a bet on the ability of the company to successfully grow and sell oranges *at a profit*; the company could perform every promised action and yet the investors could still face a loss.

This analog does not exist in this model of staking services. Users of these staking services are not making a *bet* on the success of the staking service provider as an enterprise. They are using existing staking protocols to reap a benefit, which they could do directly, or through the service provider as a convenience. While there is a risk that the service could fail to achieve the promised capabilities, that failure would be a breach of contract, not a failed investment. Any rewards the users receive are not investment gains. Reward payouts are simply the results of the successful performance of compliant validation services, and are dictated by the protocol, not the service provider. There is neither the risk that the service provider will fail to make good choices about staking, nor that the provider failed to accurately predict and adjust for market events. There is only the risk that the provider did or did not comply with a prescribed set of rules. That is simple contractual risk—no different than the risk a car owner faces when trusting a vehicle to a mechanic, or a homeowner in trusting the completion of renovations to a contractor—and is not a risk the securities laws were intended to address.

### b. Common Enterprise

*There is no common enterprise among stakers or between stakers and service providers in core staking services*

Investors in a common enterprise need the protections of the federal securities laws because the fate of their investment is tied to the fate of the enterprise—either through the seller, promoter, or third party, or through one another—such that no investor can act independently to affect the outcome of the investment. This vulnerability is categorically different from the kind of routine counterparty risk that can be mitigated by ordinary commercial due diligence, and that is entirely independent of the counterparty risk faced by other customers of a provider. In the context of core staking services, while there may be a gathering together of assets, there is no joining of fortunes and therefore no "common enterprise."

Users of this kind of staking service retain full authority over their assets, with the ability to unstake them, sell, hypothecate, vote, or pledge them or otherwise dispose of them independent of the service provider and its other customers. In fact, because the assets belong to the user throughout, the failure of the entire staking service provider has little effect on the user's property rights. The user will need only to find a new provider, or create the necessary set-up to engage in staking as an individual.

The rewards that customers of core staking services receive are the same whether the customers are using a service or staking on their own, and are unrelated to the performance of the service provider. The rewards are consideration for the performance of validation tasks, and are generated and earned based on the blockchain protocol's rules, once a validator node successfully completes its validation task. In other words, users holding identical assets can

7

**Add. 51**

expect similar staking rewards because the protocol sets the rewards rates, but this is also the case if they each stake on their own. Staking through this kind of service provider only increases convenience, not rewards allocated by the blockchain protocol. Protocol-imposed reward rates do not change whether assets are pooled together or not, or whether a validator node is operated by a user or a service. Nor does the amount of assets staked by a particular node increase the reward rate per asset—*i.e.*, the protocol does not pay escalating rewards for staking more assets.[12]

A brief example illustrates the difference between the kind of non-security fee-for-service arrangement that stockbrokers use (and that is analogous to the commissions received by staking service providers) and the arrangements of investment managers. Courts have repeatedly distinguished between the compensation of *investment managers* based on profits on the appreciation of value of speculative assets—which satisfy vertical commonality—and fees collected by *stockbrokers* "for every consummated transaction"—which do not. Why? Because the former makes choices that affect the fortunes of the customer, and receive compensation based on the value they create for their customers, whereas the latter only executes the actions the customer has requested. Investment managers' fortunes rise and fall with the choices they make, as do the fortunes of their customers. Stockbrokers have no such relationship with their customers. Similarly, the fortunes of core staking service providers and those of their customers, are independent of one another and no common enterprise exists.

### c. Reasonable Expectation of Profit

*Payment for services is not an expectation of profit*

Core staking services also fail the "expectation of profit" prong because the rewards the users receive are just payment for services rendered. As described above, the purpose of staking is to provide a validation mechanism for a network or protocol. The rewards are consideration paid for the validation services the asset owner provides by staking the assets. Those rewards are not returns on investment; instead, they are service fees, set by the blockchain protocol, and are the same whether the customer stakes on her own or through a service. However you stake, whether on your own or through this type of service, the consideration you receive for services provided is not a reasonable expectation of a return on investment; it is just a fee paid for performing a job.

The reason that "expectation of profit" is one of the prongs of *Howey* is once again financial risk. An investor in a security needs information about the issuer and the planned enterprise to know whether that enterprise is likely to produce a profit. The investor takes a risk on the enterprise—ideally an informed one, thanks to mandated disclosures—and hopes that the risk pays off. Users of this model of staking service take no such enterprise risk. There is no need to evaluate the likely success or failure of a business plan. And there is no need for the securities

---

[12] There is a common misperception that staking more assets earns a higher rate of reward. This is not true. While a larger stake will produce larger rewards on some protocols, on a *per token* basis the overall rate of return is typically flat or declining with size. To our knowledge, no protocol pays escalating per token rewards based on the amount staked. Such a feature would create economic incentives towards staker centralization, which could compromise the security of a Proof of Stake network.

**Add. 52**

laws. These staking rewards are not the "profits" the *Howey* court envisioned, and do not meet this prong of the test.

### d. Efforts of Others

*Core staking services entail ministerial efforts and not the managerial efforts of others*

While all four prongs of the *Howey* test must be met for an arrangement to constitute an offering of an investment contract, it is the last prong—profits derived from the efforts of others—that has typically required the closest analysis. Satisfying this prong requires that the investor rely on the "efforts of others" and, as later courts have held, those efforts must be characterized as "undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."[13] Those that are merely ministerial or administrative do not rise to the level required to satisfy this prong.[14]

Core staking service providers exert no discretion and have no authority to deviate from the terms of the service. There is no obligation or discretion for the service provider to seek out the best opportunities and there is no need to build trust through disclosures mandated by the securities laws. There is therefore no need for the types of disclosures securities laws require for an investor to understand how discretion would be used, such as the key people making the decisions, their backgrounds, the result of their decisions thus far, and their plans for the future. This type of information, designed to help investors decide whether to trust individuals to make good use of their money and generate profit, is not relevant in the context of core staking services. Any protections consumers may need, such as clear terms of service and recourse under contract law if the terms are violated, fall outside the remit of the SEC and outside the scope of the securities laws.

### III.    How Past Commission Actions Can Inform The Treatment of Staking Services

Over the years, many market practices have emerged that raised novel questions, and led the SEC to question the orthodoxy of its established regulatory positions. As with staking services today, past Commissions have faced similar opportunities to establish preferred market practices through the courts, and instead wisely pursued more measured and careful approaches. We offer three past examples that could serve as a guide for this Commission.

### a. 1973 Committee on Special Investment Advisory Services (SIAS)

Fifty years ago the Commission was faced with a similar question of how to determine whether an emerging technology-based service is, in fact, an offering of a security. At that time, the SEC

---

[13] *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821 (1973).

[14] SEC Strategic Hub for Innovation and Financial Technology, Framework for "Investment Contract" Analysis of Digital Assets (April 3, 2019) at section II.C.1 (stating that purchasers of digital assets do not rely on the "efforts of others" when those efforts are "ministerial in nature"); available at https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets; S.E.C. v. Life Partners, Inc., 87 F.3d 536, 545 (D.C. Cir. 1996) (noting that "purely ministerial" functions do not meet the threshold for managerial efforts under the Howey test, and "[i]ndeed, quite the opposite is true").

evaluated the emerging use of computer technology in providing investment services to individual clients. Some believed the provision of such services—which, given advances in computer technology could be provided to customers at scale—might constituted an offering of an investment contract, thus resulting in violations of the Securities Act of 1933 (the "Securities Act") and the Investment Company Act of 1940 (the "Investment Company Act").

The genesis of this debate was the "uncertainty about the applicability of the [Securities Act and the Investment Company Act]" that had arisen as a result of the SEC's action in *First National City Bank (Citibank) and Merrill Lynch, Pierce, Fenner and Smith, Inc.*[15] In this action, the SEC claimed that, under Citibank's SIAS, a customer's limited power of attorney giving Citibank investment discretion and authorizing Merrill Lynch to accept instructions from Citibank constituted an investment contract offered and sold in violation of the registration requirements of the Securities Act. The issuance of such securities also, according to the SEC, resulted in the creation of an investment company in violation of the Investment Company Act.[16] As in the Kraken matter, this was a settled action with no precedential value, but the SEC recognized that it could nonetheless create uncertainty that merited clarifying action by the SEC.

