No. 23-1779

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

IN RE COINBASE, INC.,
*Petitioner.*

---

On Petition for a Writ of Mandamus
to the United States Securities and Exchange Commission

---

BRIEF OF THE CRYPTO COUNCIL FOR INNOVATION
AS AMICUS CURIAE IN SUPPORT OF PETITIONER

---

Michelle S. Kallen
Laurel Loomis Rimon
JENNER & BLOCK LLP
1099 New York Avenue NW,
Ste 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
MKallen@jenner.com
LRimon@jenner.com

Jeremy M. Creelan
Kayvan B. Sadeghi
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036-2711
Telephone: 212-891-1600
JCreelan@jenner.com
KSadeghi@jenner.com

Kimberly M. Castle
JENNER & BLOCK LLP
455 Market Street, Ste 2100
San Francisco, CA 94105-2453
Telephone: 628-267-6800
KCastle@jenner.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae Crypto Council for Innovation certifies that it has no outstanding shares or debt securities in the hands of the public and that it does not have a parent company.  No publicly held corporation has a 10% or greater ownership in amicus curiae.

/s/ *Michelle S. Kallen*
Michelle S. Kallen

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ............................................ i

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF AMICUS CURIAE ........................................................... 1

STANDARD ...................................................................................... 3

ARGUMENT ..................................................................................... 3

I.    The SEC's failure to respond to Coinbase's petition for rulemaking is causing tangible harm to a major American industry ...................................................................................... 4

    A.    The SEC's enforcement-only approach to regulation leaves no viable path for good actors ..................................... 5

    B.    The lack of guidance is causing good actors and innovation to flee the United States .................................... 10

II.    The SEC's failure to respond to Coinbase's petition for rulemaking is part of a pattern that has stymied judicial reviews ........................................................................................ 14

CONCLUSION ................................................................................ 16

CERTIFICATE OF COMPLIANCE ....................................................... 17

CERTIFICATE OF SERVICE .............................................................. 19

# TABLE OF AUTHORITIES

Page(s)

Cases

*In re Am. Rivers & Idaho Rivers United,*
   372 F.3d 413 (D.C. Cir. 2004) .......................................................... 3, 15

*In re Bluewater Network,*
   234 F.3d 1305 (D.C. Cir. 2000) ............................................................ 3

*In re Core Commc'ns, Inc.,*
   531 F.3d 849 (D.C. Cir. 2008) .............................................................. 3

*In re Ctr. For Biological Diversity,*
   53 F.4th 665 (D.C. Cir. 2022) .............................................................. 3

*MCI Telecomms. Corp. v. F.C.C.,*
   627 F.2d 322 (D.C. Cir. 1980) .............................................................. 4

*In re People's Mojahedin Org. of Iran,*
   680 F.3d 832 (D.C. Cir. 2012) .............................................................. 3

*Pub. Citizen Health Rsch. Grp. v. Brock,*
   823 F.2d 626 (D.C. Cir. 1987) ............................................................ 15

*Telecomms. Rsch. & Action Ctr. v. F.C.C.,*
   750 F.2d 7081 (D.C. Cir. 1984) ............................................................ 3

*In re United Mine Workers of Am. Int'l Union,*
   190 F.3d 545 (D.C. Cir. 1999) .............................................................. 3

Statutes

5 U.S.C. § 704 ......................................................................................... 15

15 U.S.C. § 78 .......................................................................................... 6

15 U.S.C. § 77 .......................................................................................... 6

**Court Rules**

Federal Rule of Appellate Procedure 29 ............................................. 1, 17

Federal Rule of Appellate Procedure 32 ................................................ 17

**Other Authorities**

Banco Bilbao Vizcaya Argentaria, *Lugano stakes claim to become cryptocurrency capital of Europe* (Feb. 23, 2023) ................. 12

Lewis Cohen *et al.*, *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* (Nov. 10, 2022) ...................................................................... 8

Crypto Council for Innovation, *The Alliance* ........................................... 1

Department of the Treasury, *Crypto-Assets: Implications for Consumers, Investors, and Businesses* (Sept. 2022) .......................... 4

Developer Report, *U.S. Share of Blockchain Developers is Shrinking* ..................................................................... 13, 14