The SEC created an Advisory Committee to help dispel the uncertainty *First National* created for SIAS providers and to inform its regulatory process moving forward.[17] In establishing the Advisory Committee, then-Chairman Casey highlighted the SEC's concern that the absence of clear standards was actually inhibiting the provision of services and market activity that did not implicate the securities laws.[18] The aim of the Advisory Committee was to assist the SEC with "developing clearer policies and guidelines" with respect to SIAS programs.[19] Its work was a high priority for the SEC in order to help the Commission determine, among other things, how it could embrace technology in a manner that would accommodate the needs of smaller market participants.[20]

Based on the Advisory Committee's recommendations, the SEC eventually adopted Rule 3a-4 under the Investment Company Act, which provides investment advisory programs with a nonexclusive safe harbor exemption from the registration requirements of both the Securities Act and the Investment Company Act.[21] In the lengthy series of SEC rulemakings leading up to the adoption of Rule 3a-4, the SEC expressly acknowledged that the law was unclear and could result in inconsistent treatment of service providers on the issue of whether discretionary SIAS

---

[15] *SEC v. First Nat'l City Bank*, SEC Lit. Rel. No. 4534 (Feb. 6, 1970) ("First National").

[16] Alan Rosenblat, Chief Counsel, SEC Division of Investment Management, and Staff Liaison to the Advisory Committee, *Some Thoughts on the Federal Securities Laws Regulating External Investment Management Arrangements and the ALI Federal Securities Code Project*, 124 U. Pa. L. Rev. 587, 667 (Jan. 1976).

[17] *See supra* note 3.

[18] *See* SEC Rel. No. 33-5321 (Oct. 12, 1972) (announcing the formation of the Advisory Committee in tandem with SEC Rel. No. 33-5325).

[19] Advisory Committee Report at 1.

[20] SEC Chairman William J. Casey, "*Where Are We Going?*," Address by Chairman Casey before the Economic Club of Detroit (Sept. 18, 1972), at 10-11.

[21] SEC Rel. No. IC-22579 (Status of Investment Advisory Programs under the Investment Company Act of 1940) (Mar. 24, 1997), *available at* https://www.sec.gov/rules/final/ic-22579.txt. This release also highlighted the SEC's Division of Corporation Finance indication that, if Rule 3a-4 were to be adopted, it would not recommend that the Commission take enforcement action if interests in an investment advisory program operated in accordance with the proposed rule's requirements were not registered under the Securities Act.

programs involved a "common enterprise" under the *Howey* test and could therefore be considered investment contracts.[22] No such uncertainty existed for similar programs conducted on nondiscretionary basis. In the intervening time between the issuance of the Advisory Committee report and the adoption of Rule 3a-4, market participants were left to operate on the basis of what guidance they could glean from a series of SEC staff no-action letters regarding investment advisory programs.[23]

Almost fifty years later, this example offers a just-as-relevant approach to addressing the novel legal issues around staking services. As was the case then, the SEC is facing a new technology and would benefit from public engagement to both understand the issues and evaluate the best way to consider regulation, while acknowledging where its oversight is unnecessary. Equally important, the specific conclusions of the SEC in relation to SIAS services—that a lack of discretion points to a lack of a securities offering—provide a useful analogy to the question of how to consider staking services.

### b.  2000 Regulation Fair Disclosure

In the 1990s, the SEC again faced uncertainty in the market about how the securities laws should apply to a common industry practice. At that time, public companies would often share information with a select group of analysts and investors in advance of making full disclosures to the general public. The Commission was concerned that this was leading to a loss of investor confidence in the integrity of our capital markets. In response, the Commission adopted Regulation Fair Disclosure, and explained in its 2000 adopting release:

> *Issuer selective disclosure bears a close resemblance in this regard to ordinary "tipping" and insider trading. In both cases, a privileged few gain an informational edge -- and the ability to use that edge to profit -- from their superior access to corporate insiders, rather than from their skill, acumen, or diligence.*[24]

Importantly, rather than pursue potentially viable enforcement actions to make policy, the SEC explicitly rejected that path and instead chose rulemaking as the more prudent course, stating:

> *While we have considered this approach -- and of course we remain free to bring such cases where a selective disclosure does violate insider trading laws -- we do not agree that this is the appropriate response to the legal uncertainties posed by current insider trading law. In other contexts, we have been criticized for attempting to "make new law"*

[22] SEC Rel. No. IC-11391 (Individualized Inv. Mgmt. Servs.) (Oct. 10, 1980).

[23] *See, e.g., Shearson/American Express Incorporated*, SEC No-Action Letter (July 13, 1983); *Scudder Fund Management Service*, SEC No-Action Letter (Aug. 17, 1988); *Westfield Consultants Group, Inc.*, SEC No-Action Letter (Dec. 13, 1991). *See also* SEC Rel. No. 15292 (Nov. 2, 1978) (addressing reporting and filing requirements for certain institutional investment managers and the scope of "investment discretion" under the Securities Exchange Act of 1934); *In re Clarke Lanzen Skalla Investment Firm, Inc.*, SEC Rel. No. IA-7180, at n.1 (June 16, 1995) (noting that where asset holders take part in managed discretionary account programs but retain the indicia of individual asset ownership, "[T]here is no common enterprise and, therefore, the programs are not issuing securities. Because they are not 'issuers,' these programs are also not investment companies under Section 3(a) of the Investment Company Act.").

[24] SEC Rel. No. 33-7881 (Selective Disclosure and Insider Trading) (Aug. 15, 2000), *available at*: .https://www.sec.gov/rules/final/33-7881.htm#P48_18472.

**Add. 55**

> *in an uncertain area by means of enforcement action and urged instead to seek to change the law through notice-and-comment rulemaking. We believe that this rulemaking is the more careful and considered response to the problem presented by selective disclosure.*[25]

The Commission went on to explain that the more careful and considered approach that rulemaking offered would prevent far greater damage to the marketplace by stating:

> *We note, in addition, that if we were successful in enforcement actions charging selective disclosures as a form of fraudulent insider trading, the* in terrorem *effect of that success (and the consequent chilling effect on issuers) would certainly be far greater than the impact of the more measured approach we adopt today.*[26]

This approach illustrates how rulemaking is a better path to market regulation, even when a series of enforcement actions may be the faster and easier choice. The SEC's treatment of staking services similarly represents an uncertain area of securities regulation with the Commission potentially holding beliefs that are at odds with common industry practices. Rather than selective enforcement actions that require industry to infer how the Commission believes the law should apply to other market participants, the market would be better served by a public dialogue on the issues.

### c.  2017 The DAO Section 21(a) Report

The Commission has more recently in the context of crypto assets followed a similarly restrained approach to deferring enforcement action over a widespread market practice. In 2017, the Commission issued a Section 21(a) Investigative report on whether "The DAO," an unincorporated organization, had violated securities laws by conducting what is colloquially called an Initial Coin Offering (ICO).[27] The Commission made the determination that the DAO tokens were securities and could have taken enforcement action, but instead issued the report as an educational opportunity for market participants, making the marketplace aware of the types of activity that would lead to an enforcement action. In their report, Commission staff stated:

> *In light of the facts and circumstances, the agency has decided not to bring charges in this instance, or make findings of violations in the Report, but rather to caution the industry and market participants: the federal securities laws apply to those who offer and sell securities in the United States, regardless whether the issuing entity is a traditional company or a decentralized autonomous organization, regardless whether those securities are purchased using U.S. dollars or virtual currencies, and regardless whether they are distributed in certificated form or through distributed ledger technology.*[28]

The investigative report put the industry on notice about the Commission's concern and developing views around ICO practices, and provided an opportunity for the industry to engage

---

[25] *Id.*

[26] *Id.* at n.16.

[27] SEC Rel. No. 81207 (Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO) (July 25, 2017), *available at* https://www.sec.gov/litigation/investreport/34-81207.pdf.

[28] SEC Press Release, *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities*, (July 25, 2017), *available at* https://www.sec.gov/news/press-release/2017-131.

**Add. 56**

with the SEC on potential paths forward, including by establishing shortly thereafter a new strategic hub for innovation and financial technology ("FinHub").[29] Given the nascent state of the market, this was the right approach at the time, and illustrates how a regulator can begin to set guardrails while allowing innovation to proceed.

However, more than five years later, and despite the market having developed more fully, the Commission has yet to propose rules that would permit the activity addressed in the report. As we have separately advocated for,[30] rulemaking is now the most appropriate next step to provide a more durable framework, and to incorporate the best practices that have organically developed for issuers of digital asset tokens that may implicate securities laws. Nonetheless, we believe that the SEC started on the right path and could continue with actions that would provide an appropriate registration and reporting framework for these issuers.