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide Before the H. Comm. on Financial Services,* 117th Cong. 11 (2021) (statement of Hon. Gary Gensler, Chair, SEC) ................................... 4

Gary Gensler, *Kennedy and Crypto*, Remarks at SEC Speaks (Sep. 8, 2022) ...................................................................... 10

Andrew Griffith MP, Foreword to FUTURE FINANCIAL SERVICES REGULATORY REGIME FOR CRYPTOASSETS— CONSULTATION AND CALL FOR EVIDENCE, HM Treasury (2023). ...................................................................... 11

William Hinman, Director, Division of Corporation Finance of SEC, Remarks at Yahoo Finance All Markets Summit: Crypto (June 14, 2018) ......................................................... 7

Ankush Khardori, *Can Gary Gensler Survive Crypto Winter?* N.Y. Magazine (Feb. 23, 2023) ................................. 6

Emily Nicolle & Suvashree Ghosh, *US Crypto Crackdown Boosts Appeal of Friendlier Overseas Hubs, Bloomberg Industry Group* (Feb. 17, 2023) ............................................ 12

*Oversight of the Securities and Exchange Commission Before the H. Comm. on Financial Services* (2023) (statement of Hon. Gary Gensler, Chair, SEC) ................................... 7

Hester M. Peirce, Commissioner, SEC, Address at Securities Enforcement Forum (May 9, 2019) ........................................ 8

Andrew Perrin, *16% of Americans Say They Have Ever Invested In, Traded or Used Cryptocurrency, Pew Research Center* (Nov. 11, 2021) ........................................... 5

Pew Research Center, *Used Cryptocurrency* (Nov. 11, 2021) .............. 4, 5

Proposal for a Regulation (EU) 2020/0265 of the European Parliament and of the Council on Markets in Crypto-assets, and amending Directive (EU) 2019/193. ............................... 11

Kara McKenna Rollins, *Have the SEC's Delay Tactics Made Its Petition for Rulemaking Process Vulnerable to Challenge? A Look at In re Coinbase Inc. and SEC's Nullification of 5 U.S.C. § 553(e) by Inaction,* Yale Journal on Regulation (May 3, 2023) ............................................... 14

Securities and Exchange Commission, *Framework for 'Investment Contract' Analysis of Digital Assets* (Apr. 3, 2019) ............................................................... 7

Securities and Exchange Commission, *The Role of the SEC* ................... 9

Ben Weiss, *Kraken secures license in Ireland as U.S. crypto companies look abroad for "clarity"*, Fortune Crypto (Apr. 18, 2023) ............................................................ 12

Jeff Wilser, *Senator Cynthia "Crypto Queen" Lummis: Lack of Laws Pushing Industry Overseas*, NASDAQ (Mar. 20, 2023) ............................................................. 12

## INTEREST OF AMICUS CURIAE[1]

The Crypto Council for Innovation (CCI) is an alliance of industry leaders with a mission to communicate the opportunities presented by digital assets and demonstrate the technology's transformational potential. CCI members span the digital assets ecosystem; its membership includes nine of the leading global companies and investors operating in the industry. *See* Crypto Council for Innovation, *The Alliance*, https://tinyurl.com/bde699am. CCI's members share the goal of encouraging responsible global regulation of digital assets to unlock economic potential, improve lives, foster financial inclusion, protect national security, and combat illicit activity. CCI believes that achieving these goals requires informed, evidence-based policy decisions realized through collaborative engagement with regulators and industry.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus CCI affirms that no party or counsel for a party authored this brief in whole or in part and that no person other than amicus, its members, or its counsel has made any monetary contributions intended to fund the preparation or submission of this brief. Petitioner Coinbase is a member of CCI; its counsel, however, has not authored this brief in whole or in part, nor has Coinbase contributed funds specifically intended for the preparation or submission of this brief.

CCI has a strong interest in this action arising from harm to its members and to the broader digital asset industry caused by the U.S. Securities and Exchange Commission's (SEC or Commission) pattern of enforcement without providing a viable path to compliance. Such regulation-by-enforcement thwarts meaningful participation in agency decision-making, deprives market participants of fair notice as to what is permissible, and chills innovation and investment in digital assets.