## IV.    Investment Company Act Rule 3a-4 Lessons for Staking Services

While the SEC's process ultimately leading to the adoption of Rule 3a-4 provides a useful example of a path that could be followed again today, the SEC's statements made in its Rule 3a-4 adopting release already provide clear and unambiguous support for the fact that core staking services do not constitute an offering of securities. In particular, as the SEC noted in its Rule 3a-4 adopting release, non-discretionary programs will not, among other things, result in the issuance of "securities that are required to be registered under Section 5 of the Securities Act, regardless of whether the program is operated in accordance with the provisions of [R]ule 3a-4."[31] As discussed above, the staking services described herein do not involve any discretion on the part of the staking service provider and, as such, do not result in the issuance of securities.

Nevertheless, and despite the fact that core staking services are not investment related and do not involve the provision of investment advice, it is worth noting that the staking services described in this letter are otherwise consistent with the provisions of the safe harbor.[32] In particular, every core staking service customer "has the ability to impose reasonable restrictions on the management of their respective accounts," including the designation of particular assets that the staking service provider should deploy.[33] The staking service provider has no power, ability, discretion or authority to unilaterally deploy customer assets into staking on behalf of its customers. Further, each staking service customer receives real-time account information containing a description of all relevant account activity,[34] and retains, with respect to all assets in

---

[29] SEC Press Release, *SEC Launches New Strategic Hub for Innovation and Financial Technology*, (Oct. 18, 2018), *available at* https://www.sec.gov/news/press-release/2018-240.

[30] *See* Coinbase Global, Inc. Comment on SEC Rulemaking Petition No. 4-789 (requesting that the Commission propose and adopt rules to govern the regulation of securities that are offered and traded via digitally native methods, including potential rules to identify which digital assets are securities) (Dec. 6, 2022) *available at* https://www.sec.gov/comments/4-789/4789-20152418-320297.pdf.

[31] SEC Rel. No. IC-22579 at Section II.A, *available at* https://www.sec.gov/rules/final/ic-22579.txt.

[32] Notably, IC Act Rule 3a-4 is available for any "sponsor" of an investment advisory program, regardless of their status as an investment advisor. *See id.* at n.25; *see also* SEC, Division of Examinations, Risk Alert, Observations from Examinations of Advisers that Provide Electronic Investment Advice, at n.2 (Nov. 9, 2021), *available at* https://www.sec.gov/exams/announcement/risk-alert-electronic-investment-advice.

[33] Investment Company Act Rule 3a-4(a)(3). Note that the rule is drafted to apply to the provision of investment advisory services related to securities, which are not applicable to the staking programs described herein.

[34] *See id.* at (a)(4).

their respective account, to the same extent as if the client held the assets outside the program, the right to:

- Withdraw his/her assets;
- Vote his/her assets, or delegate the authority to vote assets to another person;
- Be provided in a timely manner with a written confirmation or other notification of each asset transaction, and all other documents required by law to be provided to asset holders; and
- Proceed directly as an asset holder against the issuer of such asset in the client's account and not be obligated to join any person involved in the operation of the program, or any other client of the program, as a condition precedent to initiating such proceeding.[35]

While this rule may not be directly applicable to staking services that may constitute investment contracts, the underlying principles provide a valuable precedent for the SEC in considering how to address staking services. Additionally, we refer the SEC back to our December 6, 2022, comment in which we provided detailed recommendations for how the SEC might approach a workable registration process for investment contracts involving digital assets.

## V.    Unintended Consequences of the Improper Application of Securities Laws

As markets become digitally native, it is critical that we get the relevant regulation right. This is especially true for the proof-of-stake consensus mechanisms that enable Layer 1 blockchains to record transactions and maintain the public ledgers in the digital asset ecosystem. The validation process underlying the proof-of-stake consensus mechanism relies on the community of blockchain users to ensure that network operations run efficiently and securely, and for their participation they earn rewards. The computing services that support staking introduce efficiency gains that enable broader participation by the user community.

As we explain throughout this letter, users of core staking services enter into contractual arrangements and the investor protection concerns underlying securities laws do not exist in the context of these services. Applying securities laws to these services does not improve the operation, performance, security, or safety of the proof-of-stake validation process or distribution of rewards. To the extent that a staking service model does constitute an investment contract, there is currently no established path to registration or other means of ensuring the offering complies with federal securities laws.

The SEC's recent enforcement action against a staking provider could have significant economic consequences to the digital asset ecosystem. In particular, the assertion by the SEC Chair that its enforcement action "*should make clear to the marketplace that staking-as-a-service providers must register*" creates strong economic incentive to leave the U.S. because (1) the SEC has not offered a workable remediation path for registration, and, more importantly, (2) there is widespread belief that there is no basis for registration for core staking service providers, as we have articulated throughout this letter. Leaving or avoiding the U.S. as a domicile for economic

---

[35] *See id.* at (a)(5).

activity is a rational response to potential injunctions and financial penalties from unclear and inappropriate regulatory responsibilities.

Pushing legitimate business activity offshore undermines the mandate set forth by President Biden in his executive order, which stated:

> *We must reinforce United States leadership in the global financial system and in technological and economic competitiveness, including through the responsible development of payment innovations and digital assets. The United States has an interest in ensuring that it remains at the forefront of responsible development and design of digital assets and the technology that underpins new forms of payments and capital flows in the international financial system.*[36]

The costs of offshoring the critical infrastructure of a nascent industry that already exceeds $1 trillion in value with an estimated 420 million participants[37] far outweighs any perceived benefit that can be achieved by applying securities laws to the proof-of-stake consensus mechanism for blockchains. Yet, this is the path we are on given the lack of industry recourse to the recent SEC action.

The federal rulemaking process is designed to protect individuals and businesses against bad customs such as these. Rulemaking requirements under the Administrative Procedure Act entail public notice and comment, while other legislative requirements and executive orders stipulate the cost benefit analysis of proposed rules. Of course, the public cannot compel the SEC to write rules subject to these requirements, such as in response to our petition for rulemaking, but the Commission should nonetheless adhere—in all of its actions—to the underlying responsibility articulated by Congress and the President to ensure that its actions entail benefits to society that outweigh the costs.

*What problem is being solved?*

The SEC could look to its own guidance on how to conduct an appropriate economic analysis in pursuit of an appropriate regulatory outcome. The SEC published this guidance in 2012 to improve its internal processes after losing in the courts for failing to adequately address the economic effects of a new rule. The guidance recognizes the SEC's statutory requirements and directs staff to the following best practices in assessing the merit of a regulatory action:

> *It is widely recognized that the basic elements of a good regulatory economic analysis are: (1) a statement of the need for the proposed action; (2) the definition of a baseline against which to measure the likely economic consequences of the proposed regulation; (3) the identification of alternative regulatory approaches; and (4) an evaluation of the*

---

[36] Exec. Order No. 14,067, 87 Fed. Reg. 14143 (Mar. 14, 2022) *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2022/03/09/executive-order-on-ensuring-responsible-development-of-digital-assets/.

[37] Cryptocurrency Ownership Data, TripleA (Jan. 4, 2023), https://triple-a.io/crypto-ownership-data/.

*benefits and costs—both quantitative and qualitative—of the proposed action and the main alternatives identified by the analysis.*[38]

These best practices are based on the long adhered-to executive order issued in 1993 by President Clinton and updated by subsequent administrations that directs federal agencies to enact a regulatory system that:

> *...improves the performance of the economy without imposing unacceptable or unreasonable costs on society; regulatory policies that recognize that the private sector and private markets are the best engine for economic growth; regulatory approaches that respect the role of State, local, and tribal governments; and regulations that are effective, consistent, sensible, and understandable.*[39]

Implementation of these principles was formally adopted in the Office of Management and Budget's Circular A-4, which, among other key elements highlighted for federal agencies, included the recommendation to solicit expert opinion, particularly early in the deliberative process, stating:

> *As you design, execute, and write your regulatory analysis, you should seek out the opinions of those who will be affected by the regulation as well as the views of those individuals and organizations who may not be affected but have special knowledge or insight into the regulatory issues. Consultation can be useful in ensuring that your analysis addresses all of the relevant issues and that you have access to all pertinent data. Early consultation can be especially helpful. You should not limit consultation to the final stages of your analytical efforts.*[40]

Finally, the National Markets Securities Improvement Act expressly directs the SEC to ensure that an action is solving a problem in the public's interest. Importantly, the Commission must do this by including factors that go beyond just investor protection, such as whether the actions will promote efficient and competitive markets.

> *Whenever pursuant to this title the Commission is engaged in rulemaking and is required to consider or determine whether an action is necessary or appropriate in the public interest, the Commission shall also consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation.*[41]

The Commission's recent action fails to address any of these recommendations. The Commission has not (1) identified a problem that securities laws can solve, (2) engaged the public, (3)

---

[38] Memorandum from the Division of Risk, Strategy, and Financial Innovation and the Office of the General Counsel, Current Guidance on Economic Analysis in SEC Rulemakings (Mar. 16, 2012) at 21, *available at* https://www.sec.gov/divisions/riskfin/rsfi_guidance_econ_analy_secrulemaking.pdf.