The relief Coinbase seeks in its petition for writ of mandamus is necessary to provide much-needed guidance to the digital assets industry. As a coalition of industry leaders with substantial expertise in the crypto space, CCI has a vital perspective to offer on issues of importance for digital asset holders, developers, operators, and investors building the digital asset ecosystem. Unless these stakeholders can rely on clear, consistent guidance—and work within a regulatory framework that makes compliance possible—digital assets, and the growing industry they fuel, will not achieve their full potential in the United States and will be pushed to the other jurisdictions actively seeking to host the next wave of innovation. The context surrounding the SEC's

approach to digital assets should inform this Court's analysis of the legal questions presented in this case.

## STANDARD

A writ of mandamus for agency inaction is appropriate when an agency subject to a clear duty to act has unreasonably delayed such action. *Telecomms. Rsch. & Action Ctr. v. F.C.C.*, 750 F.2d 70, 79–81 (D.C. Cir. 1984); *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000); *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999); *In re Ctr. For Biological Diversity*, 53 F.4th 665, 671 (D.C. Cir. 2022); *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008); *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004); *In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 836 (D.C. Cir. 2012). In issuing this writ, courts "should also take into account the nature and extent of the interests prejudiced by delay." *Bluewater*, 234 F.3d at 1315.

## ARGUMENT

Courts have long recognized that, "[m]any of the same considerations that impel judicial protection of the right to a 'speedy trial' in criminal cases or implementation of civil decrees with all deliberate speed" apply to "delay[s] in the resolution of administrative proceedings[,

which] can also deprive regulated entities, their competitors or the public of rights and economic opportunities without the due process the Constitution requires." *MCI Telecomms. Corp. v. F.C.C.*, 627 F.2d 322, 341 (D.C. Cir. 1980). The SEC's failure to issue rulemaking has deprived crypto industry participants of the clarity necessary for the industry to grow and succeed in the United States.

## I.   The SEC's failure to respond to Coinbase's petition for rulemaking is causing tangible harm to a major American industry.

Digital assets play an important role in the American economy, and their economic and political significance is growing. The market size of digital assets has expanded tremendously in recent years. In January 2020, aggregate market capitalization of all digital assets was just under $200 billion. It grew to nearly $2.9 trillion in November 2021, before falling to approximately $1.0 trillion in June 2022.[2] Pew Research Center estimated that, as of 2021, 16% of Americans have

---

[2] Department of the Treasury, *Crypto-Assets: Implications for Consumers, Investors, and Businesses* (Sept. 2022) https://home.treasury.gov/system/files/136/CryptoAsset_EO5.pdf; *see also Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide Before the H. Comm. on Financial Services, 117th Cong. 11 (2021) (statement of Hon. Gary Gensler, Chair, SEC).*

invested in, traded, or used cryptocurrency.[3]  Regulatory guidance is essential for the success of this growing industry.

### A. The SEC's enforcement-only approach to regulation leaves no viable path for good actors.

The SEC's limited guidance has been vague, inconsistent, and unworkable for the industry.  The SEC's suggestion that digital asset organizations can simply "come in and register" is not feasible for the industry for numerous reasons.  *First*, there is no actionable guidance to delineate which assets the SEC thinks require registration.  *Second*, the registration requirements that (at least at first blush) could apply are ill-fitting, inadequate, and often misleading.  *Third*, even if some assets or market participants did register, securities laws preclude market participants from servicing a category of assets (like digital assets) that includes both securities and non-securities.  Simply put, the SEC has provided no viable pathway for crypto firms to comply with existing regulations.

---

[3] *See* Andrew Perrin, *16% of Americans Say They Have Ever Invested In, Traded or Used Cryptocurrency*, Pew Research Center (Nov. 11, 2021), https://www.pewresearch.org/fact-tank/2021/11/11/16-of-americans-say-they-have-ever-invested-in-traded-or-used-cryptocurrency/.

The SEC's failure to articulate a coherent view as to which digital assets are securities creates an unacceptable and unnecessary risk for responsible actors. Securities laws impose strict liability on both issuers and third parties in secondary markets, triggered based on whether the relevant asset or assets are classified as a security. *See, e.g.*, 15 U.S.C. § 77(e) (imposing strict liability on issuers for failure to register a securities offering); 15 U.S.C. § 78(e) (imposing strict liability on exchanges for failure to register, if they facilitate transactions in securities); 15 U.S.C. § 78(o) (imposing strict liability on brokers and dealers for failing to register, if they facilitate transactions in securities).