[39] Exec. Order No. 12,866, 58 Fed. Reg. 51735 (Sept. 30, 1993) *available at* https://www.archives.gov/files/federal-register/executive-orders/pdf/12866.pdf.

[40] MB Circular A-4, Regulatory Analysis (Sept. 17, 2003) *available at* https://obamawhitehouse.archives.gov/omb/circulars_a004_a-4/.

[41] Pub. L. No. 104–290 (Oct. 11, 1996), *available at* https://www.congress.gov/104/plaws/publ290/PLAW-104publ290.pdf

solicited experts, (4) described the economic impact from its action, or (5) explained the societal benefits that will result from it. Most importantly, the Commission has entirely failed to explain how these actions, in addition to the protection of investors, will promote efficiency, competition, and capital formation in the U.S. economy.

In promulgating an enforcement action that serves to enact policy on a widespread market practice, the SEC has circumvented a rulemaking process that has served the American public well for decades. And by circumventing the reasoned decision making process promoted by the Administrative Procedure Act and other enacting statutes, the SEC is endangering America's competitiveness on the global stage. As digital asset markets develop, participants are increasingly steering clear of the U.S. in favor of jurisdictions that are seeking to establish themselves as crypto hubs by engaging with them through public consultations and viable registration paths.

The consequence of offshoring digital asset activity will be felt most heavily by small businesses and entrepreneurs who represent the backbone of the emerging digital asset ecosystem. The initial innovation wave started with them, with today's large companies like Coinbase having their origins with humble beginnings and small development teams. Many of the small development teams launching today are choosing to launch in jurisdictions with a more favorable regulatory climate. As history has shown, innovation hubs are sticky and hard to displace once they land, and persistent regulatory uncertainty in the U.S. could help to ensure that the next innovation wave lands outside of its shores.

## VI.    Path Forward

We urge the Commission to take a different approach on the treatment of staking services. We recognize that new technologies and practices can cause agencies like the SEC to feel a sense of urgency in finding a way to fit them into existing regulatory frameworks, but pursuing public engagement instead of using enforcement actions to impose regulatory requirements across a new industry is the more prudent approach.

Enforcement actions that target one market participant but otherwise implicate all market participants put industry in an untenable position. The Commission has previously recognized the importance of not "making new law" in this way, and instead pursued notice and comment rulemaking as the more careful and considered response to new technologies and market practices. As we discussed in this letter, the Commission has also previously treated analogous developments by engaging the public through Advisory Committees and by issuing an investigative report, both which can be important precursors to rulemaking.

To learn more about staking and other digital asset technologies, the Commission could engage with the public through its two standing SEC Committees—the Investor Advisory Committee and Small Business Capital Formation Advisory Committee. The Commission could alternatively host an industry roundtable, a tool commonly used by past Commissions when interested in learning from industry about market practices. Commission staff could more

generally make themselves available in public forums, by speaking at industry, academic, and government events, to share views and solicit feedback.

Collaborative engagements such as these would put the SEC and its staff in a position to better understand digital asset technology and its potential implication on securities laws. This would in turn help the Commission and SEC better assess an appropriate path to addressing any residual market concerns, which for staking services we believe would have been better addressed, if at all, through notice and comment rulemaking.

The SEC's role in protecting investors, ensuring fair, orderly and efficient markets, and facilitating capital formation is key to preserving our exemplary capital markets. We encourage the Commission to consider how our recommendations can help it to continue its work while also identifying those areas over which its supervision is not needed, the better to conserve its resources for its vital mission.

Sincerely,

Paul Grewal
Chief Legal Officer
Coinbase Global, Inc.

States that the public is entitled to the fullest practicable information regarding the decisionmaking processes of the Federal Government. It is the purpose of this Act [see Short Title note set out above] to provide the public with such information while protecting the rights of individuals and the ability of the Government to carry out its responsibilities.''

### § 553. Rule making

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

(1) a military or foreign affairs function of the United States; or

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 383.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............. | 5 U.S.C. 1003. | June 11, 1946, ch. 324, § 4, 60 Stat. 238. |

In subsection (a)(1), the words ''or naval'' are omitted as included in ''military''.

In subsection (b), the word ''when'' is substituted for ''in any situation in which''.

In subsection (c), the words ''for oral presentation'' are substituted for ''to present the same orally in any manner''. The words ''sections 556 and 557 of this title apply instead of this subsection'' are substituted for ''the requirements of sections 1006 and 1007 of this title shall apply in place of the provisions of this subsection''.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

CODIFICATION

Section 553 of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2245 of Title 7, Agriculture.

EXECUTIVE ORDER NO. 12044

Ex. Ord. No. 12044, Mar. 23, 1978, 43 F.R. 12661, as amended by Ex. Ord. No. 12221, June 27, 1980, 45 F.R. 44249, which related to the improvement of Federal regulations, was revoked by Ex. Ord. No. 12291, Feb. 17, 1981, 46 F.R. 13193, formerly set out as a note under section 601 of this title.

### § 554. Adjudications

(a) This section applies, according to the provisions thereof, in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved—

(1) a matter subject to a subsequent trial of the law and the facts de novo in a court;

(2) the selection or tenure of an employee, except a [1] administrative law judge appointed under section 3105 of this title;

(3) proceedings in which decisions rest solely on inspections, tests, or elections;

(4) the conduct of military or foreign affairs functions;

(5) cases in which an agency is acting as an agent for a court; or

(6) the certification of worker representatives.

(b) Persons entitled to notice of an agency hearing shall be timely informed of—

(1) the time, place, and nature of the hearing;

(2) the legal authority and jurisdiction under which the hearing is to be held; and

(3) the matters of fact and law asserted.

When private persons are the moving parties, other parties to the proceeding shall give prompt notice of issues controverted in fact or law; and in other instances agencies may by rule require responsive pleading. In fixing the time and place for hearings, due regard shall be had for the convenience and necessity of the parties or their representatives.

(c) The agency shall give all interested parties opportunity for—

(1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment when time, the nature of the proceeding, and the public interest permit; and

---

[1] So in original.

**Add. 63**

(2) to the extent that the parties are unable so to determine a controversy by consent, hearing and decision on notice and in accordance with sections 556 and 557 of this title.

(d) The employee who presides at the reception of evidence pursuant to section 556 of this title shall make the recommended decision or initial decision required by section 557 of this title, unless he becomes unavailable to the agency. Except to the extent required for the disposition of ex parte matters as authorized by law, such an employee may not—

(1) consult a person or party on a fact in issue, unless on notice and opportunity for all parties to participate; or

(2) be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency.

An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings. This subsection does not apply—

(A) in determining applications for initial licenses;

(B) to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; or

(C) to the agency or a member or members of the body comprising the agency.

(e) The agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 384; Pub. L. 95–251, § 2(a)(1), Mar. 27, 1978, 92 Stat. 183.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............. | 5 U.S.C. 1004. | June 11, 1946, ch. 324, § 5, 60 Stat. 239. |

In subsection (a)(2), the word "employee" is substituted for "officer or employee of the United States" in view of the definition of "employee" in section 2105.

In subsection (a)(4), the word "naval" is omitted as included in "military".

In subsection (a)(5), the word "or" is substituted for "and" since the exception is applicable if any one of the factors are involved.

In subsection (a)(6), the word "worker" is substituted for "employee", since the latter is defined in section 2105 as meaning Federal employees.

In subsection (b), the word "When" is substituted for "In instances in which".

In subsection (c)(2), the comma after the word "hearing" is omitted to correct an editorial error.

In subsection (d), the words "The employee" and "such an employee" are substituted in the first two sentences for "The same officers" and "such officers" in view of the definition of "employee" in section 2105. The word "officer" is omitted in the third and fourth sentences as included in "employee" as defined in section 2105. The prohibition in the third and fourth sentences is restated in positive form. In paragraph (C) of the last sentence, the words "in any manner" are omitted as surplusage.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

CODIFICATION

Section 554 of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2246 of Title 7, Agriculture.

AMENDMENTS

1978—Subsec. (a)(2). Pub. L. 95–251 substituted "administrative law judge" for "hearing examiner".

§ 555. Ancillary matters

(a) This section applies, according to the provisions thereof, except as otherwise provided by this subchapter.

(b) A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative. A party is entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding. So far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function. With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it. This subsection does not grant or deny a person who is not a lawyer the right to appear for or represent others before an agency or in an agency proceeding.