Notwithstanding the specter of strict liability, market participants lack means to determine which assets the SEC will view as securities. The SEC's approach to the two largest digital assets—Bitcoin and Ether—exemplifies the problem. SEC staff has repeatedly opined that Bitcoin is not a security.[4] As to Ether, however, SEC Chair Gensler has made remarks suggesting it might be subject to SEC regulation[5]; though

---

[4] Ankush Khardori, *Can Gary Gensler Survive Crypto Winter?* N.Y. Magazine (Feb. 23, 2023).

[5] *See id.* (quoting Chair Gensler as explaining that "[e]verything other than bitcoin" "falls under the SEC's jurisdiction.").

more recent statements have stepped back from that view.[6]  Most recently, SEC leadership has refused to articulate a position on Ether's security status.[7]  At the same time, the SEC has not provided a rationale for these changes.[8]

There is no discernible way to distinguish digital assets the current SEC will view as securities from those (like Bitcoin) it will treat as non-securities.  Nor has the SEC issued guidance to provide the industry comfort that its position will not shift unexpectedly (as appears to have happened with Ether).  The closest the SEC has come to providing guidance is a 2019 statement which offered a non-exhaustive list of numerous factors with no explanation as to how those factors should be applied or weighted.[9]  This guidance is of little help to the industry.

---

[6] William Hinman, Director, Division of Corporation Finance of SEC, Remarks at Yahoo Finance All Markets Summit: Crypto (June 14, 2018).

[7] *Oversight of the Securities and Exchange Commission Before the H. Comm. on Financial Services* (2023) (statement of Hon. Gary Gensler, Chair, SEC).

[8] *Id.*

[9] Securities and Exchange Commission, *Framework for 'Investment Contract' Analysis of Digital Assets*, (Apr. 3, 2019) https://www.sec.gov/news/public-statement/statement-framework-investment-contract-analysis-digital-assets.

Indeed, SEC Commissioner Hester Peirce described this framework as a "Jackson Pollock approach to splashing lots of factors on the canvas without any clear message." Hester M. Peirce, Commissioner, SEC, Address at Securities Enforcement Forum (May 9, 2019).

The ambiguity does not end at seeking to determine whether or not an asset is a "security." For example, the key registration form for domestic issuers, Form S-1, requires issuers to determine whether the securities are equity or debt securities for purposes of certain disclosures. Many digital assets, however, do not resemble debt or equity because they convey no legal relationship to any issuer and do not entitle the holder of a token to anything other than the token's functionality, such as the ability to execute a transaction.[10] This square-peg-round-hole treatment leads to innumerable problems. In short, there is no viable path to fit blockchain network tokens into existing securities

---

[10] *See* Lewis Cohen *et al.*, *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* (Nov. 10, 2022) (providing an exhaustive review of every relevant federal appellate case to have applied the *Howey* test to establish that no such authority exists for the notion that "an asset that is the object of an investment contract transaction [e.g., a token] is itself a security.").

classifications, or for assets registered as securities to perform their intended utility in a blockchain network.

The SEC's failure to provide a clear path for good actors to comply opens the door for bad actors to capture the market. It also directly undermines all three prongs of the SEC's three-part mission to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation.[11] Far from protecting investors, it exposes them to increased risk by pushing good and responsible actors out of the market, creating a vacuum to be filled by those least concerned with compliance. At the same time, the SEC's aggressive stance towards those seeking to comply impairs investors' ability to differentiate the good organizations from the bad as they are all painted with the same brush by the SEC. Enforcement without regulatory clarity also harms innovation and investor protection because responsible companies have no compliant path to bring to market the innovative products that are in demand. Instead, products will be launched by non-compliant organizations to the detriment of the market as a whole. Without consistent and transparent

---

[11] Securities and Exchange Commission, *The Role of the SEC*, https://www.investor.gov/introduction-investing/investing-basics/role-sec.

regulation, there is significant uncertainty to all stakeholders across the digital asset ecosystem. The lack of clear or consistent rules undercuts the ability to form fair, orderly, and efficient markets for digital assets, and to facilitate capital formation in the United States.