(c) Process, requirement of a report, inspection, or other investigative act or demand may not be issued, made, or enforced except as authorized by law. A person compelled to submit data or evidence is entitled to retain or, on payment of lawfully prescribed costs, procure a copy or transcript thereof, except that in a nonpublic investigatory proceeding the witness may for good cause be limited to inspection of the official transcript of his testimony.

(d) Agency subpenas authorized by law shall be issued to a party on request and, when required by rules of procedure, on a statement or showing of general relevance and reasonable scope of the evidence sought. On contest, the court shall sustain the subpena or similar process or demand to the extent that it is found to be in accordance with law. In a proceeding for enforcement, the court shall issue an order requiring the appearance of the witness or the production of the evidence or data within a reasonable time under penalty of punishment for contempt in case of contumacious failure to comply.

(e) Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 385.)

### Historical and Revision Notes

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............. | 5 U.S.C. 1005. | June 11, 1946, ch. 324, § 6, 60 Stat. 240. |

In subsection (b), the words "is entitled" are substituted for "shall be accorded the right". The word "officers" is omitted as included in "employees" in view of the definition of "employee" in section 2105. The words "with due regard for the convenience and necessity of the parties or their representatives and within a reasonable time" are substituted for "with reasonable dispatch" and "except that due regard shall be had for the convenience and necessity of the parties or their representatives". The prohibition in the last sentence is restated in positive form and the words "This subsection does not" are substituted for "Nothing herein shall be construed either to".

In subsection (c), the words "in any manner or for any purpose" are omitted as surplusage.

In subsection (e), the word "brief" is substituted for "simple". The words "of the grounds for denial" are substituted for "of procedural or other grounds" for clarity.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

#### CODIFICATION

Section 555 of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2247 of Title 7, Agriculture.

### § 556. Hearings; presiding employees; powers and duties; burden of proof; evidence; record as basis of decision

(a) This section applies, according to the provisions thereof, to hearings required by section 553 or 554 of this title to be conducted in accordance with this section.

(b) There shall preside at the taking of evidence—

(1) the agency;

(2) one or more members of the body which comprises the agency; or

(3) one or more administrative law judges appointed under section 3105 of this title.

This subchapter does not supersede the conduct of specified classes of proceedings, in whole or in part, by or before boards or other employees specially provided for by or designated under statute. The functions of presiding employees and of employees participating in decisions in accordance with section 557 of this title shall be conducted in an impartial manner. A presiding or participating employee may at any time disqualify himself. On the filing in good faith of a timely and sufficient affidavit of personal bias or other disqualification of a presiding or participating employee, the agency shall determine the matter as a part of the record and decision in the case.

(c) Subject to published rules of the agency and within its powers, employees presiding at hearings may—

(1) administer oaths and affirmations;

(2) issue subpenas authorized by law;

(3) rule on offers of proof and receive relevant evidence;

(4) take depositions or have depositions taken when the ends of justice would be served;

(5) regulate the course of the hearing;

(6) hold conferences for the settlement or simplification of the issues by consent of the parties or by the use of alternative means of dispute resolution as provided in subchapter IV of this chapter;

(7) inform the parties as to the availability of one or more alternative means of dispute resolution, and encourage use of such methods;

(8) require the attendance at any conference held pursuant to paragraph (6) of at least one representative of each party who has authority to negotiate concerning resolution of issues in controversy;

(9) dispose of procedural requests or similar matters;

(10) make or recommend decisions in accordance with section 557 of this title; and

(11) take other action authorized by agency rule consistent with this subchapter.

(d) Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof. Any oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence. A sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence. The agency may, to the extent consistent with the interests of justice and the policy of the underlying statutes administered by the agency, consider a violation of section 557(d) of this title sufficient grounds for a decision adverse to a party who has knowingly committed such violation or knowingly caused such violation to occur. A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. In rule making or determining claims for money or benefits or applications for initial licenses an agency may, when a party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form.

(e) The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, constitutes the exclusive record for decision in accordance with section 557 of this title and, on payment of lawfully prescribed costs, shall be made available to the parties. When an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 386; Pub. L. 94–409, § 4(c), Sept. 13, 1976, 90 Stat. 1247; Pub. L. 95–251, § 2(a)(1), Mar. 27, 1978, 92 Stat. 183; Pub. L. 101–552, § 4(a), Nov. 15, 1990, 104 Stat. 2737.)

### Historical and Revision Notes

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............. | 5 U.S.C. 1006. | June 11, 1946, ch. 324, § 7, 60 Stat. 241. |

In subsection (b), the words "hearing examiners" are substituted for "examiners" in paragraph (3) for clarity. The prohibition in the second sentence is restated in positive form and the words "This subchapter does not" are substituted for "but nothing in this chapter shall be deemed to". The words "employee" and "employees" are substituted for "officer" and "officers" in view of the definition of

effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............ | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, § 10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............ | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, § 10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

effectiveness or enforcement of the order, and the court shall have jurisdiction to enter such an order. A respondent served with a temporary cease-and-desist order entered without a prior Commission hearing may not apply to the court except after hearing and decision by the Commission on the respondent's application under paragraph (1) of this subsection.

**(3) No automatic stay of temporary order**

The commencement of proceedings under paragraph (2) of this subsection shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**(4) Exclusive review**

Section 77i(a) of this title shall not apply to a temporary order entered pursuant to this section.

**(e) Authority to enter order requiring accounting and disgorgement**

In any cease-and-desist proceeding under subsection (a), the Commission may enter an order requiring accounting and disgorgement, including reasonable interest. The Commission is authorized to adopt rules, regulations, and orders concerning payments to investors, rates of interest, periods of accrual, and such other matters as it deems appropriate to implement this subsection.

**(f) Authority of the Commission to prohibit persons from serving as officers or directors**

In any cease-and-desist proceeding under subsection (a), the Commission may issue an order to prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who has violated section 77q(a)(1) of this title or the rules or regulations thereunder, from acting as an officer or director of any issuer that has a class of securities registered pursuant to section 78l of this title, or that is required to file reports pursuant to section 78o(d) of this title, if the conduct of that person demonstrates unfitness to serve as an officer or director of any such issuer.

**(g) Authority to impose money penalties**

**(1) Grounds**

In any cease-and-desist proceeding under subsection (a), the Commission may impose a civil penalty on a person if the Commission finds, on the record, after notice and opportunity for hearing, that—

(A) such person—

(i) is violating or has violated any provision of this subchapter, or any rule or regulation issued under this subchapter; or

(ii) is or was a cause of the violation of any provision of this subchapter, or any rule or regulation thereunder; and

(B) such penalty is in the public interest.

**(2) Maximum amount of penalty**

**(A) First tier**

The maximum amount of a penalty for each act or omission described in paragraph (1) shall be $7,500 for a natural person or $75,000 for any other person.

**(B) Second tier**

Notwithstanding subparagraph (A), the maximum amount of penalty for each such act or omission shall be $75,000 for a natural person or $375,000 for any other person, if the act or omission described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

**(C) Third tier**

Notwithstanding subparagraphs (A) and (B), the maximum amount of penalty for each such act or omission shall be $150,000 for a natural person or $725,000 for any other person, if—

(i) the act or omission described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

(ii) such act or omission directly or indirectly resulted in—

(I) substantial losses or created a significant risk of substantial losses to other persons; or

(II) substantial pecuniary gain to the person who committed the act or omission.

**(3) Evidence concerning ability to pay**

In any proceeding in which the Commission may impose a penalty under this section, a respondent may present evidence of the ability of the respondent to pay such penalty. The Commission may, in its discretion, consider such evidence in determining whether such penalty is in the public interest. Such evidence may relate to the extent of the ability of the respondent to continue in business and the collectability of a penalty, taking into account any other claims of the United States or third parties upon the assets of the respondent and the amount of the assets of the respondent.

(May 27, 1933, ch. 38, title I, §8A, as added Pub. L. 101–429, title I, §102, Oct. 15, 1990, 104 Stat. 933; amended Pub. L. 107–204, title XI, §1105(b), July 30, 2002, 116 Stat. 809; Pub. L. 111–203, title IX, §929P(a)(1), July 21, 2010, 124 Stat. 1862.)

AMENDMENTS

2010—Subsec. (g). Pub. L. 111–203 added subsec. (g).
2002—Subsec. (f). Pub. L. 107–204 added subsec. (f).

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking.

EFFECTIVE DATE

Section effective Oct. 15, 1990, with provisions relating to civil penalties and accounting and disgorgement, see section 1(c)(1) and (2) of Pub. L. 101–429, set out in an Effective Date of 1990 Amendment note under section 77g of this title.