Chair Gensler has remarked that our "securities laws have made our capital markets the envy of the world." Gary Gensler, Chair, SEC, *Kennedy and Crypto*, Remarks at SEC Speaks (Sep. 8, 2022). But that only holds true if we honor the procedures through which that lineage of clear and fair rules was adopted.

### B.    The lack of guidance is causing good actors and innovation to flee the United States

The lack of regulatory clarity, combined with the SEC's increased enforcement actions, creates an inhospitable environment for responsible actors. This lack of guidance also means that responsible organizations who operate in the United States may have no choice but to move to other jurisdictions with regulatory frameworks that now offer more clarity.

Other countries are actively courting the next wave of technology leadership by providing regulatory frameworks that seek to foster innovation while protecting market participants. The European Union parliament, for example, recently passed the "Markets in Crypto Act,"

which was introduced as part of a "package of measures to further enable and support the potential of digital finance in terms of innovation and competition while mitigating the risks . . . in line with the Commission['s] priorities to make Europe fit for the digital age and to build a future-ready economy that works for the people."[12]  The United Kingdom is creating a framework in an effort to become a hub for innovation in the industry.  Andrew Griffith MP, *Foreword* to FUTURE FINANCIAL SERVICES REGULATORY REGIME FOR CRYPTOASSETS—CONSULTATION AND CALL FOR EVIDENCE, HM Treasury (2023) (explaining that the UK government has taken steps to develop "clear, effective, timely regulation" of digital assets that will allow it "to be home to the most open, well-regulated, and technologically advanced capital markets in the world").

As a result, other jurisdictions have already started replacing the United States as a hub for innovation and digital assets.  Senator Lummis recently observed that the United States is falling behind as firms turn their attention and hiring abroad because "our regulatory

---

[12] Proposal for a Regulation (EU) 2020/0265 of the European Parliament and of the Council on Markets in Crypto-assets, and amending Directive (EU) 2019/193, https://eur-lex.europa.eu/resource.html?uri=cellar:f69f89bb-fe54-11ea-b44f-01aa75ed71a1.0001.02/DOC_1&format=PDF.

framework is not fleshed out." Jeff Wilser, *Senator Cynthia "Crypto Queen" Lummis: Lack of Laws Pushing Industry Overseas*, NASDAQ (Mar. 20, 2023). The Chief Investment Officer at Arca, for example, stated the new companies his firm is exploring are "not even bothering with the U.S."[13] And one of the largest cryptocurrency exchanges secured a virtual asset service provider license in Ireland.[14] "[T]he timing of [the] announcement coincides with a widespread crypto crackdown in the U.S. that's prompted firms to look abroad." *Id.* Crypto firms have turned to Paris and Hong Kong, for example, "as more friendly bases for operations than cities in the U.S." *Id.*; Banco Bilbao Vizcaya Argentaria, *Lugano stakes claim to become cryptocurrency capital of Europe* (Feb. 23, 2023); Emily Nicolle & Suvashree Ghosh, *US Crypto Crackdown Boosts Appeal of Friendlier Overseas Hubs*, Bloomberg Industry Group (Feb. 17, 2023) (describing how other countries are capitalizing on U.S. inaction and lack of regulatory clarity).

---

[13] Emily Nicolle & Suvashree Ghosh, *US Crypto Crackdown Boosts Appeal of Friendlier Overseas Hubs*, Bloomberg Government, (Feb. 17, 2023).
   [14] Ben Weiss, *Kraken secures license in Ireland as U.S. crypto companies look abroad for "clarity"*, Fortune Crypto (Apr. 18, 2023).