**§ 77i. Court review of orders**

(a) Any person aggrieved by an order of the Commission may obtain a review of such order in the court of appeals of the United States, within any circuit wherein such person resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such Court, within sixty days after the entry of such order, a written petition praying that the order of the Commission be modified or be set aside in whole or in part. A copy of such

petition shall be forthwith transmitted by the clerk of the court to the Commission, and thereupon the Commission shall file in the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission. The finding of the Commission as to the facts, if supported by evidence, shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the hearing before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts, by reason of the additional evidence so taken, and it shall file such modified or new findings, which, if supported by evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The jurisdiction of the court shall be exclusive and its judgment and decree, affirming, modifying, or setting aside, in whole or in part, any order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

(b) The commencement of proceedings under subsection (a) shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(May 27, 1933, ch. 38, title I, § 9, 48 Stat. 80; Pub. L. 85–791, § 9, Aug. 28, 1958, 72 Stat. 945; Pub. L. 100–181, title II, § 206, Dec. 4, 1987, 101 Stat. 1252.)

AMENDMENTS

1987—Subsec. (a). Pub. L. 100–181 substituted "court of appeals" for "Circuit Court of Appeals", "United States Court of Appeals for the District of Columbia, by filing in such Court" for "Court of Appeals of the District of Columbia, by filing in such court", and "section 1254 of title 28" for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)".

1958—Subsec. (a). Pub. L. 85–791, in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", struck out "certify and" before "file in the court", struck out "a transcript of" after "file in the court", and inserted "as provided in section 2112 of title 28".

TRANSFER OF FUNCTIONS

For transfer of functions of Securities and Exchange Commission, with certain exceptions, to Chairman of such Commission, see Reorg. Plan No. 10 of 1950, §§ 1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out under section 78d of this title.

## § 77j. Information required in prospectus

### (a) Information in registration statement; documents not required

Except to the extent otherwise permitted or required pursuant to this subsection or subsections (c), (d), or (e)—

(1) a prospectus relating to a security other than a security issued by a foreign government or political subdivision thereof, shall contain the information contained in the registration

statement, but it need not include the documents referred to in paragraphs (28) to (32), inclusive, of schedule A of section 77aa of this title;

(2) a prospectus relating to a security issued by a foreign government or political subdivision thereof shall contain the information contained in the registration statement, but it need not include the documents referred to in paragraphs (13) and (14) of schedule B of section 77aa of this title;

(3) notwithstanding the provisions of paragraphs (1) and (2) of this subsection when a prospectus is issued more than nine months after the effective date of the registration statement, the information contained therein shall be as of a date not more than sixteen months prior to such use, so far as such information is known to the user of such prospectus or can be furnished by such user without unreasonable effort or expense;

(4) there may be omitted from any prospectus any of the information required under this subsection which the Commission may by rules or regulations designate as not being necessary or appropriate in the public interest or for the protection of investors.

### (b) Summarizations and omissions allowed by rules and regulations

In addition to the prospectus permitted or required in subsection (a), the Commission shall by rules or regulations deemed necessary or appropriate in the public interest or for the protection of investors permit the use of a prospectus for the purposes of subsection (b)(1) of section 77e of this title which omits in part or summarizes information in the prospectus specified in subsection (a). A prospectus permitted under this subsection shall, except to the extent the Commission by rules or regulations deemed necessary or appropriate in the public interest or for the protection of investors otherwise provides, be filed as part of the registration statement but shall not be deemed a part of such registration statement for the purposes of section 77k of this title. The Commission may at any time issue an order preventing or suspending the use of a prospectus permitted under this subsection, if it has reason to believe that such prospectus has not been filed (if required to be filed as part of the registration statement) or includes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which such prospectus is or is to be used, not misleading. Upon issuance of an order under this subsection, the Commission shall give notice of the issuance of such order and opportunity for hearing by personal service or the sending of confirmed telegraphic notice. The Commission shall vacate or modify the order at any time for good cause or if such prospectus has been filed or amended in accordance with such order.

### (c) Additional information required by rules and regulations

Any prospectus shall contain such other information as the Commission may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of investors.

out as a note under section 5301 of Title 12, Banks and Banking.

### DEFINITION

For definition of "Commission" as used in this section, see section 5301 of Title 12, Banks and Banking.

## § 78d–9. Report on oversight of national securities associations

### (a) Report required

Not later than 2 years after July 21, 2010, and every 3 years thereafter, the Comptroller General of the United States shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a report that includes an evaluation of the oversight by the Commission of national securities associations registered under section 78o–3 of this title with respect to—

(1) the governance of such national securities associations, including the identification and management of conflicts of interest by such national securities associations, together with an analysis of the impact of any conflicts of interest on the regulatory enforcement or rulemaking by such national securities associations;

(2) the examinations carried out by the national securities associations, including the expertise of the examiners;

(3) the executive compensation practices of such national securities associations;

(4) the arbitration services provided by the national securities associations;

(5) the review performed by national securities associations of advertising by the members of the national securities associations;

(6) the cooperation with and assistance to State securities administrators by the national securities associations to promote investor protection;

(7) how the funding of national securities associations is used to support the mission of the national securities associations, including—

(A) the methods of funding;

(B) the sufficiency of funds;

(C) how funds are invested by the national securities association pending use; and

(D) the impact of the methods, sufficiency, and investment of funds on regulatory enforcement by the national securities associations;

(8) the policies regarding the employment of former employees of national securities associations by regulated entities;

(9) the ongoing effectiveness of the rules of the national securities associations in achieving the goals of the rules;

(10) the transparency of governance and activities of the national securities associations; and

(11) any other issue that has an impact, as determined by the Comptroller General, on the effectiveness of such national securities associations in performing their mission and in dealing fairly with investors and members; [1]

---

[1] So in original. The semicolon probably should be a period.

### (b) Reimbursements for cost of reports

#### (1) Reimbursements required

The Commission shall reimburse the Government Accountability Office for the full cost of making the reports under subsection (a), as billed therefor by the Comptroller General.

#### (2) Crediting and use of reimbursements

Such reimbursements shall—

(A) be credited to the appropriation account "Salaries and Expenses, Government Accountability Office" current when the payment is received; and

(B) remain available until expended.

(Pub. L. 111–203, title IX, §964, July 21, 2010, 124 Stat. 1910.)

### CODIFICATION

Section was enacted as part of the Investor Protection and Securities Reform Act of 2010 and also as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and not as part of the Securities Exchange Act of 1934 which comprises this chapter.

### EFFECTIVE DATE

Section effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as a note under section 5301 of Title 12, Banks and Banking.

### DEFINITIONS

For definitions of terms used in this section, see section 5301 of Title 12, Banks and Banking.

## § 78e. Transactions on unregistered exchanges

It shall be unlawful for any broker, dealer, or exchange, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security, or to report any such transaction, unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such registration upon application by the exchange because, in the opinion of the Commission, by reason of the limited volume of transactions effected on such exchange, it is not practicable and not necessary or appropriate in the public interest or for the protection of investors to require such registration.

(June 6, 1934, ch. 404, title I, §5, 48 Stat. 885.)

### TRANSFER OF FUNCTIONS

For transfer of functions of Securities and Exchange Commission, with certain exceptions, to Chairman of such Commission, see Reorg. Plan No. 10 of 1950, §§1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out under section 78d of this title.

## § 78f. National securities exchanges

### (a) Registration; application

An exchange may be registered as a national securities exchange under the terms and conditions hereinafter provided in this section and in accordance with the provisions of section 78s(a) of this title, by filing with the Commission an application for registration in such form as the Commission, by rule, may prescribe containing the rules of the exchange and such other information

viding for written objection to public disclosure of information, was struck out.

CHANGE OF NAME

Section 203(a) of act Aug. 23, 1935, substituted "Board of Governors of the Federal Reserve System" for "Federal Reserve Board".

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking.

EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 94–29 effective June 4, 1975, see section 31(a) of Pub. L. 94–29, set out as a note under section 78b of this title.

TRANSFER OF FUNCTIONS

For transfer of functions of Securities and Exchange Commission, with certain exceptions, to Chairman of such Commission, see Reorg. Plan No. 10 of 1950, §§1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out under section 78d of this title.

## § 78y. Court review of orders and rules

**(a) Final Commission orders; persons aggrieved; petition; record; findings; affirmance, modification, enforcement, or setting aside of orders; remand to adduce additional evidence**

(1) A person aggrieved by a final order of the Commission entered pursuant to this chapter may obtain review of the order in the United States Court of Appeals for the circuit in which he resides or has his principal place of business, or for the District of Columbia Circuit, by filing in such court, within sixty days after the entry of the order, a written petition requesting that the order be modified or set aside in whole or in part.