The flight from the United States is reflected in the declining status of this country as a hub for blockchain developers (those who write the computer code that is responsible for much of the innovation driving the digital asset ecosystem). Since 2018, the share of global blockchain developers in the United States has dropped from 40% to 29%, losing two percent market share per year as the industry waits for clarity from the SEC and other regulators.[15] Over the same period, continental Europe has seen its share of developers grow, as have many other jurisdictions. *Id.* Developers are the backbone of the digital asset economy and are a "leading indicator of value creation." *Id.* This trend has raised concerns about the substantial harm our declining influence could cause to the United States, including loss of jobs in an industry estimated to create up to 4 million jobs by 2030. The country risks losing influence over defining the standards that will shape a new global financial infrastructure, with potential national security implications if the next wave of global financial infrastructure evolves primarily outside the United States. *See id.* Providing regulatory clarity could allow the

---

[15] Developer Report, *U.S. Share of Blockchain Developers is Shrinking*, https://www.developerreport.com/developer-report-geography.

U.S. to recapture its position, "encourage more innovation and foster growth," and "become an attractive destination for both new and established developers." *Id.*

## II. The SEC's failure to respond to Coinbase's petition for rulemaking is part of a pattern that has stymied judicial review

The SEC's failure to act in connection to Coinbase's petition for rulemaking is not isolated. The SEC has received five petitions for rulemaking in the last five years seeking clarity on the Securities and Exchange Act's application to the cryptoeconomy; the SEC has neglected to act on all five. *See* Kara McKenna Rollins, *Have the SEC's Delay Tactics Made Its Petition for Rulemaking Process Vulnerable to Challenge? A Look at In re Coinbase Inc. and SEC's Nullification of 5 U.S.C. § 553(e) by Inaction*, Yale Journal on Regulation (May 3, 2023).[16] Without clear guidance from the SEC, industry members lack tools to decipher how the SEC would interpret securities laws.

The proper approach is for the SEC to initiate rulemaking procedures that will provide fair notice, an opportunity to be heard, and

---

[16] The inaction in the crypto industry appears part of a broader trend of SEC inaction on rulemaking petitions generally. *Id.* (gathering data to show that "the SEC has a clear pattern and practice of ignoring petitions for rulemaking").

will allow for judicial review in due course.  Instead, by withholding a decision on Coinbase's petition, the SEC is thwarting judicial review of the policies guiding its enforcement actions.  5 U.S.C. § 704; *In re Am. Rivers & Idaho Rivers United*, 372 F.3d at 419.

*    *    *

Crafting rules to regulate digital assets is not a simple task and courts are typically sympathetic to that complexity and the limited resources of agency staff.  "At some point," however, agency inaction—arising from "bureaucratic recalcitrance, factional infighting, [] special interest politics," or other reasons—calls for a court to "lean forward from the bench to let an agency know, in no uncertain terms, that enough is enough."  *Pub. Citizen Health Rsch. Grp. v. Brock*, 823 F.2d 626, 627 (D.C. Cir. 1987).  For Coinbase's petition for rulemaking to the SEC, that time has come.

## CONCLUSION

For the foregoing reasons, this Court should grant Coinbase's petition for a writ of mandamus.

May 10, 2023                    Respectfully submitted,

                               */s/ Michelle S. Kallen*
                               Michelle S. Kallen (Bar No. 1030497)
                               JENNER & BLOCK LLP
                               1099 New York Avenue NW, Ste 900
                               Washington, DC, 20001-4412
                               Telephone: (202) 639-6000
                               MKallen@jenner.com

                               *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(4) and 32(g), and Third Circuit L.A.R. 28.3(d) and 31.1(c), the undersigned counsel for amicus curiae certifies as follows:

1.  I am a member of the bar of this Court.

2.  This brief complies with the type-volume limitation of Rule 29(a)(5) because the brief contains 2923 words, excluding the parts of the brief exempted by Rule 32(f).

3.  This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because the brief was prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century font.

4.  The text of the electronic brief is identical to the text in the paper copies.

5.  A virus detection program, Palo Alto WildFire, has been run on the file and no virus was detected.

I understand that a material misrepresentation may result in the Court's striking the brief and imposing sanctions.

May 10, 2023                                Respectfully submitted,

_/s/ Michelle S. Kallen_

_Counsel for Amicus Curiae_

## CERTIFICATE OF SERVICE

I hereby certify that that on May 10, 2023, I electronically filed the foregoing brief with the Clerk of the Court using the appellate CM/ECF system.  I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished via CM/ECF.

 May 10, 2023                    Respectfully submitted,

                                */s/ Michelle S. Kallen*
                                Michelle S. Kallen

                                *Counsel for Amicus Curiae*