(2) A copy of the petition shall be transmitted forthwith by the clerk of the court to a member of the Commission or an officer designated by the Commission for that purpose. Thereupon the Commission shall file in the court the record on which the order complained of is entered, as provided in section 2112 of title 28 and the Federal Rules of Appellate Procedure.

(3) On the filing of the petition, the court has jurisdiction, which becomes exclusive on the filing of the record, to affirm or modify and enforce or to set aside the order in whole or in part.

(4) The findings of the Commission as to the facts, if supported by substantial evidence, are conclusive.

(5) If either party applies to the court for leave to adduce additional evidence and shows to the satisfaction of the court that the additional evidence is material and that there was reasonable ground for failure to adduce it before the Commission, the court may remand the case to the Commission for further proceedings, in whatever manner and on whatever conditions the court considers appropriate. If the case is remanded to the Commission, it shall file in the court a supplemental record containing any new evidence, any further or modified findings, and any new order.

**(b) Commission rules; persons adversely affected; petition; record; affirmance, enforcement, or setting aside of rules; findings; transfer of proceedings**

(1) A person adversely affected by a rule of the Commission promulgated pursuant to section 78f, 78i(h)(2), 78k, 78k–1, 78o(c)(5) or (6), 78o–3, 78q, 78q–1, or 78s of this title may obtain review of this rule in the United States Court of Appeals for the circuit in which he resides or has his principal place of business or for the District of Columbia Circuit, by filing in such court, within sixty days after the promulgation of the rule, a written petition requesting that the rule be set aside.

(2) A copy of the petition shall be transmitted forthwith by the clerk of the court to a member of the Commission or an officer designated for that purpose. Thereupon, the Commission shall file in the court the rule under review and any documents referred to therein, the Commission's notice of proposed rulemaking and any documents referred to therein, all written submissions and the transcript of any oral presentations in the rulemaking, factual information not included in the foregoing that was considered by the Commission in the promulgation of the rule or proffered by the Commission as pertinent to the rule, the report of any advisory committee received or considered by the Commission in the rulemaking, and any other materials prescribed by the court.

(3) On the filing of the petition, the court has jurisdiction, which becomes exclusive on the filing of the materials set forth in paragraph (2) of this subsection, to affirm and enforce or to set aside the rule.

(4) The findings of the Commission as to the facts identified by the Commission as the basis, in whole or in part, of the rule, if supported by substantial evidence, are conclusive. The court shall affirm and enforce the rule unless the Commission's action in promulgating the rule is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law.

(5) If proceedings have been instituted under this subsection in two or more courts of appeals with respect to the same rule, the Commission shall file the materials set forth in paragraph (2) of this subsection in that court in which a proceeding was first instituted. The other courts shall thereupon transfer all such proceedings to the court in which the materials have been filed. For the convenience of the parties in the interest of justice that court may thereafter transfer all the proceedings to any other court of appeals.

**(c) Objections not urged before Commission; stay of orders and rules; transfer of enforcement or review proceedings**

(1) No objection to an order or rule of the Commission, for which review is sought under this section, may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so.

(2) The filing of a petition under this section does not operate as a stay of the Commission's order or rule. Until the court's jurisdiction becomes exclusive, the Commission may stay its order or rule pending judicial review if it finds that justice so requires. After the filing of a petition under this section, the court, on whatever conditions may be required and to the extent necessary to prevent irreparable injury, may issue all

necessary and appropriate process to stay the order or rule or to preserve status or rights pending its review; but (notwithstanding section 705 of title 5) no such process may be issued by the court before the filing of the record or the materials set forth in subsection (b)(2) of this section unless: (A) the Commission has denied a stay or failed to grant requested relief, (B) a reasonable period has expired since the filing of an application for a stay without a decision by the Commission, or (C) there was reasonable ground for failure to apply to the Commission.

(3) When the same order or rule is the subject of one or more petitions for review filed under this section and an action for enforcement filed in a district court of the United States under section 78u(d) or (e) of this title, that court in which the petition or the action is first filed has jurisdiction with respect to the order or rule to the exclusion of any other court, and thereupon all such proceedings shall be transferred to that court; but, for the convenience of the parties in the interest of justice, that court may thereafter transfer all the proceedings to any other court of appeals or district court of the United States, whether or not a petition for review or an action for enforcement was originally filed in the transferee court. The scope of review by a district court under section 78u(d) or (e) of this title is in all cases the same as by a court of appeals under this section.

**(d) Other appropriate regulatory agencies**

(1) For purposes of the preceding subsections of this section, the term "Commission" includes the agencies enumerated in section 78c(a)(34) of this title insofar as such agencies are acting pursuant to this chapter and the Secretary of the Treasury insofar as he is acting pursuant to section 78o–5 of this title.

(2) For purposes of subsection (a)(4) of this section and section 706 of title 5, an order of the Commission pursuant to section 78s(a) of this title denying registration to a clearing agency for which the Commission is not the appropriate regulatory agency or pursuant to section 78s(b) of this title disapproving a proposed rule change by such a clearing agency shall be deemed to be an order of the appropriate regulatory agency for such clearing agency insofar as such order was entered by reason of a determination by such appropriate regulatory agency pursuant to section 78s(a)(2)(C) or 78s(b)(4)(C) of this title that such registration or proposed rule change would be inconsistent with the safeguarding of securities or funds.

(June 6, 1934, ch. 404, title I, § 25, 48 Stat. 901; June 7, 1934, ch. 426, 48 Stat. 926; June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 85–791, § 10, Aug. 28, 1958, 72 Stat. 945; Pub. L. 94–29, § 20, June 4, 1975, 89 Stat. 158; Pub. L. 99–571, title I, § 102(k), Oct. 28, 1986, 100 Stat. 3220; Pub. L. 101–432, § 6(b), Oct. 16, 1990, 104 Stat. 975.)

REFERENCES IN TEXT

This chapter, referred to in subsecs. (a)(1) and (d)(1), was in the original "this title". See References in Text note set out under section 78a of this title.

The Federal Rules of Appellate Procedure, referred to in subsec. (a)(2), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

1990—Subsec. (b)(1). Pub. L. 101–432 inserted "78i(h)(2)," after "section 78f,".

1986—Subsec. (d)(1). Pub. L. 99–571 inserted "and the Secretary of the Treasury insofar as he is acting pursuant to section 78o–5 of this title".

1975—Subsec. (a). Pub. L. 94–29 revised existing provisions into five numbered paragraphs.

Subsec. (b). Pub. L. 94–29 substituted provisions permitting persons adversely affected by any rule promulgated by the Commission pursuant to sections 78f, 78k, 78k–1, 78o(c)(5) or (6), 78o–3, 78q, 78q–1, or 78s of this title to obtain direct review in an appropriate Court of Appeals for provisions that commencement of proceedings under subsec. (a) shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

Subsecs. (c), (d). Pub. L. 94–29 added subsecs. (c) and (d).

1958—Subsec. (a). Pub. L. 85–791, in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", struck out "certify and" before "file in the court", struck out "a transcript of" after "file in the court", and inserted "as provided in section 2112 of title 28", and, in third sentence, substituted "petition" for "transcript", and "jurisdiction, which upon the filing of the record shall be exclusive" for "exclusive jurisdiction".

CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

Act June 7, 1934, substituted "United States Court of Appeals for the District of Columbia" for "Court of Appeals for District of Columbia".

EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99–571 effective 270 days after Oct. 28, 1986, see section 401 of Pub. L. 99–571, set out as an Effective Date note under section 78o–5 of this title.

EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 94–29 effective June 4, 1975, see section 31(a) of Pub. L. 94–29, set out as a note under section 78b of this title.

TRANSFER OF FUNCTIONS

For transfer of functions of Securities and Exchange Commission, with certain exceptions, to Chairman of such Commission, see Reorg. Plan No. 10 of 1950, §§ 1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out under section 78d of this title.

**§ 78z. Unlawful representations**

No action or failure to act by the Commission or the Board of Governors of the Federal Reserve System, in the administration of this chapter shall be construed to mean that the particular authority has in any way passed upon the merits of, or given approval to, any security or any transaction or transactions therein, nor shall such action or failure to act with regard to any statement or report filed with or examined by such authority pursuant to this chapter or rules and regulations thereunder, be deemed a finding by such authority that such statement or report is true and accurate on its face or that it is not false or misleading. It shall be unlawful to make, or cause to be made, to any prospective purchaser or seller of a security any representation that any such action or failure to act by any such authority is to be so construed or has such effect.

(June 6, 1934, ch. 404, title I, § 26, 48 Stat. 902; Pub. L. 105–353, title III, § 301(b)(5), Nov. 3, 1998, 112 Stat. 3236.)

Sec.
1657.    Priority of civil actions.
1658.    Time limitations on the commencement of civil
         actions arising under Acts of Congress.
1659.    Stay of certain actions pending disposition of
         related proceedings before the United States
         International Trade Commission.

AMENDMENTS

1994—Pub. L. 103–465, title III, § 321(b)(1)(B), Dec. 8, 1994, 108 Stat. 4946, added item 1659.

1990—Pub. L. 101–650, title III, § 313(b), Dec. 1, 1990, 104 Stat. 5115, added item 1658.

1984—Pub. L. 98–620, title IV, § 401(b), Nov. 8, 1984, 98 Stat. 3357, added item 1657.

§ 1651. Writs

(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

(b) An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction.

(June 25, 1948, ch. 646, 62 Stat. 944; May 24, 1949, ch. 139, § 90, 63 Stat. 102.)

HISTORICAL AND REVISION NOTES

1948 ACT

Based on title 28, U.S.C., 1940 ed., §§ 342, 376, 377 (Mar. 3, 1911, ch. 231, §§ 234, 261, 262, 36 Stat. 1156, 1162).

Section consolidates sections 342, 376, and 377 of title 28, U.S.C., 1940 ed., with necessary changes in phraseology.

Such section 342 provided:

"The Supreme Court shall have power to issue writs of prohibition to the district courts, when proceeding as courts of admiralty and maritime jurisdiction; and writs of mandamus, in cases warranted by the principles and usages of law, to any courts appointed under the authority of the United States, or to persons holding office under the authority of the United States, where a State, or an ambassador, or other public minister, or a consul, or vice consul is a party."

Such section 376 provided:

"Writs of ne exeat may be granted by any justice of the Supreme Court, in cases where they might be granted by the Supreme Court; and by any district judge, in cases where they might be granted by the district court of which he is a judge. But no writ of ne exeat shall be granted unless a suit in equity is commenced, and satisfactory proof is made to the court or judge granting the same that the defendant designs quickly to depart from the United States."

Such section 377 provided:

"The Supreme Court and the district courts shall have power to issue writs of scire facias. The Supreme Court, the circuit courts of appeals, and the district courts shall have power to issue all writs not specifically provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the usages and principles of law."

The special provisions of section 342 of title 28, U.S.C., 1940 ed., with reference to writs of prohibition and mandamus, admiralty courts and other courts and officers of the United States were omitted as unnecessary in view of the revised section.

The revised section extends the power to issue writs in aid of jurisdiction, to all courts established by Act of Congress, thus making explicit the right to exercise powers implied from the creation of such courts.

The provisions of section 376 of title 28, U.S.C., 1940 ed., with respect to the powers of a justice or judge in issuing writs of ne exeat were changed and made the basis of subsection (b) of the revised section but the conditions and limitations on the writ of ne exeat were omitted as merely confirmatory of well-settled principles of law.

The provision in section 377 of title 28, U.S.C., 1940 ed., authorizing issuance of writs of scire facias, was omitted in view of rule 81(b) of the Federal Rules of Civil Procedure abolishing such writ. The revised section is expressive of the construction recently placed upon such section by the Supreme Court in *U.S. Alkali Export Assn. v. U.S.*, 65 S.Ct. 1120, 325 U.S. 196, 89 L.Ed. 1554, and *De Beers Consol. Mines v. U.S.*, 65 S.Ct. 1130, 325 U.S. 212, 89 L.Ed. 1566.

1949 ACT

This section corrects a grammatical error in subsection (a) of section 1651 of title 28, U.S.C.

AMENDMENTS

1949—Subsec. (a). Act May 24, 1949, inserted "and" after "jurisdictions".

WRIT OF ERROR

Act Jan. 31, 1928, ch. 14, § 2, 45 Stat. 54, as amended Apr. 26, 1928, ch. 440, 45 Stat. 466; June 25, 1948, ch. 646, § 23, 62 Stat. 990, provided that: "All Acts of Congress referring to writs of error shall be construed as amended to the extent necessary to substitute appeal for writ of error."

§ 1652. State laws as rules of decision

The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.

(June 25, 1948, ch. 646, 62 Stat. 944.)

HISTORICAL REVISION NOTES

Based on title 28, U.S.C., 1940 ed., § 725 (R.S. § 721).

"Civil actions" was substituted for "trials at common law" to clarify the meaning of the Rules of Decision Act in the light of the Federal Rules of Civil Procedure. Such Act has been held to apply to suits in equity.

Changes were made in phraseology.

§ 1653. Amendment of pleadings to show jurisdiction

Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts.

(June 25, 1948, ch. 646, 62 Stat. 944.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., § 399 (Mar. 3, 1911, ch. 231, § 274c, as added Mar. 3, 1915, ch. 90, 38 Stat. 956).

Section was extended to permit amendment of all jurisdictional allegations instead of merely allegations of diversity of citizenship as provided by section 399 of title 28, U.S.C., 1940 ed.

Changes were made in phraseology.

§ 1654. Appearance personally or by counsel

In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein.

(June 25, 1948, ch. 646, 62 Stat. 944; May 24, 1949, ch. 139, § 91, 63 Stat. 103.)

HISTORICAL REVISION NOTES

1948 ACT

Based on title 28, U.S.C., 1940 ed., § 394 (Mar. 3, 1911, ch. 231, § 272, 36 Stat. 1164).

accordance with orders of the Commission.

(d) *Public availability of orders.* Any final order of the Commission denying or sustaining an application for confidential treatment shall be made public. Any prior findings or opinions relating to an application for confidential treatment under this section shall be made public at such time as the material as to which confidentiality was requested is made public.

[60 FR 32796, June 23, 1995, as amended at 76 FR 71875, Nov. 21, 2011]

### § 201.191 Adjudications not required to be determined on the record after notice and opportunity for hearing.

(a) *Scope of the rule.* This rule applies to every case of adjudication, as defined in 5 U.S.C. 551, pursuant to any statute which the Commission administers, where adjudication is not required to be determined on the record after notice and opportunity for hearing and which the Commission has not chosen to determine on the record after notice and opportunity for hearing.

(b) *Procedure.* In every case of adjudication under paragraph (a) of this section, the Commission shall give prompt notice of any adverse action or final disposition to any person who has requested the Commission to make (or not to make) any such adjudication, and furnish to any such person a written statement of reasons therefor. Additional procedures may be specified in rules relating to specific types of such adjudications. Where any such rule provides for the publication of a Commission order, notice of the action or disposition shall be deemed to be given by such publication.

(c) *Contents of the record.* If the Commission provides notice and opportunity for the submission of written comments by parties to the adjudication or, as the case may be, by other interested persons, written comments received on or before the closing date for comments, unless accorded confidential treatment pursuant to statute or rule of the Commission, become a part of the record of the adjudication. The Commission, in its discretion, may accept and include in the record written comments filed with the Commission after the closing date.

### § 201.192 Rulemaking: Issuance, amendment and repeal of rules of general application.

(a) *By petition.* Any person desiring the issuance, amendment or repeal of a rule of general application may file a petition therefor with the Secretary. Such petition shall include a statement setting forth the text or the substance of any proposed rule or amendment desired or specifying the rule the repeal of which is desired, and stating the nature of his or her interest and his or her reasons for seeking the issuance, amendment or repeal of the rule. The Secretary shall acknowledge, in writing, receipt of the petition and refer it to the appropriate division or office for consideration and recommendation. Such recommendations shall be transmitted with the petition to the Commission for such action as the Commission deems appropriate. The Secretary shall notify the petitioner of the action taken by the Commission.

(b) *Notice of proposed issuance, amendment or repeal of rules.* Except where the Commission finds that notice and public procedure are impracticable, unnecessary, or contrary to the public interest, whenever the Commission proposes to issue, amend, or repeal any rule or regulation of general application other than an interpretive rule; general statement of policy; or rule of agency organization, procedure, or practice; or any matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts, there shall first be published in the FEDERAL REGISTER a notice of the proposed action. Such notice shall include:

(1) A statement of the time, place, and nature of the rulemaking proceeding, with particular reference to the manner in which interested persons shall be afforded the opportunity to participate in such proceeding;

(2) Reference to the authority under which the rule is proposed; and

(3) The terms or substance of the proposed rule or a description of the subjects and issues involved.

### § 201.193 Applications by barred individuals for consent to associate.

(a) *Preliminary note.* This section governs applications to the Commission by

144